UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

| | |
|---|---|
| VICTORY RECORDS, INC., and ANOTHER VICTORY, INC.,<br><br>Plaintiffs,<br><br>- against -<br><br>VIRGIN RECORDS AMERICA, INC.,<br>a division of EMI MUSIC NORTH AMERICA,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Case No.: 08-CV-00314 (PKC)

**DECLARATION OF**
**ANDREW H. BART**

------------------------------------------------------------------X

**ANDREW H. BART**, an attorney duly admitted to practice before the Courts of the State of New York, declares the following to be true under the penalty of perjury:

1.     I am a partner of the law firm of Jenner & Block LLP, attorneys for defendant Virgin Records America, Inc. ("Virgin"), and have personal knowledge of the facts set forth herein.  I submit this declaration in support of the Virgin's motion (1) to transfer the above-captioned action (the "New York Victory Action") commenced by plaintiffs Victory Records, Inc. (individually, "Victory") and Another Victory, Inc. (collectively, "Plaintiffs") to the Northern District of Illinois where a related action is pending, pursuant to 28 U.S.C. § 1404(a); or, in the alternative (2) to stay the New York Victory Action pending resolution of the related action that is pending in the Northern District of Illinois.

2.      I respectfully present this declaration to submit documents to the Court which provide the foundation for some of the facts which form the basis of this motion.

3.     Plaintiffs' claims against Virgin in the instant Action arise out of a recording agreement which was entered into on or about December 11, 2003 between Plaintiffs and

recording artists Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt Ridenour, JT Woodruff and Hawthorne Heights, LLC (collectively, "Hawthorne Heights") (the "Victory Agreement"). A true and correct copy of the Complaint in this Action is submitted herewith as Exhibit A.

4.    On or about August 7, 2006, Hawthorne Heights brought an action against Plaintiffs asserting claims for copyright infringement, trademark infringement, unfair competition, invasion of privacy, fraud, interference with business relations, rescission and declaratory judgment (the "Hawthorne Heights Action"). A true and correct copy of the Complaint in the Hawthorne Heights Action is submitted herewith as Exhibit B.

5.    Plaintiffs answered Hawthorne Heights' claims and asserted a number of counterclaims. The claims and counterclaims in the Hawthorne Heights Action arise out of the parties' performance under the Victory Agreement. A true and correct copy of the Answer and Counterclaims in the Hawthorne Heights Action is submitted herewith as Exhibit C. The Hawthorne Heights Action requires a determination of whether either or both of the parties are in breach of the Victory Agreement.

6.    On or about November 2, 2006, Plaintiffs instituted a separate action against Virgin and EMI Music North America in the Northern District of Illinois asserting a claim for tortious interference with Victory's contractual relations with Hawthorne Heights (the "Illinois Victory Action"). A true and correct copy of the Complaint in the Illinois Victory Action is submitted herewith as Exhibit D. That interference claim was premised on the assertion that Virgin had interfered with Victory's rights under the Victory Agreement.

7.    On or about January 10, 2007, the Court in the Hawthorne Heights Action issued an opinion finding that the Victory Agreement was not terminable at will. A true and correct

copy of the January 10, 2007 Decision in the Hawthorne Heights Action is submitted herewith as Exhibit E.

8.      Shortly thereafter, Plaintiffs filed a motion to consolidate the Hawthorne Heights Action with the pending Illinois Victory Action.  A true and correct copy of Plaintiffs' motion to consolidate is submitted herewith as Exhibit F.  That motion consisted solely of facts that were known to Plaintiffs at the time they initially filed the Illinois Victory Action as a separate, unrelated action.

9.      By Notification of Docket Entry dated April 3, 2007, Judge Moran concluded that the Illinois Victory Action was related to the Hawthorne Heights Action and should proceed before the same judge and found that "[b]oth cases arise out of the same fight, and having one Judge handling both may likely result in a substantial saving of judicial time and effort." A true and correct copy of the Notification of Docket Entry dated April 3, 2007 is submitted herewith as Exhibit G.

10.     Subsequently, by decision dated March 1, 2007, the Court determined that the Victory Agreement was non-exclusive and that Hawthorne Heights was free to record for other parties during the term of its contract with Plaintiffs.  A true and correct copy of the Court's March 1, 2007 Decision is submitted herewith as Exhibit H.

11.     By decision dated May 16, 2007, the Court denied Plaintiffs' motion for reconsideration of its March 1 decision and found that Plaintiffs were merely "required to deliver an album to Victory within a reasonable time." A true and correct copy of the Court's May 16, 2007 Decision is submitted herewith as Exhibit I.

12.      Later, by decision dated May 17, 2007, the Court granted Hawthorne Heights' motion for a preliminary injunction and enjoined Plaintiffs from interfering with Hawthorne

Heights' right to record new material with a producer or label of its choosing.   A true and correct copy of the Court's May 17, 2007 Decision is submitted herewith as Exhibit J.

13.     On or about July 5, 2007, Plaintiffs entered into a stipulation with Virgin to voluntarily dismiss the Illinois Victory Action.  A true and correct copy of the Stipulation of Dismissal in the Illinois Victory Action is submitted herewith as Exhibit K.

14.     Plaintiffs have no connection to this forum and have conceded in their Complaint, that they are both Illinois corporations with their principal places of business in Illinois.  See Exhibit A.

15.     In their pre-motion correspondence to the Court, Plaintiffs represented that Hawthorne Heights recently filed a voluntary petition for bankruptcy and that the Hawthorne Heights Action is presently stayed.  A true and correct copy of Plaintiffs' letter to the Court dated March 19, 2008 is submitted herewith as Exhibit L.

16.     However, there are no facts contained on the docket sheet in the Hawthorne Heights Action in the Northern District of Illinois that are supportive of Plaintiffs' representations concerning the bankruptcy and any alleged stay of the Hawthorne Heights Action. A true and correct copy of the docket sheet in the Hawthorne Heights Action is submitted herewith as Exhibit M.

17.     As demonstrated by the documents herein, Plaintiffs' decision to file the New York Victory Action in this Court is pure procedural gamesmanship.  Accordingly, in the interests of justice, this Court should transfer the New York Victory Action to the Northern District of Illinois, where the action was initially brought and where the related Hawthorne Heights Action is pending

I declare under penalty of perjury that the foregoing is true and correct.

4

Dated: April 17, 2008
     New York, New York

                                                    Andrew H. Bart

# EXHIBIT A



$^{\oplus}$&AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
|---|---|---|

VICTORY RECORDS, INC., and ANOTHER
VICTORY, INC.

**SUMMONS IN A CIVIL ACTION**

V.

VIRGIN RECORDS AMERICA, INC.,
a division of EMI MUSIC NORTH AMERICA

CASE NUMBER:

**08 CV 00314**

TO: (Name and address of Defendant)

> Virgin Records America, Inc., a division of EMI Music North America
> c/o The Prentice-Hall Corporation System, Inc., Registered Agent
> P.O. Box 526036
> Sacramento, CA 95802

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

> Robert S. Meloni, Esq.,
> Thomas P. McCaffrey, Esq.
> MELONI & MCCAFFREY, P.C.
> 1350 Avenue of the Americas - Suite 3100
> New York, New York 10019

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

_____
CLERK

(By) DEPUTY CLERK

DATE   1/14/2008

**MELONI & McCAFFREY, P.C.**
ROBERT S. MELONI (RM-8087)
THOMAS P. MCCAFFREY (TPM-4057)
1350 Avenue of the Americas, Suite 3100
New York, New York 10019
Telephone: 212-957-5577
Facsimile: 800-659-3985

08 CV 00314

*Attorneys for Plaintiffs Victory Records, Inc.
and Another Victory, Inc.*

JAN 14 2008

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTORY RECORDS, INC., and ANOTHER VICTORY, INC., ) | **COMPLAINT** |
| Plaintiffs, ) | |
| v. ) | |
| VIRGIN RECORDS AMERICA, INC., a division of EMI MUSIC NORTH AMERICA, ) | |
| Defendant. ) | |

Plaintiffs, Victory Records, Inc. and Another Victory, Inc. (collectively "Victory"), by and through their undersigned attorneys, as and for their Complaint, alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. Victory Records, Inc. ("Victory") is an Illinois corporation. Its principal place of business is at 346 N. Justine Street, Chicago, Illinois 60607.

2. Another Victory Inc. ("AVI") is an Illinois corporation. Its principal place of business is at 346 N. Justine Street, Chicago, Illinois 60607.

3.     Virgin Records America, Inc. ("Virgin Records/EMI") is a California corporation.  Its principal place of business is at 150 Fifth Avenue, New York, New York 10011.

4.     Upon information and belief Defendant Virgin Records/EMI is a wholly owned subsidiary of EMI Music North America ("EMI"), an entity of unknown legal status with its principal place of business located at 150 Fifth Avenue, New York, New York 10011.  EMI is affiliated with EMI Group PLC, a corporation registered in the United Kingdom.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The citizenship of Victory is fully diverse from that of Defendant, and the amount in controversy exceeds $75,000, exclusive of interest.

6.     This Court has personal jurisdiction over Virgin Records/EMI because it conducts business continuously and systematically in New York for the purpose of engaging in, *inter alia*, marketing and promotional activities pertaining to the sale of sound recordings.

7.     Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## SUMMARY OF CASE

8.     This case involves an all-too familiar story in the music industry:  an unknown musical band from small-town, Middle-America, flies below the music industry radar until it gets its long-shot at success by signing a contract with an independent record company.   That company then devotes huge amounts of resources, money,

experience, passion, time and effort to promoting and marketing the band, and, as a result, the band beats the industry's odds and achieves commercial and critical success.

9.     Suddenly superstars with a proven track record and established following, the band is noticed by the "major" record companies, who, relieved of the economic risks and burdens of breaking the band, swoop in to capitalize on the band's hard-won success with the intent to release the band's next album and reap the resulting profits. The majors, fully aware of the band's existing contractual obligations, nonetheless ardently pursue the band with ready promises of greater fame, fortune and money than life with the independent record company could possibly offer. The frailties of human nature take hold and the band moves on to purportedly greener pastures, resulting in a win for the major, but a huge economic loss for the independent label. This case is a text-book example of that scenario.

10.     During the summer of 2003, the musical group in question, the individuals comprising the musical group Hawthorne Heights ("Hawthorne Heights" or the "Band")[1], were members of a recently reconfigured and renamed, unknown local band playing sporadically in small clubs in the Ohio area. Nonetheless, the Band's relentless campaign to pique the interest of Victory's owner, Tony Brummel, through emails, press kits and demos, finally paid off when it was signed to a multi-album recording, publishing, and merchandising agreement with Victory dated December 10, 2003, as amended on April 28, 2004 ("Victory Agreement"). A copy of the Victory Agreement, as amended, is attached hereto as Exhibit A.

---

[1] The individual members are Eron Bucciarelli-Tieger Micah Carli, Matt Ridenour, JT Woodruff, and the recently deceased Casey Calvert.

3

11. The Victory Agreement was negotiated by the Band's then-attorney, Daniel Friedman ("Friedman"). Since 2003, Friedman had been the Band's attorney and sometime *de facto* manager, until his termination by the Band in late 2007.

12. The Victory Agreement, among other things, contained the Band's explicit and binding commitment for an initial studio album and options for three consecutive studio albums, and gave Victory ownership of sound recording copyrights through a recording deal, and ownership of musical compositions copyrights through a publishing and administration deal. It also granted Victory trademark and merchandising rights in the name HAWTHORNE HEIGHTS.

13. The Band exclusively recorded and willingly delivered two consecutive albums to Victory pursuant to the Victory Agreement. It also willingly transferred its ownership in the sound recordings and musical compositions appearing on those albums to Victory and AVI, respectively.

14. Victory funded, manufactured, and aggressively distributed, promoted and marketed the Band's albums and established trademark rights in the name HAWTHORNE HEIGHTS at the cost of millions of dollars. AVI also funded and actively exploited and administered the musical compositions. The Band, in turn, benefited from Victory's investment of resources, money and sweat equity by making millions of dollars and becoming a rare music industry success story.

15. The process of successfully establishing or "breaking" an unknown band by an independent record company is a labor-intensive, high-risk scenario that requires large, upfront investment in the first album. This investment typically is recouped -- if at all -- through the continued production, distribution and sales of high quality, in-demand

4

music on subsequent albums. As a result, an artist's recording contract typically has a commitment to provide multiple albums over a period of years.

16.    The four-album commitment in the Victory Agreement, although relatively short by music industry standards, is essential to the economic viability of an independent record company, which needs the financial return from sales of subsequent records to fund the continued marketing support of the signed band and to justify its initial investment.

17.    Thus, upon the release of a successful debut album, a record company normally expects to see a return on its investment from the follow-up albums, building on the momentum and foundation of the initial record release.

18.    Moreover, the assignment of rights to sound recordings and the musical compositions delivered with each new album provides additional long-term assets and income streams that, among other things, allow the independent record company to stay in business.

19.    In this case, as a direct result of the intentional intervention, meetings, promises made, strategies developed, instructions given and financial and litigation support supplied by Virgin Records/EMI over a period of months beginning in early 2006, the Band: (1) expressly repudiated the Victory Agreement on August 3, 2006 by letter to Victory written by their litigator, Rhonda Trotter, claiming that the Victory Agreement was immediately terminated on the purported grounds that it was terminable "at will"; (2) filed an action on August 7, 2006 in Illinois federal court seeking, *inter alia*, a declaration of the Victory Agreement's immediate termination, despite the inconsistency between the need for that judicial declaration and the Band's position that

the termination could be effectuated unilaterally by their written notice alone; and (3) engaged in a coordinated public relations smear campaign, including public postings on the Internet, beginning that same day.

20.    As a direct result of Virgin Records/EMI's intentional interference, the Band, beginning in or about 2006, commenced the process of recording an entire album of original musical compositions which, despite the continuing term of the Victory Agreement, the Band has publicly announced will <u>not</u> be released through Victory.

21.    Defendant has tortiously interfered with the Victory Agreement and with Victory's prospective business relationship with the Band and Victory has suffered and continues to suffer extensive damages as a result.  The damage to Victory had been done by August 2006, even though by 2007 Virgin Records/EMI declined to fund the recording of Hawthorne Heights' new studio album, for reasons wholly unrelated to any respect for Victory's rights.  Despite the decision by Virgin Records/EMI not to move forward with the Band, it must nevertheless be held accountable for its unlawful conduct.

## STATEMENT OF FACTS

**The Victory Agreement**

22.    The Victory Agreement refers to the written recording, publishing, and merchandising agreement between Victory and the Band dated December 10, 2003, as amended on April 28, 2004.

23.    By its express and unambiguous terms, the Victory Agreement imposes on the Band a Recording Commitment requiring the Band to deliver four consecutive studio Albums to Victory during its Term. That Term is measured initially by the first 18-month

period from the date of the Agreement, and thereafter by "separate, consecutive and irrevocable" option periods each commencing 12 months from the date of delivery of the previous Album constituting the Band's Recording Commitment for that Option Period. In other words, the Band is committed under the Victory Agreement until the date that is 12 months from the delivery date of its fourth Album.

24.    Victory has fully performed its obligations to the Band under the Victory Agreement.

25.    However, since the execution of the Victory Agreement, the Band has delivered only two studio albums: *"The Silence In Black And White"* and *"If Only You Were Lonely."* Under Victory's watch, *The Silence In Black And White* had sold over 1,000,000 units. But for Virgin Records/EMI's intentional interference, Victory had reasonable expectations that *If Only You Were Lonely,* which was released on February 28, 2006, would be as successful as the first album. Once the Band repudiated the Victory Agreement, they refused to participate with Victory in the marketing of the second album, which has only sold half the number of units as its predecessor, despite the tremendous marketing, promotional and financial investment by Victory.

26.    Victory has exercised its option for the Third Album and fully intends to exercise the option for the Fourth Album.

27.    The Victory Agreement remains in full force and effect.


**Virgin Records/EMI Tortiously Interferes with the Victory Agreement**

28.    Upon information and belief, in February 2006, at about the time the Band released its second album under the Victory Agreement, Daniel Friedman, the Band's

then-business attorney and advisor, met in New York City with David Wolter, the senior director of the Artists and Repertoire ("A&R") department for Virgin Records/EMI, concerning another band Friedman represented.

29.    Wolter saw Friedman as the conduit Virgin/EMI could use to poach the Band from Victory.

30.    Wolter immediately brought Jeff Kempler, then Executive Vice President of Business Affairs for Virgin Records/EMI, in on the negotiations with Friedman in order to get what Virgin Records/EMI was really after, an exclusive recording agreement with the Band. Kempler was the perfect Virgin Records/EMI minion to carry this out, since, upon information and belief, he had experience in extracting bands from other independent labels. Upon information and belief, Kempler also had an ax to grind with Victory, and Brummel in particular, as a result of past unrelated dealings with Brummel during Kempler's previous incarnation as Senior VP of Business and Legal Affairs at Universal's Island Def Jam record label.

31.    On information and belief, Virgin was motivated to act as it did out of malice and a desire to harm Victory and Brummel.

32.    Upon information and belief, when Wolter voiced Virgin Records/EMI's interest in signing the Band, Friedman first proposed that Virgin Records/EMI set up a so-called vanity label whereby the Band could record, produce and distribute recordings of other bands that the Band would discover and sign. To sweeten that offer, Friedman threw in an existing album called "A Day In The Life" which was recorded prior to 2003 by a predecessor music group of which, of the Band's current membership, only JT Woodruff was a member.

8

33.    However, on January 7, 2006, JT Woodruff, through his company Carbon Copy Media, LLC ("Carbon Copy"), had entered into an exclusive record distribution agreement with Victory which provided for, *inter alia*, the assignment of exclusive rights to the "Day In The Life" album ("Carbon Copy Agreement"). Victory paid Carbon Copy $75, 000 for said distribution rights.

34.    Using the proposed vanity label deal as a pretense, Virgin Records/EMI executives redirected the negotiations to obtain what they were really after, an *exclusive* recording agreement with the Band. Virgin Records/EMI proposed that any deal entered into with the Band would include distribution of the Band's recordings as well.

35.    Having negotiated the Victory Agreement and guided the Band's business activities with Victory for the three years after its execution, Friedman knew that the Band remained bound thereby, but nevertheless he and the Band listened carefully to what Wolter and Kempler were offering.

36.    Upon information and belief, in March 2006, Friedman attended a number of meetings in New York City with Kempler, Wolter, or both, to discuss what it would take to sign the Band exclusively to Virgin Records/EMI.

37.    Upon information and belief, in the ensuing months, and prior to June 2006, Kempler and Friedman negotiated and agreed to the material terms of an agreement to sign the Band as exclusive recording artists with Virgin Records/EMI. The only obstacle to consummating that deal was the Victory Agreement.

38.    Upon information and belief, in or around March 2006, Friedman provided Kempler with a copy of the Victory Agreement and the exclusive distribution agreement between Victory Records and Carbon Copy Media dated January 7, 2006.

39.    Kempler then spearheaded a campaign to cause the Band to terminate the

Victory Agreement and sign with Virgin Records/EMI.    The first step was for Kempler

to find and indoctrinate a litigator on behalf of the Band.  The second step was for Virgin

Records/EMI to fund the contemplated litigation needed to free the Band from its

contract with Victory.  The third step was for the Band to publicly repudiate the Victory

Agreement and to initiate a shock and awe litigation and public relations campaign with

the intent to force Victory into capitulating into a quick settlement, freeing the Band to

sign with Virgin Records/EMI.

40.    Upon information and belief, both Kempler and Wolter reported regularly to

Jason Flom, Virgin's CEO, and kept him fully informed as they proceeded with each step

of their plan to poach the Band from Victory.

41.    Kempler executed the first step on behalf of Virgin Records/EMI by

contacting a series of litigators to gauge their interest in representing the Band in the

contemplated litigation against Victory.  Kempler's inquiries ultimately led to the referral

and retainer of Rhonda Trotter by the Band.

42.    Rhonda Trotter is a member of Kaye Scholer LLP, one of the largest and

most prominent law firms in the country.  Trotter is a seasoned litigator with extensive

experience in high-profile cases involving, *inter alia*, claims of tortious interference in

the music industry.[2]

---

[2] One notable example is a well known case handled by Trotter while she was still counsel for
TVT Records, an independent record company that sued Universal Music Group's urban music
label, Island Def Jam Music Group and its President, Lyor Cohen, claiming that they had
tortiously interfered with TVT's contract with a musical group signed to TVT, ironically all
occurring during a period when Kempler was the senior vice president of business and legal
affairs for Island Def Jam.

43.    Kempler then had several meetings and conversations with Trotter during which, upon information and belief, they discussed the most effective and expedient way to free the Band from the Victory Agreement.

44.    With Trotter now on board and with the program, Kempler then devised a way to fund the litigation.  The Band entered into an agreement which granted Virgin Records/EMI the right to exclusively negotiate with the Band an exclusive recording artist and record distribution deal.  This negotiation agreement was ultimately finalized and signed by Virgin Records/EMI and the Band on or about June 8, 2006 (the "Virgin Agreement").

45.    Upon information and belief, the Virgin Agreement was a thinly veiled business arrangement to provide the funding for the contemplated litigation.  Virgin Records/EMI provided the Band up to $55,000.00, which in reality would be used to fund the Band's short-term litigation expenses.  The parties believed this would be enough for their "shock and awe" campaign to have the intended effect – Victory's total capitulation – and thus free the Band to render their services as recording artists to Virgin Records/EMI on an exclusive basis.

46.    However, on information and belief, by June 8, 2006, many of the material terms of the exclusive recording artist agreement had already been substantially negotiated and agreed to by Virgin Records/EMI and the Band.  During the purported negotiation period, very little, if anything, was actually negotiated.  In other words, the Virgin Agreement was not intended to provide Virgin Records/EMI the time necessary to actually negotiate an exclusive recording and distribution agreement with the Band.  It

11

was solely designed to provide the Band with the money and time to execute the plan to repudiate and terminate the Victory Agreement.

47. Using Virgin Records/EMI's initial $35,000 payment, the Band then formally retained Trotter's firm, Kaye Scholer LLP, to extricate the Band from the Victory Agreement, a strategy that Kempler and Trotter had been refining since Kempler first met with Trotter in May 2006.

48. Virgin Records/EMI also paid the Band the second payment of $20,000 for litigation expenses, thereby supplementing the Band's war chest.

49. The cabal launched its "shock and awe" campaign on August 3, 2006 with delivery of Trotter's letter to Victory in which the Band repudiated and purported to formally terminate the Victory Agreement, followed by the widely circulated media announcement that the Band had "left" Victory over a host of purported defalcations. This salvo was followed by the commencement on August 7, 2006 of the legal action entitled *Eron Buccarielli-Tieger, et al. v. Victory Records, Inc., et al*, No. 06-C-4258 in the federal district court for the Northern District of Illinois, Eastern Division, which likewise repudiated and otherwise sought to terminate the Victory Agreement.

50. The Band's follow-up public relations blitz provided maximum exposure for the unfounded and scurrilous attacks on Victory and its founder and owner Tony Brummel. This tandem litigation and public relations campaign was intended to put Victory on the defensive and impugn the integrity and credibility of Victory and Brummel, so that Victory would be forced to submit to the Band's extortionate demand for an uncompensated release from the Victory Agreement and a return of all of the intellectual property rights involved. Virgin Records/EMI could then collect the Band's

spoils and reap the rewards of Victory's hard spent toil, brand equity, A&R expertise, marketing savvy and massive financial investment.

51.    Notwithstanding the material breach caused by the Band's open repudiation of the Victory Agreement in its letter, in the media and in the courtroom, in an Order dated October 17, 2006, the Illinois District Court emphatically dismissed the Band's claim that the Victory Agreement was terminable at will and rejected the Band's assertion that it was free from its contractual obligations to Victory.

52.    In a subsequent ruling dated May 16, 2007, the Illinois District Court interpreted the Band's obligations under Victory Agreement to be non-exclusive, but nevertheless found the Band was still obligated to deliver two additional albums to Victory "within a reasonable time" during the remainder of the contract term.

53.    Rick Smith, who initially was hired by the Band to provide radio promotion support for the Band in the Fall of 2006, and then served as the Band's personal manager from January to May 2007, believed that a "reasonable time" for the delivery of the third album to Victory, consistent with the record industry standards for so-called "album cycles," would have been in or about January 2007, or about one year from the delivery of the Band's second album.

54.    During the three years leading up to the Band's repudiation of the Victory Agreement, the Band and Victory had operated as if that agreement were *exclusive*, and both parties had the reasonable expectation that it would remain so, consistent with the parties' past course of conduct.

55.    Virgin Records/EMI's strategy nevertheless has had its intended effect, and the damage had been done. Sales of the first two albums the Band recorded for Victory

have plummeted since the Band's repudiation. Copies of the Band's albums have been returned to Victory by its retail accounts in such vast numbers as to cause Victory millions of dollars in damages for returned product alone.

56. The Band's relationship with Victory has been irreconcilably cloven. Despite the Illinois District Court's May 2007 ruling, the Band continues to repudiate and refuse to fulfill its obligations to deliver a third album under the Victory Agreement and continues to pursue its pointless litigation seeking to terminate the Victory Agreement. Finally, upon information and belief, the Band continues to write and record music for release on another label, all in breach of the Victory Agreement, thereby causing Victory increasingly escalating damages.

## COUNT I
### (Tortious Interference with Contract)

57. Victory repeats and realleges the allegations in Paragraphs 1 through 56 herein.

58. The Victory Agreement is a valid and enforceable contract between the Band and Victory Records, Inc.

59. Virgin Records/EMI was aware of the contractual relationship between the Band and Victory created by the Victory Agreement prior to the time it intentionally interfered with that relationship.

60. Virgin Records/EMI intentionally induced the Band to breach the Victory Agreement by, *inter alia*, devising and funding the strategy of wrongfully repudiating the Victory Agreement.

61. But for Virgin Records/EMI's actions, the Band would not have repudiated and breached the Victory Agreement.

14

62.   As a result of Virgin Records/EMI's actions, Victory has been damaged in an amount to be determined at trial, but in no event less than $10,000,000.

63.   In addition, Virgin Records/EMI's actions are the type of intentional, willful, wanton and deliberate conduct that justifies the imposition of punitive damages in an amount to be established at trial, but in no event less than $25,000,000.

## COUNT II
### (Tortious Interference with Business Relations)

64.   Victory repeats and realleges the allegations in Paragraphs 1 through 63 herein.

65.   Under the terms of the Victory Agreement as written, understood and carried out by the parties, the Band exclusively and consecutively recorded and delivered the first two albums in what was agreed to be a four consecutive album deal.

66.   Based upon the parties' prior conduct under the Victory Agreement, Victory had a reasonable expectation that the Band would have exclusively and consecutively recorded and delivered the third and fourth albums on the schedule set forth in the Victory Agreement without interruption.

67.   Based upon the parties' prior conduct under the Victory Agreement, Victory had a reasonable expectation that the Band would actively promote the second album in the same manner as it had promoted the first album, with, at a minimum, a similar result in sales.

68.   Virgin Records/EMI knew that Victory had the above reasonable expectations at the time it intentionally interfered with Victory's relationship with the Band.

69.   Virgin Records/EMI's actions were performed with the intent to injure Victory, with the knowledge that the Band's refusal to exclusively and consecutively record the third and fourth albums, and its refusal to actively promote the second album, would destroy the value of the Victory Agreement.

70.   But for Virgin Records/EMI's intentional interference with Victory's existing and prospective business relationship with the Band, the Band would have exclusively and consecutively recorded and delivered the third and fourth albums on the schedule set forth in the Victory Agreement without interruption.

71.   But for Virgin Records/EMI's intentional interference with Victory's existing and prospective business relationship with the Band, the Band would have continued to actively promote the second album, and Victory would not have received returns of over 500,000 units of that album that had been shipped to retailers.

72.   As a result of Virgin Records/EMI's actions, Victory has been damaged in an amount to be determined at trial, but in no event less than $10,000,000.

73.   In addition, Virgin Records/EMI's actions are the type of intentional, willful, wanton and deliberate conduct that justifies the imposition of punitive damages in an amount to be established at trial, but in no event less than $25,000,000.

**WHEREFORE**, Victory respectfully prays that the Court find in its favor and enter an order and judgment awarding:

a.     Compensatory damages in an amount to be proved at trial, but not less than $10,000,000;

b.     Punitive damages in an amount to be determined at trial but in no event less than $25,000,000;

c.     The costs of suit and attorneys fees;

d.     Interest on its damages at the legal rate; and

e.     Such other and further relief that the Court may deem to be just and
       proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all

issues which are so triable.

Dated: January 14, 2008

MELONI & MCCAFFREY, P.C.

By:_____
       Robert S. Meloni (RM 8087)
       Thomas P. McCaffrey (TPM 4057)

1350 Avenue of the Americas - Suite 3100
New York, New York 10019
Tel: (212) 957-5577

*Attorneys for Plaintiffs Victory Records, Inc. and
Another Victory, Inc.*

17

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION,

RECEIVED

AUG 07 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| ERON BUCCIARELLI-TIEGER, an individual; CASEY CALVERT, an individual; MICAH CARLI, an individual; MATT RIDENOUR, an individual, JT WOODRUFF, an individual, collectively professionally known as "HAWTHORNE HEIGHTS;" and HAWTHORNE HEIGHTS, LLC, an Ohio limited liability company, | ) ) ) ) ) ) ) ) ) | No. **06C 4258** JURY DEMANDED |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | MAGISTRATE JUDGE BROWN JUDGE MORAN |
| VICTORY RECORDS, INC., an Illinois corporation; ANOTHER VICTORY, INC., an Illinois corporation; ANTHONY K. "TONY" BRUMMEL, an individual; and DOES 1 through 25, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt Ridenour, JT

Woodruff, and Hawthorne Heights, LLC (collectively "Plaintiffs" or "Hawthorne Heights") for

their complaint against Defendants Victory Records, Inc., Another Victory, Inc., and Anthony K.

"Tony" Brummel (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.      This case is about the CEO and sole shareholder of Victory Records -- the second

largest independent record company in the world -- taking advantage of rock band Hawthorne

Heights, and severely damaging the band's reputation and relationship with its fans.   Tony

Brummel, Victory's CEO, has engaged in a series of heavy-handed, overly-aggressive, unethical

and illegal schemes and tactics in order to line his and Victory's own pockets at the expense of Hawthorne Heights. Among other outrageous acts, Brummel physically threatened various music industry figures and directed Victory personnel and street team members nationwide to enter record stores and intentionally hide another artist's CDs and move Hawthorne Heights CDs to more prominent places within the stores. Despite the band's lack of knowledge or approval of Brummel's schemes and tactics, Hawthorne Heights has become irreparably associated in the public mind with Brummel's conduct. Indeed, Brummel has intended for Hawthorne Heights to absorb the risk associated with his misguided tactics by widely disseminating, without the band's approval, statements falsely attributed to the members of Hawthorne Heights, including Brummel's so-called "Manifesto" to which he signed the band's name without their knowledge or approval, and which falsely stated that the band believed it was in some type of war with artists in the hip-hop and R&B music genres, leading many to brand the band as racist.

2.    Hawthorne Heights received no "up-side" as a result of Brummel and Victory's conduct, because while Victory and Brummel have received in excess of $10 million in revenues from their sale of Hawthorne Heights' CDs, DVDs and merchandise, Victory and Brummel have engaged in egregiously fraudulent accounting practices. Despite having sold nearly 1.5 million units of Hawthorne Heights' recordings and videos, Victory and Brummel claim that Hawthorne Heights owes Victory in excess of one million dollars.

## PARTIES

3.    Eron Bucciarelli-Tieger ("Bucciarrelli") is a citizen and resident of Englewood, Ohio.

4.    Casey Calvert ("Calvert") is a citizen and resident of Hamilton, Ohio.

5.    Micah Carli ("Carli") is a citizen and resident of Troy, Ohio.

23199201.DOC                                    2

6.    Matt Ridenour ("Ridenour") is a citizen and resident of Dayton, Ohio.

7.    JT Woodruff ("Woodruff") is a citizen and resident of Maineville, Ohio.

8.    Hawthorne Heights, LLC is a limited liability company, organized under the laws of the state of Ohio, with its principal place of business in Dayton, Ohio.

9.    Defendant Victory Records, Inc. ("Victory Records") is, upon information and belief, an Illinois corporation, with its principal place of business in Chicago, Illinois.

10.    Defendant Another Victory, Inc. ("Another Victory") is, upon information and belief, an Illinois corporation, with its principal place of business in Chicago, Illinois.

11.    Defendant Anthony K. "Tony" Brummel ("Brummel") is, upon information and belief, a citizen and resident of Chicago, Illinois.

12.    Plaintiffs are uncertain of the true names and capacities of those defendants sued by the fictitious names Does 1 through 25, who also are responsible and liable for the injuries alleged in this Complaint and who proximately caused damage to Plaintiffs. Plaintiffs will amend this Complaint to add the true names and capacities of the Does when they become known.

13.    This Court has subject matter jurisdiction over the federal copyright infringement claim pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b). The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), in that the state claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

14.    The Court has personal jurisdiction over the defendants because the defendants reside and do business in the state of Illinois.

15.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because the defendants are subject to personal jurisdiction in this judicial district, and because a substantial part of the events giving rise to the claims in this Complaint occurred in this District.

16.    Hawthorne Heights is a musical band that has been performing together since 2001, and under the name "Hawthorne Heights" since June 2003. On or about December 11, 2003, Hawthorne Heights entered into a non-exclusive recording agreement with Victory Records, which was amended on or about April 28, 2004. Collectively, the December 11, 2003 agreement, and the April 28, 2004 amendment are hereafter referred to as "the Agreement." A copy of the Agreement is attached to this Complaint as Exhibit A.

17.    The Agreement contains no assignments or transfers of copyrights in recordings delivered by Hawthorne Heights to Victory Records, nor were the recordings made on a "work for hire" basis.

18.    Pursuant to the Agreement, Hawthorne Heights delivered to Victory Records master recordings and video recordings of the band's performances to be embodied on an album entitled "The Silence in Black and White" ("the Silence Album"), and a DVD of the same title ("the Silence DVD"). Victory Records released the Silence Album on or about June 8, 2004, and the Silence Album sold in excess of 800,000 units, obtaining "Gold" status. Victory Records also released the Silence DVD as part of a package with the Silence Album.

19.    During the period from approximately September through December 2005, Hawthorne Heights delivered to Victory Records video recordings of the band's performances to

be embodied on a DVD entitled "This Is Who We Are" ("the Who We Are DVD"). Victory Records released the Who We Are DVD in or about January 2006.

20.     In or about December 2005, Hawthorne Heights delivered to Victory Records master recordings of the band's performances to be embodied on an album entitled "If Only You Were Lonely" ("the Lonely Album"). Victory Records released the Lonely Album on or about February 28, 2006.

21.     Under the Agreement, Victory Records was granted an implied non-exclusive license to market, distribute and exploit the master recordings and an implied non-exclusive license to use the trademark "Hawthorne Heights" and the names and likenesses of the members of Hawthorne Heights in connection with the marketing and sale of the recordings delivered under the Agreement.

22.     By letter dated August 3, 2006, Hawthorne Heights properly terminated the implied non-exclusive licenses granted to Victory to market, exploit and distribute the recordings, to use the trademark "Hawthorne Heights," and to use the names and likenesses of the members of Hawthorne Heights. Hawthorne Heights informed Victory Records that any future distribution of the recordings, use of the trademark "Hawthorne Heights," or use of the names and likenesses of the members of Hawthorne Heights would violate Hawthorne Heights' rights, including copyright and trademark rights. A copy of the notice of termination is attached to this Complaint as Exhibit B.

23.     Despite the termination of the non-exclusive licenses, Victory Records is continuing to market, exploit and distribute the recordings, to use the trademark HAWTHORNE HEIGHTS, and to use the names and likenesses of the members of Hawthorne Heights.

24.    Under the Agreement, Victory Records was obligated to properly account to and pay Hawthorne Heights master royalties on all sales of records, digital downloads, and other exploitations of the master recordings delivered by Hawthorne Heights.  Victory Records was also obligated to properly account and pay to Hawthorne Heights mechanical and other publishing royalties for all exploitations of the musical compositions embodied in the recordings, and for Victory Records' sales of other Hawthorne Heights merchandise.

25.    Despite these obligations, Victory Records has issued fraudulent royalty statements to Hawthorne Heights, including without limitation, as follows:

A.    failing to account and pay to Hawthorne Heights for Victory Records' record and mechanical royalties for digital download, ringtone, and foreign sales and licensing revenues;

B.    failing to account and pay to Hawthorne Heights royalties and fees from the use of Hawthorne Heights' musical compositions and recordings in the soundtracks for the motion pictures "Elektra" and "Underworld: Evolution;"

C.    failing to account and pay to Hawthorne Heights royalties and fees received by Victory Records for the use of Hawthorne Heights' musical compositions and recordings in various Electronic Arts' videogames, including "MVP 2006 NCAA Baseball," "Ford Racing," and "Amp'd Snowboarding."

D.    applying a 10% rather than the 11% escalating royalty rate provided for in the Agreement on sales of Hawthorne Heights' albums sold at or above the suggested retail list price of $12.98, and failing to pay producers royalties owed on the albums;

E.    improperly charging co-op advertising costs at 100%, rather than the 50% rate provided for in the Agreement;

F.     failing to properly account and pay public performance royalties;

G.     improperly accounting for only 50% as opposed to 100% of mechanical royalties as required, failing to pay mechanicals at full statutory rate, and failing to account at all for mechanical royalties on "sampler" CDs released by Victory;

H.     failing to fully account for sales of Hawthorne Heights merchandise, including T-shirts, sweatshirts, messenger bags, and other goods;

I.     fraudulently charging Hawthorne Heights and other Victory Records' artists 100% each in costs for shared advertising when those costs should have been allocated on a pro-rata basis.

26.     Notwithstanding the lack of an assignment or other basis for Victory Records to claim copyright rights in the master recordings, video recordings, or musical compositions delivered by Hawthorne Heights under the Agreement, Victory Records and its publishing affiliate Another Victory have filed registrations with the U.S. Copyright Office, fraudulently claiming that they are the owners of the recordings and compositions. These false statements amount to a "fraud on the Copyright Office," and all registrations obtained by Victory Records and Another Victory are therefore void.

27.     Victory Records and Brummel have engaged in other outrageous acts that have caused damage to Hawthorne Heights' goodwill and reputation. For example, in February 2006, prior to the release date of the Lonely Album, Victory Records and Brummel instructed members of the Victory Records' promotional "street teams" to go into retail stores and intentionally hide copies of CDs by R&B artist "Ne-Yo", in order to boost sales of the Lonely Album. Victory and Brummel concocted this outrageous scheme without the knowledge, consent or approval of Hawthorne Heights. Ultimately, the scheme was discovered by the general public, and upon

questioning by various media outlets, Brummel claimed that the instructions were "a joke." Contrary to Brummel's public "explanation", Hawthorne Heights recently obtained documentary proof that the instructions were not in fact, a joke, and that Brummel and Victory issued the instructions as part of an overall scheme to have the Lonely Album outpace first week sales of "Ne-Yo's" album. Hawthorne Heights was and has been associated with the outrageous and misguided scheme, and has suffered lost record sales, publishing revenues, merchandising revenues, and touring revenues as a result.

28.    Brummel has also engaged in other outrageous acts, physically threatening music industry professionals --including Hawthorne Heights' personal manager -- and radio station personnel who refused to increase airplay of Hawthorne Heights' recordings.

29.    In addition, despite Hawthorne Heights' legal rights under the Agreement to develop, market and sell its own merchandise, Victory and Brummel have intentionally interfered with Hawthorne Heights' business relationships with merchandising outlets and companies, causing those outlets to cut off negotiations with Hawthorne Heights.

## COUNT I

### (For Willful Copyright Infringement in Violation of 17 U.S.C. § 501 et seq. against Defendant Victory Records)

30.    Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

31.    The Silence Album, the Silence DVD, the Lonely Album and the Who We Are DVD are original creations of Hawthorne Heights. Hawthorne Heights owns the copyrights for the Silence Album, the Silence DVD, the Lonely Album, and the Who We Are DVD. The Silence Album and the Lonely Album were duly registered by Hawthorne Heights with the

United States Copyright Office on July 12, 2006. The copyright registration number for the Silence Album is SR 379-964 and the number for the Lonely Album is SR 379-963. Copyright registration applications have been submitted to the Copyright Office for the Silence DVD, the Who We Are DVD, and the musical compositions embodied in each of the recordings. A copy of each of the registration and registration applications is attached hereto as Exhibit C.

32.    On August 3, 2006, Hawthorne Heights properly terminated the implied non-exclusive license that Victory Records had to use, exploit or distribute the Hawthorne Heights recordings.

33.    Despite this termination, Victory Records has continued to market, distribute and otherwise exploit the Hawthorne Heights recordings and compositions, without permission or authorization from Hawthorne Heights, and in willful violation of Hawthorne Heights' rights under 17 U.S.C. § 106.

34.    Hawthorne Heights has been damaged by Defendants' infringing conduct in an amount to be proven at trial, and is entitled to, among other things, Defendants' profits obtained from Defendants' infringing conduct.

## COUNT II

### (For Willful Trademark Infringement in Violation of 15 U.S.C. § 1125(a) against Defendant Victory Records)

35.    Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

36.    Hawthorne Heights owns common law trademark rights in its mark HAWTHORNE HEIGHTS, which has acquired distinctiveness over more than three years of extensive and substantially exclusive and continuous use.

37.     On August 3, 2006, Hawthorne Heights properly terminated the non-exclusive implied license it had granted to Victory Records to use the HAWTHORNE HEIGHTS mark in connection with the marketing and exploitation of Hawthorne Heights' recordings.

38.     Despite this termination, Victory Records has continued to use the HAWTHORNE HEIGHTS mark and has created and continues to create a likelihood of confusion, mistake or deception as to the affliation, connections, association, origin, sponsorship, approval, of Victory Records' goods and services relative to Hawthorne Heights' goods and services, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

39.     By reason of Victory Records' unlawful actions, Hawthorne Heights has suffered and continues to suffer irreparable harm including, but not limited to, detriment and diminution in value of the HAWTHORNE HEIGHTS mark, for which there is not adequate remedy at law. Accordingly, Hawthorne Heights is entitled to an injunction against Victory Records, pursuant to 15 U.S.C. §§ 1125(a) and 1116.

40.     Hawthorne Heights also has suffered and continues to suffer injury and is entitled to recover damages sustained by Victory Records' actions, all profits realized by Victory Records and costs of suit, pursuant to 15 U.S.C. §§ 1125(a) and 1117.

41.     Victory Records knew or had reason to know of Hawthorne Heights' ownership of the HAWTHORNE HEIGHTS mark, and Victory Records' actions were willful, deliberate and fraudulent, entitling Hawthorne Heights to damages and an award of reasonable attorneys' fees against Victory Records, pursuant to 15 U.S.C. §§ 1125(a) and 1117.

## COUNT III

### (For Unfair Competition in Violation of 15 U.S.C. § 1125(a) against Defendant

### Victory Records)

42.    Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

43.    Victory Records' interstate distribution, advertising, promotion and sale of products bearing the HAWTHORNE HEIGHTS mark constitutes unfair competition, false designation of origin and false representations in interstate commerce, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

44.    Victory Records' interstate distribution, advertising, promotion and sale of products bearing the HAWTHORNE HEIGHTS mark have created and continue to create a likelihood of confusion, mistake or deception as to the affiliation, connection, association, origin, sponsorship and approval of Victory Records' products by Hawthorne Heights.

45.    By reason of Victory Records' unlawful actions, Hawthorne Heights has suffered and continues to suffer irreparable harm including, but not limited to, detriment and diminution in value of the HAWTHORNE HEIGHTS mark, for which there is not adequate remedy at law. Accordingly, Hawthorne Heights is entitled to an injunction against Victory Records, pursuant to 15 U.S.C. §§ 1125(a) and 1116.

46.    Hawthorne Heights also has suffered and continues to suffer injury and is entitled to recover damages sustained by Victory Records' actions, all profits realized by Victory Records and costs of suit, pursuant to 15 U.S.C. §§ 1125(a) and 1117.

47.    Victory Records knew or had reason to know of Hawthorne Heights' ownership of the HAWTHORNE HEIGHTS mark, and Victory Records' actions were willful, deliberate

and fraudulent, entitling Hawthorne Heights to damages and an award of reasonable attorneys'
fees against Victory Records, pursuant to 15 U.S.C. §§ 1125(a) and 1117.

## COUNT IV

### (For Invasion of Privacy – False Light against All Defendants)

48.     Hawthorne Heights realleges each of the preceding allegations, as if fully set forth
herein.

49.     As a result of Defendants' email instructions to the promotional "street teams" to
intentionally misplace copies of the Ne-Yo CD so that the Lonely Album would have greater
sales, and the public's association of the Defendants with Hawthorne Heights, Hawthorne
Heights was placed in a false light before the public, which erroneously believed that Hawthorne
Heights had prior knowledge of, approved of, or otherwise consented to or condoned the
outrageous scheme.

50.     As a result of Defendants' action, Hawthorne Heights was placed in a false light
that would be highly offensive to a reasonable person.

51.     Defendants acted with actual malice, with knowledge that the public would
falsely associate the outrageous scheme with Hawthorne Heights, or with reckless disregard for
whether the public would associate the outrageous scheme with Hawthorne Heights.

52.     Hawthorne Heights has suffered actual and special damages as a result of
Defendants' actions, including lost record sales, publishing revenues, merchandising revenues
and touring revenues.

53.     Defendants' actions were willful, fraudulent, and malicious, or Defendants' acted
with such gross negligence as to indicate a wanton disregard of Hawthorne Heights' rights.
Hawthorne Heights is therefore entitled to punitive damages.

## COUNT V

### (For Fraud Against all Defendants)

54.     Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

55.     Victory Records, Another Victory, and Brummel issued a series of fraudulent royalty statements to Hawthorne Heights. On or about December 10, 2004, the Defendants issued a royalty statement for the quarter ending September 30, 2004. On or about March 7, 2005, the Defendants issued a royalty statement for the quarter ending December 21, 2004. On or about June 8, 2005, the Defendants issued a royalty statement for the quarter ending March 31, 2005. In or about August 2005, the Defendants issued a royalty statement for the quarter ending June 30, 2005. In or about December 2005, the Defendants issued a royalty statement for the period ending September 30, 2005. In or about March 2006, the Defendants issued a royalty statement for the quarter ending December 31, 2005. Collectively, these statements are referred to herein as the "Fraudulent Victory Royalty Statements."

56.     Each of the Fraudulent Victory Royalty Statements contained material and intentional misstatements of fact, including a gross underreporting of sales of recordings, and charging in excess of actual costs incurred for advertising and other costs, thereby showing Hawthorne Heights' royalty account as unrecouped in excess of one million dollars.

57.     The Defendants knew that the Fraudulent Victory Royalty Statements underreported sales and reflected improper costs and intended that Hawthorne Heights rely on the statements as accurate and continue delivering recordings and other materials to Victory Records.

58.    Hawthorne Heights was unaware that the Fraudulent Victory Royalty Statements underreported sales and reflected improper costs, and reasonably relied to its detriment upon the accuracy of the Fraudulent Victory Royalty Statements by continuing to deliver recordings and other materials to Victory Records and Brummel for exploitation.

59.    Hawthorne Heights has suffered damage as a result of the defendants' fraudulent acts, in an amount to be proven at trial.

60.    The Defendants' actions were willful, fraudulent, and malicious, or the Defendants acted with such gross negligence as to indicate a wanton disregard of Hawthorne Heights' rights. Hawthorne Heights is therefore entitled to punitive damages.

## COUNT VI

### (For Interference with Business Relations against Victory Records and Brummel)

61.    Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

62.    Hawthorne Heights' had a reasonable expectancy of entering into a valid business relationship with merchandise retailer Hot Topic for the sales of Hawthorne Heights' merchandise.

63.    Victory Records and Brummel knew of this expectancy and intentionally interfered with the expectancy.

64.    As a result of Victory Records and Brummel's interference, Hawthorne Heights was unable to consummate the business relationship with Hot Topic.

65.    Hawthorne Heights was damaged and continues to suffer damage as a result of the defendants' intentional interference, in an amount to be proven at trial.

66.     Defendants' actions were willful, fraudulent, and malicious, or Defendants' acted with such gross negligence as to indicate a wanton disregard of Hawthorne Heights' rights. Hawthorne Heights is therefore entitled to punitive damages.

## COUNT VII

### (For Rescission Against Victory Records)

67.     Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

68.     As a result of Victory Records' material breaches and failure to perform its obligations under the Agreement, Hawthorne Heights is entitled to rescission of the Agreement.

69.     Victory Records' fraudulent and other illegal actions have made restoration to the status quo impossible and Victory Records has benefited from the Agreement, collecting millions of dollars in revenues from exploitation of the Hawthorne Heights' recordings and merchandise.

70.     Hawthorne Heights is entitled to rescission of the Agreement, and for restitution with respect to Victory Records' exploitation of Hawthorne Heights' recordings, musical compositions, and merchandise.

## COUNT VIII

### (For Unjust Enrichment Against All Defendants)

71.     Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

72.     As a result of Victory Records and Another Victory's fraudulent accountings and failure to pay Hawthorne Heights royalties and fees for the sale and other exploitation of Hawthorne Heights recordings and merchandise, the Defendants have unjustly retained a benefit

to Hawthorne Heights' detriment, and the Defendants retention of the benefit violates the fundamental principles of justice, equity, and good conscience, for which Hawthorne Heights has no adequate remedy at law.

73.     Hawthorne Heights has a need for discovery of the amounts the Defendants have illegally failed to pay, and the accounts are of a complex nature.

74.     Hawthorne Heights is therefore entitled to an accounting and imposition of a constructive trust.

## COUNT IX

### (For A Declaratory Judgment Against Victory Records and Another Victory)

75.     Hawthorne Heights realleges each of the preceding allegations, as if fully set forth herein.

76.     The Agreement does not provide that Hawthorne Heights must render its recording services exclusively for Victory Records, and Hawthorne Heights has informed Victory Records of its intention to render recording services for other entities and companies. Victory Records has asserted that Hawthorne Heights is obligated to record exclusively for Victory Records.

77.     An actual, substantial and justiciable controversy exists between Hawthorne Heights and Victory Records regarding the lack of exclusivity as to recording services rendered by Hawthorne Heights under the Agreement.

78.     Hawthorne Heights seeks a judicial determination by this Court that it is not required under the terms of the Agreement to render recording or any other services exclusively for Victory Records.

79.    Furthermore, Victory Records and Another Victory have fraudulently obtained copyright registrations for Hawthorne Heights' recordings and musical compositions and Hawthorne Heights seeks an order from this Court directing the U.S. Copyright Office to cancel all such registrations.

## PRAYER FOR RELIEF

WHEREFORE, Hawthorne Heights respectfully prays that the Court find in its favor and enter an order and judgment:

A.    for preliminary and permanent injunctive relief enjoining Victory Records and Another Victory from marketing, promoting, distributing, or selling recordings, musical compositions, or any other materials delivered by Hawthorne Heights to Victory Records under the Agreement, including without limitation, the recordings and musical compositions contained on the Silence Album, the Silence DVD, the Lonely Album, and the Who We Are DVD;

B.    for compensatory damages in an amount to be determined at trial;

C.    for punitive damages;

D.    for attorneys' fees pursuant to 17 U.S.C. § 505;

E.    for a declaration that Hawthorne Heights is not required to render its recording services exclusively for Victory Records;

F.    for an order directing the U.S. Copyright Office to cancel all copyright registrations obtained by Defendants for Hawthorne Heights' recordings and musical compositions;

G.    for rescission of the Agreement;

H.    for an accounting and imposition of a constructive trust in its favor;

I.    for costs of suit;

J.    for interest on its damages at the legal interest rate; and

K. for such other and further relief as this Court may deem appropriate.

[This space intentionally blank]

## JURY DEMAND

Plaintiffs hereby demand a jury trial for all claims and issues so triable.

Dated: August 7, 2006

Respectfully Submitted,



Anthony G. Stamato (#6207688)
Robert Spalding (#6256701)
KAYE SCHOLER LLC
3 First National Plaza
70 West Madison Street, Suite 4100
Chicago, Illinois 60602
(312) 583-2300 (telephone)
(312) 583-2360 (facsimile)

Rhonda R. Trotter (California Bar No. 169241)
(*pro hac vice* applicant)
KAYE SCHOLER LLP
1999 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
(310) 788-1000 (telephone)
(310) 788-1212 (facsimile)

*Attorneys for Plaintiffs*

# EXHIBIT A

12/12/2003  11:09   3125556555                    VICTORY RECORDS                 PAGE  02
12/12/2003  18:31   3148957114                   DANIEL R FRIEDMAN              PAGE  05/06
12/11/03   10:37  FAX 1 857 598 8644              VICTORY PR AYE                  002



**VICTORY RECORDS**

**VICTORY RECORDS**
**DEAL MEMO**

346 N. Justine Street, Chicago, IL 60657
Phone (773) 666-9292 / Fax (773) 855-3869
Troy@Victoryrecords.com

Received 12/10/03

12/11/03 Revisions in BLUE

## ARTIST: HAWTHORNE HEIGHTS

1. Terms
4 Album deal with option to pursued, third and fourth album.

Company shall submit and distribute albums within 4 months of the completion of each full-length master recording and delivery of all parts necessary to manufacture unless otherwise agreed to between Company and Artist.

2. Territory
Worldwide.

3. Royalty Breakdown
Albums SLR.08 SLRP:
LP1: 15% of SLRP after 50,000 units sold +1%
LP2: 16% of SLRP after 50,000 units sold +2%
LP3: 17% of SLRP after 50,000 units sold +2%

A.K.B.

12/12/2003  11:09    3126668565
12/12/2003  18:31    2144697214
12/11/03  ...  FAX 1 ...  ...
VICTORY RECORDS
DANIEL M FRIEDMAN
PAGE  03
PAGE  04/06

12/12/2003  11:09  3126668666          VICTORY RECORDS                    PAGE  04

12/12/2002  18:31  2144697114          DANIEL R FRIEDMAN                  PAGE  05/06

12/11/03  21:39 FAX 1 497 335 0644     XXXXX FOR AXX                      ⌐004

20. **Artistic Input**
Artist has much artistic input in the design of all musical products, advertisements and promotional materials. Company will seek Artist's approval, not to be unreasonably withheld or in a manner which is unreasonably detrimental to the sales or promotional potential of the Artist.

21. **Distribution of Releases**
All territories where Company is currently distributed.

22. **Radio Single**
Victory agrees to manufacture a radio single for each album to be serviced to Commercial and Commercial Specialty proposals. Company and Artist will mutually agree in good faith regarding the chosen single.

23. **Commitments**
Company intends to allocating the following for each album: (this would be included in the amount in a 'miscellaneous album')
(a) Co-Op Advertising $39,000.00, (advertising done with retailers and distributors)
(b) Consumer Advertising $5,000.00, (advertising done in consumer publications promotion the record)
(c) Instore Promotions $10,000.00,
(d) Outside Radio Promotion up to $4,000.00 to $39,000.00,
(e) Video Budget $5,000.00.

24. **Additional Commitment(s)**
If sales of any Album exceed 50,000 units in the first 12 months of release Artist will receive a non-recoupable bonus of $7,500.00.

Company will outfit two types of promotional posters- tour and retail.

25. **Bonus**
If any record earns the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $5,000.00 bonus for each album. Notwithstanding the foregoing, if any record enters the top 100 positions of the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $10,000.00 bonus.

26. **Touring**
Artist agrees that it will tour in support of full-length recording to the best of its ability. Company agrees to assist Artist in the form of a Tour Support Fund not to exceed $25,000.00 for each album, from which Artist can request fully recoupable advances. This fund becomes active upon shipping of Title And master. Advance requests can not to exceed $1,500.00 per 30-day period unless agreed upon between Company and Artist. $5,000.00 from the Tour Support Fund can be immediately used on a drum payment on a new tour vehicle.

27. **CD Sales on Tour**
Company will sell the Artist copies of its full length CD for sales on tour at $4.00 per CD. Such sales will be at half the royalty rate and free of mechanical royalties.

28. **Attorney's Fees**
Company will, immediately upon the execution of this deal memo pay attorney's fees of $2,500.00 to Daniel L. Friedman Esq. Such monies shall be treated as a fully recoupable advance to Artist.

DATED AND EXECUTED in Chicago, Illinois, in the day and the year first above written.

**VICTORY RECORDS**
(hereinafter called "Company")

A4B

3

12/12/2003  11:00    3126558565                      VICTORY RECORDS                    PAGE  05

12/12/2003  19:31    3144697114                      DANIEL R FRIEDMAN                   PAGE  05/05

12/11/03  10:54 FAX 1 637 846 9041    ROEDER FOR ATM                                     05

04/28/2004  09:57  3144597114        DANIEL R FRIEDMAN          PAGE  82/85

Victory Records Inc.
346 N. Justine Street
Chicago, Illinois 60607

Dated as of: April 28, 2004

Eron Bucciarelli-Tieger, Casey Calvert,
Micah Carli, Matt Ridenour, and JT Woodruff
p/k/a Hawthorne Heights
106 Devonhurst Drive, Apt. E
Kettering, Ohio 45429

Re:    Amendment to the Victory Records Deal Memo By and Between Victory
       Records Inc. and Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt
       Ridenour, and JT Woodruff p/k/a Hawthorne Heights

Dear Eron, Casey, Micah, Matt, and JT:

Reference is hereby made to that certain Victory Records Deal Memo by and between
Victory Records Inc. ("Company") and you ("you" or "Artist") dated as of the eleventh (11th)
day of December, 2003, as amended (the "Deal Memo").

Notwithstanding anything to the contrary implied or expressed in the Deal Memo, the
Deal Memo is hereby amended and modified as follows:

Section 3 of the Deal Memo is hereby deleted in its entirety and replaced with the
following:

"3.    Royalty Breakdowns: If above $12.98 SLRP:
LP1: 11% of SLRP; after 50,000 units sold +1%
LP2: 12% of SLRP; after 50,000 units sold +1%
LP3: 13% of SLRP; after 50,000 units sold +1%
LP4: 14% of SLRP; after 50,000 units sold +1%

If any Album is priced below $12.98 SLRP:
The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

Notwithstanding anything contrary contained herein, in the event that Artist enters into a
producer agreement (or a mixer agreement or similar agreement) that allows for the
producer (or mixer or otherwise) to receive a percentage of SRLP, such percentage of
SRLP shall be added onto the Artist's royalty percentages of SRLP set forth herein (so
that Artist will receive no less than the royalty percentages of SRLP set forth herein).

Notwithstanding the foregoing, or anything contrary contained herein, with regard to LPI, Artist intends to enter into a producer agreement with Sean O'Keefe in which Sean O'Keefe will be entitled to 2% of SRLP; as such Artist's royalty in connection with LPI will be increased to 13% of SRLP; after 50,000 units sold +1%.

In the event that any producer (or mixer or otherwise) is entitled to royalties pursuant to a producer agreement (or mixer agreement or similar agreement), Artist may execute and deliver to Company a customary letter of direction authorizing and directing Company to pay royalties directly to such producer (or mixer or otherwise) and to send such producer (or mixer or otherwise) appropriate statements of account therewith, at the same times as Company pays royalties (and renders accountings) to Artist. In the event that Artist sends to Company a customary letter of direction as set forth herein, Company shall pay royalties and send appropriate statements of account in accordance with such letter of direction.

15% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any licensing will be split 50/50 between Company and Artist.

Canada: 80% of the basic royalty rate.
Japan, U.K. and Europe: 75% of the basic royalty rate (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australasia (Australia, New Zealand): 75% of the basic royalty rate.
All other Territories: 50% of the basic royalty rate."

Each and every term of the Deal Memo not hereby modified or amended shall remain in full force and effect as set forth therein. Unless indicated to the contrary hereinabove, all terms used herein shall have the same meanings ascribed to them in the Deal Memo.

-2-

04/28/2004  09:57    3144657114              DANIEL R FRIEDMAN              PAGE  05/05

If the foregoing accurately reflects your understanding of the subject matter hereof, please so indicate your acceptance by signing where indicated below.

Very truly yours,

VICTORY RECORDS INC.

By: _____
Anthony K. Brummel, President

AGREED TO AND ACCEPTED:

ERON BUCCIARELLI-TIEGER,
CASEY CALVERT, MICAH CARLI,
MATT RIDENOUR, AND JT WOODRUFF
P/K/A HAWTHORNE HEIGHTS

_____
Name:  Eron Bucciarelli-Tieger

_____
Name:  Casey Calvert

_____
Name:  Micah Carli

_____
Name:  Matt Ridenour

_____
Name:  JT Woodruff

- 3 -

# EXHIBIT B

# KAYE SCHOLER LLP

1999 Avenue of the Stars, Suite 1700
Los Angeles, California  90067-6048
310 788-1000
Fax 310 788-1200
www.kayescholer.com

Rhonda R. Trotter
310 788-1053
Direct Fax 310 229-1853
rtrotter@kayescholer.com

August 3, 2006

**VIA CERTIFIED MAIL, E-MAIL, HAND DELIVERY AND FACSIMILE**

Anthony K. Brummel
President
Victory Records, Inc.
346 N. Justine Street
Chicago, IL  60607

Re:    Hawthorne Heights Notice of Termination and Rescission

Dear Mr. Brummel:

This firm is litigation counsel to Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt Ridenour and JT Woodruff, collectively professionally known as "Hawthorne Heights" (hereinafter, "Hawthorne Heights").

Reference is made to that certain agreement entered by and between Hawthorne Heights and Victory Records, Inc. ("Victory") dated as of December 11, 2003, as amended April 28, 2004 ("the Agreement").

You are notified that Hawthorne Heights hereby immediately terminates any implied non-exclusive license that Victory may have with respect to the marketing, promotion, distribution and/or other exploitation of any recordings or other materials delivered by Hawthorne Heights to Victory under the Agreement, including without limitation, master recordings, musical compositions, artwork, photographs, video recordings, and DVDs.  You are also hereby notified that Hawthorne Heights hereby terminates any implied non-exclusive license Victory may have under the Agreement with respect to the use or exploitation of the names, likenesses or voices of Hawthorne Heights or any of its members, whether or not in connection with master recordings delivered by Hawthorne Heights under the Agreement.  Furthermore, you are notified that Hawthorne Heights hereby rescinds the Agreement in its entirety due Victory's egregious material breaches of the Agreement as set forth below.

Any further marketing, promotion, distribution or exploitation by you or Victory with respect to recordings or materials previously delivered to Victory by Hawthorne Heights, or use of Hawthorne Heights' names or likenesses, shall constitute, among other things, willful copyright infringement, willful trademark infringement, and violations of Hawthorne Heights'

23199359.DOC



KAYE SCHOLER LLP

Anthony K. Brummel
August 3, 2006
Page 2

constitutional rights of privacy and publicity, for which Hawthorne Heights will immediately seek all available legal remedies. *See Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999).

As you know as the drafter of the Agreement, Victory has no ownership of any recordings, musical compositions, or materials delivered by Hawthorne Heights under the Agreement, whether under a theory of "work for hire" or assignment. Indeed, Victory's previously-held purported right to exploit the recordings delivered would have been on an implied, non-exclusive basis that has now been terminated. We have become aware that, notwithstanding this, Victory has apparently registered -- with itself as "Claimant" -- at least one copyright with the U.S. Copyright Office with respect to the recordings made by Hawthorne Heights embodied on the album entitled "The Silence in Black and White." Moreover, Victory's publishing affiliate, Another Victory, Inc., has registered copyrights for Hawthorne Heights' musical compositions. These registrations amount to a "fraud on the Copyright Office" as neither Victory nor Another Victory has copyright ownership in Hawthorne Heights' recordings or musical compositions, whether by "work for hire" or otherwise, and hence, the registrations are void.

Moreover, Victory holds no rights to Hawthorne Heights' name(s) or likeness(es) and, to the extent such rights might be implied based on the Agreement, those have been terminated as well.

Although Hawthorne Heights need not provide "cause" to terminate any implied, nonexclusive licenses previously granted to Victory (*See Walthal*, 172 F.3d at 485), you should be aware that Hawthorne Heights does, in fact, have more than ample cause to terminate the licenses and to rescind the Agreement because of, among other things, the following outrageous and egregious acts by you and Victory:

(1)     Victory has made in excess of $10 million, yet has patently failed to account and pay Hawthorne Heights monies due under the Agreement. Among other things, Victory has failed to account for any foreign, digital download, ringtone sales, or license revenues; has failed to account for royalties and fees received as a result of the use of Hawthorne Heights' musical compositions and recordings in the motion picture soundtracks "Elektra" and "Underworld: Evolution"; has failed to account for royalties and fees received as a result of the use of Hawthorne Heights' musical compositions and recordings in the Electronic Arts' videogames "MVP 2006 NCAA Baseball;" "Ford Racing" and "Amp'd Snowboarding;" has wrongfully applied a 10%, rather than the 11% escalating royalty rate mandated by the Agreement; has failed to pay required bonuses on the "If Only You Were Lonely Album;" has charged 100% of co-op advertising costs (as opposed to 50% as provided for in the Agreement); has failed to account for the publishers' share of public

23199359.DOC



# KAYE SCHOLER LLP

Anthony K. Brummel
August 3, 2006
Page 3

performance royalties; has improperly accounted for only 50% of mechanical royalties, and has failed to pay mechanicals at the full statutory rate required; has failed to pay any mechanicals on "samplers" released by Victory; has registered Hawthorne Heights' compositions with ASCAP fraudulently claiming a 100% publishers' share in the compositions; has failed to fully account for merchandise sales; and has fraudulently double and triple-charged Hawthorne Heights and other Victory artists 100% each in advertising costs, when in fact those costs should have been allocated on a pro-rata basis;

(2)     You and Victory have engaged in outrageous conduct resulting in Hawthorne Heights suffering tremendous damage including: lost record sales, lost publishing revenues, lost merchandising revenues, lost touring revenues, and other damage to Hawthorne Heights' goodwill and reputation. By way of example only: Victory distributed various email communications to members of its "street teams" directing those members to go into retail outlets to intentionally "misplace" copies of CDs by Island Def Jam artist "Ne-Yo" in order to "boost sales" of Hawthorne Heights' sophomore album. You and Victory concocted this outrageous scheme without any knowledge, involvement or consent of Hawthorne Heights, and, as you know, the scheme was ultimately discovered by the general public. Although you have publicly referred to the email communications as "a joke," we have obtained documentary evidence that the communications were not in fact "a joke," and indeed that you personally were integrally involved in developing and approving their dissemination. Notwithstanding Hawthorne Heights' lack of knowledge or involvement in the scheme, members of the consuming public view Hawthorne Heights as integrally involved with the scheme, and, as a result, Hawthorne Heights has suffered – and continues to suffer – significant damage to its reputation, and resulting damage in lost sales, publishing, touring, and merchandising revenues;

(3)     You and Victory have interfered with Hawthorne Heights' creative vision and relationship with its fans by drafting and issuing your so-called "Manifesto" – which you falsely attributed to the band – portraying the band as engaged in some type of war with artists in other music genres;

(4)     You and Victory have unjustifiably physically threatened professional music industry figures in an apparent misguided effort to increase Hawthorne Heights' "spins" on radio, causing those radio stations to refuse to play Hawthorne Heights' recordings, and you have physically threatened Hawthorne Heights' personal manager, John Germinario;

23199359.DOC

# KAYE SCHOLER LLP

Anthony K. Brummel
August 3, 2006
Page 4

    (5)       You and Victory have damaged Hawthorne Heights' relationship with producers and other music industry professionals by failing to account or pay to them royalties owing to them per the Agreement; and

    (6)       You and Victory have intentionally interfered with Hawthorne Heights' relationships with retailers -- including Hot Topic -- with respect to Hawthorne Heights merchandise, causing Hawthorne Heights significant lost merchandising revenues, and exposing you and Victory to punitive damages.

    In addition, as you know, whatever purported obligations Victory believes that Hawthorne Heights has, or previously had, under the Agreement, Hawthorne Heights' obligations were on an entirely non-exclusive basis. Hence, Hawthorne Heights has always been -- and is now -- free to pursue other avenues for the making, marketing, and exploitation of its recording; songwriting; and performing services, and for developing and selling Hawthorne Heights merchandise.

    Moreover, due to Victory's material breaches of the Agreement as set forth above, Hawthorne Heights has rescinded the Agreement in its entirety. Hawthorne Heights therefore has no obligations whatsoever under the Agreement.

    Because of the egregious conduct of you and Victory, Hawthorne Heights is prepared to immediately file the enclosed complaint to enforce all of its legal rights and remedies. Note that if, after receipt of this notice, Victory violates Hawthorne Heights' copyright and trademark rights by continuing to exploit or distribute recordings and other materials delivered by Hawthorne Heights pursuant to the Agreement, Hawthorne Heights will include in the complaint, among other things, the claims for willful copyright infringement and willful trademark infringement.

    Hawthorne Heights is currently willing to enter into immediate negotiations with you and Victory to resolve these disputes in an amicable and non-public forum.

    If you wish to enter into immediate negotiations towards such a resolution, please contact or have your attorney contact the undersigned (not the band) in writing no later than Friday, August 4, 2006, 5:00 p.m. (Pacific Daylight Time). Your response must include firm proposed dates for a meeting during the week of August 7. In the absence of an affirmative response, we will immediately file the complaint, and will vigorously pursue all remedies.

23199359.DOC

# KAYE SCHOLER LLP

Anthony K. Brummel
August 3, 2006
Page 5

      This letter is not intended to contain a full recitation of the facts, and all of Hawthorne Heights' rights and remedies are expressly reserved.

      Sincerely,

      Rhonda R. Trotter

enclosures

23199359.DOC

# EXHIBIT C

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**SR 379-963**

EFFECTIVE DATE OF REGISTRATION

7     12     06
Month   Day   Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**  TITLE OF THIS WORK ▼
If Only You Were Lonely

PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼  This Is Who We Are, We Are So Last Year, Language Lessons (Five Words Or Less), Pens And Needles, Saying Sorry, Dead In The Water, I Am On Your Side, Breathing In Sequence, Light Sleeper, Cross Me Off Your List, Where Can I Stab Myself In The Ears, December

**2**

**a**  NAME OF AUTHOR ▼
Hawthorne Heights, LLC

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ United States

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?     ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼
Sound Recording

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**  NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?     ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**  NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?     ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a**  YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED
2005
This information must be given in all cases.

**b**  DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ January    Day ▶ 1    Year ▶ 2006
United States    ◀ Nation

**4**

**a**  COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Hawthorne Heights, LLC / 217 Pointers Run / Englewood, OH 45322

**b**  TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
JUL 12 2006
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
Jul 12 2006
FUNDS RECEIVED

---

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.  • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ____ pages



| EXAMINED BY *HEL* | | FORM SR |
|---|---|---|
| CHECKED BY | | |
| CORRESPONDENCE □ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

□ Yes  □ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. □ This work was previously registered in unpublished form and now has been published for the first time.

b. □ This is the first application submitted by this author as copyright claimant.

c. □ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼        Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION**

Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

a

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

b

**6**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account. Account Number ▼

a    Name ▼                                          Thomson CompuMark        001796

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/ZIP ▼

b    Daniel R. Friedman / Attorney at Law / 377 Dinsmoor Drive / Chesterfield, Missouri 63017

Area code and daytime telephone number    (314) 469-7113        Fax number    (314) 469-7114

Email    danielrfriedman@aol.com

**7**

**CERTIFICATION** I, the undersigned, hereby certify that I am the

Check only one ▼

□ author

□ other copyright claimant

□ owner of exclusive right(s)

☑ authorized agent of  Hawthorne Heights, LLC

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Evan Buccieralli-Tieger                                          Date  July 7, 2006

Handwritten signature (x) ▼

X  *[signature]*

**8**

**9**

Certificate will be mailed in window envelope to this address

Name ▼

Daniel R. Friedman, Attorney at Law

Number/Street/Apt ▼

377 Dinsmoor Drive

City/State/ZIP ▼

Chesterfield, Missouri 63017

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.*

Rev: June 2002—80,000    Web Rev: June 2002    ⊕ Printed on recycled paper        U.S. Government Printing Office: 2000-461-113/29,021

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

SR 379-964

EFFECTIVE DATE OF REGISTRATION

7 / 12 / 06
Month / Day / Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

TITLE OF THIS WORK ▼
The Silence in Black And White

PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼
Life On Standby, Dissolve And Decay, Niki FM, The Transition, Blue Burns Orange, Silver Bullet, Screenwriting An Apology, Ohio Is For Lovers, Wake Up Call, Sandpaper And Silk, Speeding Up The Octaves

**2** **a**

NAME OF AUTHOR ▼
Hawthorne Heights, LLC

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ United States }

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼
Sound Recording

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____ }

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
Domiciled in ▶ _____ }

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3** **a**

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED
2004  ◀ Year in all cases.
This information must be given

**b**

DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ June  Day ▶ 1  Year ▶ 2004
United States  ◀ Nation

**4** **a**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Hawthorne Heights, LLC / 217 Pointers Run / Englewood, OH 45322

APPLICATION RECEIVED
JUL 12 2006
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
JUL 12 2006

FUNDS RECEIVED

**b**

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

---

**MORE ON BACK ▶**
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.       • Sign the form at line 8

DO NOT WRITE HERE

Page 1 of ___ 2 ___ pages



EXAMINED BY **HEC**                                                FORM SR

CHECKED BY

CORRESPONDENCE
☐ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

a. ☐ This work was previously registered in unpublished form and now has been published for the first time.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼        Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION**

Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**6**
See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼        Account Number ▼

**a**        Thomson Compulmark        001794

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/ZIP ▼

**b**  Daniel R. Friedman / Attorney at Law / 377 Dinsmoor Drive / Chesterfield, Missouri 63017

Area code and daytime telephone number  **(314) 469-7113**        Fax number  **(314) 469-7114**

Email  dsnic.trfriedman@aol.com

**CERTIFICATION** I, the undersigned, hereby certify that I am the

Check only one ▼

☐ author

☐ other copyright claimant

☐ owner of exclusive right(s)

☑ authorized agent of  **Hawthorne Heights, LLC**

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Eron Bucciarelli-Tieger        Date  July 7, 2006

Handwritten signature (X) ▼

X _____

**8**

Certificate
will be
mailed in
window
envelope
to this
address

Name ▼
Daniel R. Friedman, Attorney at Law

Number/Street/Apt ▼
377 Dinsmoor Drive

City/State/ZIP ▼
Chesterfield, Missouri 63017

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev. June 2002—80,000    Web Rev. June 2002    ☼ Printed on recycled paper        U.S. Government Printing Office: 2000-461-113/20,021

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000.

**FORM PA**
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

_____

PA _____ PAU

EFFECTIVE DATE OF REGISTRATION

_____

Month        Day        Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**    TITLE OF THIS WORK ▼

The Silence In Black And White

PREVIOUS OR ALTERNATIVE TITLES ▼

Lift On Standby, Dissolve And Decay, Niki FM, The Transition, Blue Burns Orange, Silver Bullet, Screenwriting An
Apology, Ohio Is For Lovers, Wake Up Call, Sandpaper And Silk, Speeding Up The Octanes

NATURE OF THIS WORK ▼ See instructions

Words and Music

**2**    **a**    NAME OF AUTHOR ▼
Eron Bucciarelli-Tieger

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼
1979

Was this contribution to the work a
"work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of United States
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK
Anonymous?      ☐ Yes ☒ No
Pseudonymous?   ☐ Yes ☒ No

If the answer to either
of these questions is
"Yes," see detailed
instructions.

NOTE

Under the law,
the "author" of
a "work made
for hire" is
generally the
employer, not
the employee
(see instruc-
tions). For any
part of this
work that was
"made for hire"
check "Yes" in
the space
provided, give
the employer
(or other
person for
whom the work
was prepared)
as "Author" of
that part, and
leave the
space for dates
of birth and
death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Words and Music

**b**    NAME OF AUTHOR ▼
Casey H. Calvert

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼
1981

Was this contribution to the work a
"work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of United States
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK
Anonymous?      ☐ Yes ☒ No
Pseudonymous?   ☐ Yes ☒ No

If the answer to either
of these questions is
"Yes," see detailed
instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Words and Music

**c**    NAME OF AUTHOR ▼
Micah Alan Carli

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼
1979

Was this contribution to the work a
"work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of United States
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK
Anonymous?      ☐ Yes ☒ No
Pseudonymous?   ☐ Yes ☒ No

If the answer to either
of these questions is
"Yes," see detailed
instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Words and Music

**3**    **a**    YEAR IN WHICH CREATION OF THIS
WORK WAS COMPLETED    This information
must be given
2004    Year    in all cases.

**b**    DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information    Month June    Day 1    Year 2004
ONLY if this work
has been published.    United States    Nation

**4**    COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as
the author given in space 2. ▼

Eron Bucciarelli-Tieger / 217 Pointers Run / Englewood, Ohio 45322

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

See instructions
before completing
this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in
space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

---

MORE ON BACK ▶    • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of _____ pages

# CONTINUATION SHEET
# FOR APPLICATION FORMS

**FORM ____ /CON**

UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| PA|PAU|BE|SEG|SEU|SR|SRU|TX|TXU|VA|VAU |
|---|---|---|---|---|---|---|---|---|---|---|

EFFECTIVE DATE OF REGISTRATION

(Month)          (Day)          (Year)

CONTINUATION SHEET RECEIVED

Page _____ of _____ pages

- This Continuation Sheet is used in conjunction with Forms CA, PA, SE, SR, TX, and VA, only. Indicate which basic form you are continuing in the space in the upper right-hand corner.
- If at all possible, try to fit the information called for into the spaces provided on the basic form.
- If you do not have enough space for all the information you need to give on the basic form, use this Continuation Sheet and submit it with the basic form.
- If you submit this Continuation Sheet, clip (do not tape or staple) it to the basic form and fold the two together before submitting them.
- Space A of this sheet is intended to identify the basic application. Space B is a continuation of Space 2 on the basic application. Space B is not applicable to Short forms. Space C (on the reverse side of this sheet) is for the continuation of Spaces 1, 4, or 6 on the basic application or for the continuation of Space 1 on any of the three Short Forms PA, TX, or VA.

DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY

---

**A**
Identification of Application

IDENTIFICATION OF CONTINUATION SHEET: This sheet is a continuation of the application for copyright registration on the basic form submitted for the following work:
- TITLE: (Give the title as given under the heading "Title of this Work" in Space 1 of the basic form.)

The Silence In Black And White

- NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S): (Give the name and address of at least one copyright claimant as given in Space 4 of the basic form or Space 2 of any of the Short Forms PA, TX, or VA.)

Eron Bucciarelli-Tieger / 217 Pointers Run / Englewood, Ohio 45322

---

**B**
Continuation of Space 2

**d**

| NAME OF AUTHOR ▼ | DATES OF BIRTH AND DEATH |
|---|---|
| Matthew Phillip Ridenour | Year Born▼ 1982    Year Died▼ |

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☑ No
Pseudonymous?    ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by the author in which copyright is claimed. ▼
Words and Music

**e**

| NAME OF AUTHOR ▼ | DATES OF BIRTH AND DEATH |
|---|---|
| James Thomas Woodruff II | Year Born▼ 1978    Year Died▼ |

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☑ No
Pseudonymous?    ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by the author in which copyright is claimed. ▼
Words and Music

**f**

| NAME OF AUTHOR ▼ | DATES OF BIRTH AND DEATH |
|---|---|
|  | Year Born▼    Year Died▼ |

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ _____
{ Domiciled in ▶ _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of the material created by the author in which copyright is claimed. ▼

---

Use the reverse side of this sheet if you need more space for continuation of Spaces 1, 4, or 6 of the basic form or for the continuation of Space 1 on any of the Short Forms PA, TX, or VA.

CONTINUATION OF (Check which):    ☐ Space 1    ☑ Space 4    ☐ Space 6

4 COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2.

**C**

Continuation of other Spaces

Micah Alan Carli
516 Ohio Ave.
Troy, Ohio 45373

Casey H. Calvert
9B Shrada Court
Hamilton, Ohio 45013

Matthew Phillip Ridenour
2908 Roanoke Avenue
Dayton, Ohio 45419

James Thomas Woodruff II
268 Coyote Drive
Maineville, Ohio 45039

Certificate will be mailed in window envelope to this address:

Name ▼
Daniel R. Friedman, Attorney at Law

Number/Street/Apt ▼
577 Dinsmoor Drive

City/State/ZIP ▼
Chesterfield, Missouri 63017

**D**

MAIL CERTIFICATE TO
• Complete all necessary spaces
• Sign your application

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE
1. Application form
2. Nonrefundable fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO
Library of Congress, Copyright Office
101 Independence Avenue S.E.
Washington, D.C. 20559-6000

June 1999—30,000
WEB REV. June 1999        ♻ PRINTED ON RECYCLED PAPER        ☆U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/82

| EXAMINED BY | | FORM PA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5** PREVIOUS REGISTRATION Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give Previous Registration Number ▼    Year of Registration ▼

**6** DERIVATIVE WORK OR COMPILATION  Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼
b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**7** a. DEPOSIT ACCOUNT If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account. Name ▼    Account Number ▼
b. CORRESPONDENCE Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼
Daniel R. Friedman / Attorney at Law / 377 Dinsmoor Drive / Chesterfield, Missouri 63017

Area code and daytime telephone number  ( 314  ) 469-7113    Fax number  ( 314  ) 469-7114
Email  danielrfriedman@aol.com

**8** CERTIFICATION* I, the undersigned, hereby certify that I am the
Check only one ▶ ☐ author
☐ other copyright claimant
☐ owner of exclusive rights
☑ authorized agent of
Name of author or other copyright claimant, or owner of exclusive rights ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Bron Bocciarelli-Tieger    Date July 7, 2006
Handwritten signature (X) ▼
X _(signature)_

**9** Certificate will be mailed in window envelope to this address:
Name ▼
Daniel R. Friedman, Attorney at Law
Number/Street/Apt ▼
377 Dinsmoor Drive
City/State/ZIP ▼
Chesterfield, Missouri 63017

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev. June 2002—20,000  Web Rev. June 2002  ☺ Printed on recycled paper    U.S. Government Printing Office: 2000-461-113/29,081

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000.

**FORM PA**
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

_____

PA _____ PAU _____

EFFECTIVE DATE OF REGISTRATION

Month _____ Day _____ Year _____

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**

TITLE OF THIS WORK ▼

If Only You Were Lonely

PREVIOUS OR ALTERNATIVE TITLES ▼     This Is Who We Are, We Are So Last Year,
Language Lessons (Five Words Or Less), Pens And Needles, Saying Sorry, Dead In The Water, I Am On Your Side,
Breathing In Sequence, Light Sleeper, Cross Me Off Your List, Where Can I Stab Myself In The Ears, Decembers

NATURE OF THIS WORK ▼ See instructions

Words and Music

**2**

**a** NAME OF AUTHOR ▼
Eron Bucciarelli-Tieger

Was this contribution to the work a
"work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of United States
Domiciled in _____

DATES OF BIRTH AND DEATH
Year Born ▼ Year Died ▼
1979

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?     ☐ Yes ☒ No
Pseudonymous?  ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Words and Music

**NOTE**

Under the law,
the "author" of
a "work made
for hire" is
generally the
employer, not
the employee
(see instruc-
tions). For any
part of this
work that was
"made for hire"
check "Yes" in
the space
provided, give
the employer
(or other
person for
whom the work
was prepared)
as "Author" of
that part, and
leave the
space for dates
of birth and
death blank.

**b** NAME OF AUTHOR ▼
Casey H. Calvert

Was this contribution to the work a
"work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of United States
Domiciled in _____

DATES OF BIRTH AND DEATH
Year Born ▼ Year Died ▼
1981

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?     ☐ Yes ☒ No
Pseudonymous?  ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Words and Music

**c** NAME OF AUTHOR ▼
Micah Alan Carli

Was this contribution to the work a
"work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of United States
Domiciled in _____

DATES OF BIRTH AND DEATH
Year Born ▼ Year Died ▼
1979

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?     ☐ Yes ☒ No
Pseudonymous?  ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Words and Music

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2005 Year

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information Month January Day 1 Year 2006
ONLY if this work has been published. Nation United States

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Eron Bucciarelli-Tieger / 217 Pointers Run / Englewood, Ohio 45322

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

MORE ON BACK ▶   • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of _____ pages

# CONTINUATION SHEET
# FOR APPLICATION FORMS

- This Continuation Sheet is used in conjunction with Forms CA, PA, SE, SR, TX, and VA, only. Indicate which basic form you are continuing in the space in the upper right-hand corner.
- If at all possible, try to fit the information called for into the spaces provided on the basic form.
- If you do not have enough space for all the information you need to give on the basic form, use this Continuation Sheet and submit it with the basic form.
- If you submit this Continuation Sheet, clip (do not tape or staple) it to the basic form and fold the two together before submitting them.
- Space A of this sheet is intended to identify the basic application. Space B is a continuation of Space 2 on the basic application. Space B is not applicable to Short forms.
  Space C (on the reverse side of this sheet) is for the continuation of Spaces 1, 4, or 6 on the basic application or for the continuation of Space 1 on any of the three Short Forms PA, TX, or VA.

**FORM _____ /CON**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

| PA | PAU | SE | SEG | SEU | SR | SRU | TX | TXU | VA | VAU |
|----|----|----|----|----|----|----|----|----|----|----|

EFFECTIVE DATE OF REGISTRATION

(Month)      (Day)      (Year)
CONTINUATION SHEET RECEIVED

Page _____ of _____ pages

DO NOT WRITE ABOVE THIS LINE. FOR COPYRIGHT OFFICE USE ONLY

**A** Identification of Application

IDENTIFICATION OF CONTINUATION SHEET: This sheet is a continuation of the application for copyright registration on the basic form submitted for the following work:
- TITLE: (Give the title as given under the heading "Title of this Work" in Space 1 of the basic form)

  **If Only You Were Lonely**
- NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S): (Give the name and address of at least one copyright claimant as given in Space 4 of the basic form or Space 2 of any of the Short Forms PA, TX, or VA.)

  Eros Bucciarelli-Tieger / 217 Pointers Run / Englewood, Ohio 45322

**B** Continuation of Space 2

**d**

| NAME OF AUTHOR ▼ | DATES OF BIRTH AND DEATH |
|---|---|
| Matthew Phillip Rideour | Year Born ▼ 1982   Year Died ▼ |

Was this contribution to the work a "work made for hire"?
☐ Yes  ☑ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☑ No

NATURE OF AUTHORSHIP Briefly describe nature of the material created by the author in which copyright is claimed. ▼
Words and Music

**e**

| NAME OF AUTHOR ▼ | DATES OF BIRTH AND DEATH |
|---|---|
| James Thomas Woodruff II | Year Born ▼ 1978   Year Died ▼ |

Was this contribution to the work a "work made for hire"?
☐ Yes  ☑ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ United States
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☑ No

NATURE OF AUTHORSHIP Briefly describe nature of the material created by the author in which copyright is claimed. ▼
Words and Music

**f**

| NAME OF AUTHOR ▼ | DATES OF BIRTH AND DEATH |
|---|---|
|  | Year Born ▼   Year Died ▼ |

Was this contribution to the work a "work made for hire"?
☐ Yes  ☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of the material created by the author in which copyright is claimed. ▼

Use the reverse side of this sheet if you need more space for continuation of Spaces 1, 4, or 6 of the basic form or for the continuation of Space 1 on any of the Short Forms PA, TX, or VA.

CONTINUATION OF (Check which):    ☐ Space 1    ☑ Space 4    ☐ Space 6

**C**

4 COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2.

Continuation of other Spaces

Micah Alan Carli
516 Ohio Ave.
Troy, Ohio 45373

Casey H. Calvert
9B Shenda Court
Hamilton, Ohio 45013

Matthew Phillip Ridenour
2908 Roanoke Avenue
Dayton, Ohio 45419

James Thomas Woodruff II
268 Coyote Drive
Maineville, Ohio 45039

---

**D**

Certificate will be mailed in window envelope to this address:

Name ▼
David R. Friedman, Attorney at Law

Number/Street/Apt ▼
577 Dinsmoor Drive

City/State/ZIP ▼
Chesterfield, Missouri 63017

YOU MUST:
• Complete all necessary spaces
• Sign your application

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable fee in check or money order payable to Register of Copyrights
3. Deposit material

Library of Congress, Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

| EXAMINED BY | FORM PA |
| CHECKED BY | |
| ☐ CORRESPONDENCE ☐ Yes | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼     Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**6**

See instructions before completing this space.

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼     Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Daniel R. Friedman / Attorney at Law / 577 Dinsmoor Drive / Chesterfield, Missouri 63017

**b**

Area code and daytime telephone number ( 314 ) 469-7113     Fax number ( 314 ) 469-7114
Email danielrfriedman@aol.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶
☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Enzo Bucciarelli-Tieger     Date July 7, 2006

Handwritten signature (X) ▼
☞ X _____

| Certificate will be mailed in window envelope to this address: | Name ▼ Daniel R. Friedman, Attorney at Law | |
| | Number/Street/Apt ▼ 577 Dinsmoor Drive | |
| | City/State/ZIP ▼ Chesterfield, Missouri 63017 | |

YOU MUST:
• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: June 2002—80,000   Web Rev: June 2002   ⊕ Printed on recycled paper   U.S. Government Printing Office: 2000-461-113/20,021

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.

**Form PA**
For a Work of Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

_____

PA            PAU

EFFECTIVE DATE OF REGISTRATION

_____

Month      Day      Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**  TITLE OF THIS WORK ▼

The Silence In Black And White

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See instructions

Audiovisual Work

---

**2**  **a**  NAME OF AUTHOR ▼

Hawthorne Heights, LLC

DATES OF BIRTH AND DEATH
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
Domiciled in United States

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?        ☐ Yes ☒ No
Pseudonymous?   ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Audiovisual Work

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**  NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**  NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼      Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3**  **a**  YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2004  Year

**b**  DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information Month June    Day 1    Year 2005
ONLY if this work has been published.    United States

---

**4**  COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Hawthorne Heights, LLC / 217 Pointers Run / Englewood, OH 45322

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

---

**MORE ON BACK ▶**  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.          • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of _____ pages

| EXAMINED BY | | FORM PA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼        Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**

**a**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼        Account Number ▼

**7**

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

Daniel R. Friedman / Attorney at Law / 377 Dinsmoor Drive / Chesterfield, Missouri 63017

**b**

Area code and daytime telephone number  ( 314 ) 469-7113        Fax number  ( 314 ) 469-7114

Email  danielrfriedman@aol.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ▶  ☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of Hawthorne Heights, LLC

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Eron Bucciarelli-Tieger        Date  July 7, 2006

Handwritten signature (X) ▼

☞ x [signature]

**9**

| Certificate will be mailed in window envelope to this address: | Name ▼ Daniel R. Friedman, Attorney at Law |
|---|---|
| | Number/Street/Apt ▼ 377 Dinsmoor Drive |
| | City/State/Zip ▼ Chesterfield, Missouri 63017 |

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form PA—Full  Rev: 06/2002  Printed on recycled paper        U.S. Government Printing Office: 2000-xxx-xxx/xxx

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000.

**Form PA**
For a Work of Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PA            PAU

EFFECTIVE DATE OF REGISTRATION

Month        Day        Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** TITLE OF THIS WORK ▼

This Is Who We Are

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See Instructions

Audiovisual Work

---

**2**

**a** NAME OF AUTHOR ▼

Hawthorne Heights, LLC

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
Domiciled in United States

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
If the answer to either of these questions is "Yes," see detailed instructions.
Anonymous?       ☐ Yes  ☑ No
Pseudonymous?    ☐ Yes  ☑ No

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

Audiovisual Work

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
If the answer to either of these questions is "Yes," see detailed instructions.
Anonymous?       ☐ Yes  ☐ No
Pseudonymous?    ☐ Yes  ☐ No

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
If the answer to either of these questions is "Yes," see detailed instructions.
Anonymous?       ☐ Yes  ☐ No
Pseudonymous?    ☐ Yes  ☐ No

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED  This information must be given in all cases.
2005  Year ◄

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK  Complete this information ONLY if this work has been published.
Month January  Day 1  Year 2006
Nation United States

---

**4**

See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Hawthorne Heights, LLC / 217 Pointers Run / Englewood, OH 45322

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

---

MORE ON BACK ▶  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.  • See detailed instructions.  • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of ___ pages

| EXAMINED BY | | FORM PA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☐ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C. **5**

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation. **6**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼    **a**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼   **b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account. **7**
Name ▼          Account Number ▼   **a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip▼   **b**
Daniel R. Friedman / Attorney at Law / 377 Dinsmoor Drive / Chesterfield, Missouri 63017

Area code and daytime telephone number ( 314 ) 469-7113          Fax Number ( 314 ) 469-7114
Email  danielrfriedman@aol.com

**CERTIFICATION** I, the undersigned, hereby certify that I am the **8**

Check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of Hawthorne Heights, LLC
  Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Eron Bucciarelli-Tieger          Date July 7, 2006

Handwritten signature (X) ▼
X

**9**

Certificate will be mailed in window envelope to this address:

Name ▼
Daniel R. Friedman, Attorney at Law
Number/Street/Apt ▼
377 Dinsmoor Drive
City/State/Zip ▼
Chesterfield, Missouri 63017

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

ERON BUCCIARELLI-TIEGER, an
individual; CASEY CALVERT, an individual;
MICAH CARLI, an individual; MATT
RIDENOUR, an individual; JT WOODRUFF,
an individual, collectively professionally
known as "Hawthorne Heights"; and
HAWTHORNE HEIGHTS, LLC, an Ohio
limited liability company,

        Plaintiffs,

        v.

VICTORY RECORDS, INC., an Illinois
corporation; ANOTHER VICTORY, INC.,
an Illinois corporation; ANTHONY K. "TONY"
BRUMMEL, an individual; and DOES 1
through 25,

        Defendants.

----------------------------------------------------

VICTORY RECORDS, INC., an Illinois
corporation,

        Counterclaim Plaintiff,

        v.

ERON BUCCIARELLI-TIEGER, an
individual; CASEY CALVERT, an individual;
MICAH CARLI, an individual; MATT
RIDENOUR, an individual; JT WOODRUFF,
an individual, collectively professionally
known as "Hawthorne Heights"; and
HAWTHORNE HEIGHTS, LLC, an Ohio
limited liability company,

        Counterclaim Defendants.

No. 06-CV-4258

## ANSWER AND COUNTERCLAIMS

Judge James B. Moran
Magistrate Judge Morton Denlow

Defendants, Victory Records, Inc. ("Victory"), Another Victory, Inc. ("Another Victory"), and Anthony K. "Tony" Brummel ("Brummel") (collectively, Victory, Another Victory and Brummel are referred to herein as "Defendants"), as and for their Answer to the Complaint of Plaintiffs, Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt Ridenour, JT Woodruff, and Hawthorne Heights, LLC, (collectively, "Plaintiffs" or "Hawthorne Heights"), respond as follows:

1.    The Defendants deny the allegations in Paragraph 1 of the Complaint, except admit that Brummel is the CEO and sole shareholder of Victory.

2.    The Defendants deny the allegations in Paragraph 2 of the Complaint.

3.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 3 of the Complaint.

4.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 4 of the Complaint.

5.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 5 of the Complaint.

6.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 6 of the Complaint.

7.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 7 of the Complaint.

8.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 8 of the Complaint.

9.    The Defendants admit the allegations in Paragraph 9 of the Complaint.

10.    The Defendants admit the allegations in Paragraph 10 of the Complaint.

11.    The Defendants admit the allegations in Paragraph 11 of the Complaint.

12.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 12 of the Complaint.

13.    The allegations in Paragraph 13 of the Complaint consist of legal conclusions, to which no response is required.

14.    The allegations in Paragraph 14 of the Complaint consist of legal conclusions, to which no response is required.

15.    The allegations in Paragraph 15 of the Complaint consist of legal conclusions, to which no response is required.

16.    The Defendants deny knowledge or information sufficient to form a belief with respect to the allegations in the first sentence of Paragraph 16 of the Complaint, and deny the allegations in the second sentence thereof with respect to the allegation that the Agreement is "non-exclusive".

17.    The Defendants deny the allegations in Paragraph 17 of the Complaint, and respectfully refer the Court to the Agreement, the terms of which speak for themselves.

18.    The Defendants admit the allegations in Paragraph 18 of the Complaint.

19.    The Defendants admit the allegations in Paragraph 19 of the Complaint.

20.    The Defendants admit the allegations in Paragraph 20 of the Complaint.

21.    The Defendants deny the allegations in Paragraph 21 of the Complaint, and respectfully refer the Court to the Agreement, the terms of which speak for themselves.

22.    The Defendants deny the allegations in Paragraph 22 of the Complaint.

23.     The Defendants admit the allegations in Paragraph 23 of the Complaint, except acknowledge that Victory continues to perform under the Agreement, which remains legally binding on the parties thereto.

24.     With respect to the allegations in Paragraph 24 of the Complaint, the Defendants respectfully refer the Court to the Agreement, the terms of which speak for themselves.

25.     The Defendants deny the allegations in Paragraph 25 of the Complaint.

26.     The Defendants deny the allegations in Paragraph 26 of the Complaint.

27.     The Defendants deny the allegations in Paragraph 27 of the Complaint.

28.     The Defendants deny the allegations in Paragraph 28 of the Complaint.

29.     The Defendants deny the allegations in Paragraph 29 of the Complaint.

30.     The Defendants respond to the allegations of paragraph 30 of the Complaint by repeating their responses as if fully set forth herein.

31.     The Defendants deny the allegations in Paragraph 31 of the Complaint, except deny knowledge or information sufficient to form a belief with respect to the allegations in Paragraph 31 of the Complaint concerning the Plaintiffs' submission of a copyright registration application for the Silence DVD.

32.     The Defendants deny the allegations in Paragraph 32 of the Complaint.

33.     The Defendants deny the allegations in Paragraph 33 of the Complaint, except acknowledge that Victory continues to perform under the Agreement, which remains legally binding on the parties thereto.

34.     The Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     The Defendants respond to the allegations of paragraph 35 of the Complaint by repeating their responses as if fully set forth herein.

36.     The Defendants deny the allegations in Paragraph 36 of the Complaint.

37.     The Defendants deny the allegations in Paragraph 37 of the Complaint.

38.     The Defendants deny the allegations in Paragraph 38 of the Complaint.

39.     The Defendants deny the allegations in Paragraph 39 of the Complaint.

40.     The Defendants deny the allegations in Paragraph 40 of the Complaint.

41.     The Defendants deny the allegations in Paragraph 41 of the Complaint.

42.     The Defendants respond to the allegations of paragraph 42 of the Complaint by repeating their responses as if fully set forth herein.

43.     The Defendants deny the allegations in Paragraph 43 of the Complaint.

44.     The Defendants deny the allegations in Paragraph 44 of the Complaint.

45.     The Defendants deny the allegations in Paragraph 45 of the Complaint.

46.     The Defendants deny the allegations in Paragraph 46 of the Complaint.

47.     The Defendants deny the allegations in Paragraph 47 of the Complaint.

48.     The Defendants respond to the allegations of paragraph 48 of the Complaint by repeating their responses as if fully set forth herein.

49.     The Defendants deny the allegations in Paragraph 49 of the Complaint.

50.     The Defendants deny the allegations in Paragraph 50 of the Complaint.

51.     The Defendants deny the allegations in Paragraph 51 of the Complaint.

52.     The Defendants deny the allegations in Paragraph 52 of the Complaint.

53.     The Defendants deny the allegations in Paragraph 53 of the Complaint.

54.     The Defendants respond to the allegations of paragraph 54 of the Complaint by repeating their responses as if fully set forth herein.

55.    The Defendants deny the allegations in Paragraph 55 of the Complaint, except acknowledge that Victory issued proper royalty statements under the Agreement.

56.    The Defendants deny the allegations in Paragraph 56 of the Complaint.

57.    The Defendants deny the allegations in Paragraph 57 of the Complaint.

58.    The Defendants deny the allegations in Paragraph 58 of the Complaint.

59.    The Defendants deny the allegations in Paragraph 59 of the Complaint.

60.    The Defendants deny the allegations in Paragraph 60 of the Complaint.

61.    The Defendants respond to the allegations of Paragraph 61 of the Complaint by repeating their responses as if fully set forth herein.

62.    The Defendants deny the allegations in Paragraph 62 of the Complaint.

63.    The Defendants deny the allegations in Paragraph 63 of the Complaint.

64.    The Defendants deny the allegations in Paragraph 64 of the Complaint.

65.    The Defendants deny the allegations in Paragraph 65 of the Complaint.

66.    The Defendants deny the allegations in Paragraph 66 of the Complaint.

67.    The Defendants respond to the allegations of Paragraph 67 of the Complaint by repeating their responses as if fully set forth herein.

68.    The Defendants deny the allegations in Paragraph 68 of the Complaint.

69.    The Defendants deny the allegations in Paragraph 69 of the Complaint.

70.    The Defendants deny the allegations in Paragraph 70 of the Complaint.

71.    The Defendants respond to the allegations of Paragraph 71 of the Complaint by repeating their responses as if fully set forth herein.

72.    The Defendants deny the allegations in Paragraph 72 of the Complaint.

73.    The Defendants deny the allegations in Paragraph 73 of the Complaint.

74.    The Defendants deny the allegations in Paragraph 74 of the Complaint.

75.    The Defendants respond to the allegations of Paragraph 75 of the Complaint by repeating their responses as if fully set forth herein.

76.    The Defendants deny the allegations in Paragraph 76 of the Complaint, except acknowledge that Victory has reminded the Plaintiffs of their obligations under the Agreement.

77.    The Defendants deny the allegations in Paragraph 77 of the Complaint.

78.    The Defendants deny the allegations in Paragraph 78 of the Complaint.

79.    The Defendants deny the allegations in Paragraph 79 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim on which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrines of waiver, estoppel and laches.

## THIRD AFFIRMATIVE DEFENSE

The Complaint is barred by fraud, mistake and/or the doctrine of unclean hands.

## COUNTERCLAIMS

**A.    OVERVIEW**

80.    The case filed by the plaintiffs in this action (collectively, "the Plaintiffs" or the "Group") is really about greed, despite the unfounded and spurious laundry list of allegations made concerning Victory Records, Inc. ("Victory") and its founder and owner, Anthony Brummel ("Brummel"), who are responsible for putting the Group on the map. The plaintiffs are now willing to say anything – no matter how untrue or defamatory – as a strategy designed to free themselves from their legal obligations to the independent record label that made them

famous, in favor of the "greener pastures" and financial inducements offered by so-called "major" record distribution companies.   Unfortunately, it is a common story in the music business.

81.     Brummel and Victory took a chance on the Group in late 2003, signing a young, untested group of musicians who had dogged him for months, sending demo tape after demo tape, along with emails and phone calls, in order to get Brummel's attention and a chance to join the Victory family of artists.

82.     Brummel gave them that chance in late 2003, signing them to a long-term recording artist, merchandising and publishing contract, and then risking millions of dollars by funding the production of two musical albums and five music videos, and by aggressively and passionately marketing, promoting and distributing those products.   However, Victory's investment cannot be measured merely in dollars. Brummel, and the staff of Victory, invested significant time and energy, as well as their reputation, in making the Group a success. That reputation is widely acknowledged throughout the music industry, and was recently acknowledged when Victory was nominated for the best independent record label of 2005 by the National Association of Recording Merchandisers (NARM), a not-for-profit trade association that serves the music software industry.

83.     Victory's reputation for developing and building careers for unknown, non-mainstream artists is unprecedented, often without the benefit of radio, television and other mainstream marketing and media support that is almost always only available to so-called major record companies.

84.     The plaintiffs now seek to destroy that reputation by making false and wildly scurrilous allegations in these proceedings, as well as planning a carefully orchestrated smear

campaign through various music trade publications, websites and other media designed, upon information and belief, by Sitrick & Company, a high powered public relations firm based in Los Angeles.

85.    The Group benefited from Victory's efforts in ways that went far beyond the monies they were paid by Victory (in excess of $1 million for record and publishing royalties and advances alone). They are hardly the starving and victimized artists they portrayed in their Complaint.

86.    Upon information and belief, since signing with Victory, the Group made well over $4 million on their own, solely as a result of the fame and celebrity that Victory brought to them. They earned these additional monies largely from concerts and live engagements fees, merchandise sold at those events, and commercial endorsements. Victory did not share in any of that money, even though it was Victory that gave the Group the ability to generate such large sums through these ancillary income sources, which are directly tied to Victory's efforts in marketing, promoting and selling their albums.

87.    Not surprisingly, the Group chose to file this lawsuit *after* they became such a huge commercial success. Upon information and belief, they are now actively soliciting, and have been actively soliciting for months, a new recording agreement with major record labels, with whom they believe they can make even more money. This, despite the fact that they are still obligated by written contract to deliver two additional full-length studio albums to Victory.

88.    The Plaintiffs' campaign has two main strategies. One is the specious claim that the Agreement -- despite having an explicit term measured by the delivery of four albums -- is terminable at will. The other -- which is a tacit acknowledgement of the frivolousness of their claim concerning the Agreement -- is to publicly trash Victory in the press. The former strategy

will be put to the test through a motion to dismiss at the appropriate time.  The latter strategy has already caused Victory considerable harm, and leaves it no choice but to assert counterclaims in this action.

89.    In addition to seeking money damages for the trade libel perpetrated by the Plaintiffs, their actions have also forced Victory to seek various forms of equitable and declaratory relief.  First, with respect to the Agreement, Victory seeks a declaration that it remains in full force and effect and a preliminary and permanent injunction barring the Group from making records other than with Victory until the Group has discharged its duties under the Agreement.[1]  Second, Victory seeks a declaration that, consistent with the registrations in the United States Copyright Office, it is the owner of the copyrights in all records made pursuant to the Agreement.  Similarly, Victory seeks a declaration of its status as the senior user and owner of the HAWTHORNE HEIGHTS trademark.

## B.    STATEMENT OF FACTS

### The Agreement And The Parties' Performance Thereunder.

90.    As defined herein, the "Agreement" refers to the written recording, merchandizing and publishing agreement between Victory and the Group (defined as "Artist") dated as of December 10, 2003, as amended on April 28, 2004.  A copy of the Agreement is attached as Exhibit A to the Complaint.

91.    By its express and unambiguous terms, the Agreement imposes on Hawthorne Heights a *Recording Commitment* requiring the Group to deliver four (4) studio Albums to Victory *during a stated term*. That Term is measured initially by the first eighteen (18) month

---

[1] In addition, Hawthorne Heights will be liable for any financial harm it has caused Victory by breaching the Agreement.

period from the date of the Agreement, and thereafter by "separate, consecutive and irrevocable" option periods each commencing twelve (12) months from the date of delivery of the last Album constituting the Artist's Recording Commitment for that Option Period.   In other words, the Group is committed under the Agreement until the date that is 12 months from the delivery date of their fourth Album.

92.    Since the Agreement was executed, the Group has only delivered two studio albums (the second of which was delivered in early 2006):  "The Silence In Black And White" and "If Only You Were Lonely."  Victory has exercised its option for the Third Album. The Agreement therefore remains in full force and effect.

93.    In light of these facts, the Group's assertion that the Agreement is terminable at will is not only incorrect, it is risible (not to mention frivolous as a matter of law).

94.    The words and actions of the Group constitute an anticipatory breach of the Agreement.

**Victory is the Owner of the Copyrights in the Subject Albums**.

95.    Turning to the scope of rights granted the Agreement, the document as a whole makes clear that Victory is the owner of the copyrights in the subject albums as "collective works" consisting of the individual musical recordings, as well as the artwork, liner notes and other elements that distinguish the album from the individual recordings.

96.    Victory commissioned these recordings as part of its regular business of creating, marketing and selling collective musical works or compilations, such as the albums comprising the Group's delivery obligations under the Agreement. In addition to providing 100% of the recording funds for both albums, Victory also had the right to control the manner and means of creating each album, the right to assign additional projects to the Plaintiffs pursuant to their

multi-album contract; Victory participated in and had the right to control and/or approve, and in fact did approve, the selection of the producers of the albums as well as the selection, and arrangement of a number of component works of the albums.

97.    The ownership by record companies of master recordings as works for hire pursuant to agreements between artists and the companies is virtually a universal practice in the record industry. Tellingly, until August 2006, the Group never objected to the copyrights registered by Victory for the two albums delivered by the Group under the Agreement at or about the time each was released (June 21, 2004 and February 28, 2006, respectively), even though the Group was fully aware of the existence of the registrations.[2]

98.    Alternatively, the Agreement granted Victory an exclusive license in the subject Albums.  The idea that Victory would agree to provide all of the funding to record, market, promote and distribute these albums,  which expenses aggregated in the millions of dollars per album,  yet allow competitor record companies to commercially release and sell them pursuant to purported authorizations by the recording artist is not only inconsistent with the terms of the Agreement and the course of conduct between the parties to this action, but it is virtually unheard of in the record industry and is in flagrant disregard of industry practices.

---

[2] Victory obtained a copyright registration for the sound recording album entitled "The Silence In Black And White" bearing Registration No. SR-354-165, dated June 21, 2004, as a "collective work." Victory has not yet applied for a copyright registration for the album entitled "If Only You Were Lonely", which is also owned by Victory. However, on July 12, 2006, Hawthorne Heights LLC obtained copyright registrations for the same sound recording album -- "The Silence In Black And White" bearing Registration No. SR 379-964, as well as the sound recording album entitled "If Only You Were Lonely" bearing Registration No. SR-379-963, also dated July 12, 2006. Upon information and belief, both Hawthorne Heights registrations were requested in anticipation of this lawsuit, and solely for the purpose of the Plaintiffs attempt to obtain jurisdiction under the Copyright act for its claims under Title 17. To the extent that Hawthorne Heights has attempted to register or re-register these works, it has committed fraud on the Copyright Office.

99.     The Group has not even attempted to re-release the two submitted albums elsewhere, and there is no possibility that any record company would agree to do so even if the Group wanted them to do so.

**Victory is the Owner of the Copyrights in Musical Compositions Written by the Group Members.**

100.     Victory (or its publishing designee Another Victory, Inc.) is the owner and exclusive administrator of the copyrights in the musical compositions written, in whole or in part, by the Plaintiffs (individually or collectively), to the extent of their authorship contributions (the "Compositions"), pursuant to the terms of the Agreement as well as the 2-1/2 year course of conduct between the parties beginning in December 2003.

101.     Paragraph 5 of the Agreement states as follows:

5. Publishing:

$5,000.00 fully recoupable advance for publishing deal Another Victory Inc. (ASCAP) half of which will be paid upon signing of this deal memo, the other half upon release of LP1.

Future publishing advances will be based on 25% of the # of units sold on previous release 18 months after U.S. release date and be paid upon delivery of the corresponding Album to Company. For example, if LP1 sells 50,000 units in its first 18 months of release the publishing advance on LP2 would be $12,500.00. The minimum advance for any album will be no less than $5,000.00. Only the Compositions recorded during the term of this agreement and/or the Compositions that are released by Company will be included as part of the publishing agreement.

102.     For each quarter-annual accounting period beginning with March 30, 2004, and continuing through June 30, 2006, Another Victory accounted to the Group for their share of writer royalties for the exploitation of the Compositions, and paid the Group any writer royalties shown to be due thereby including without limitation, mechanical royalties derived from the sale

of the subject albums. Another Victory, Inc. paid publishing advances to the Group, including the publishing advances referred to in paragraph 5 of the Agreement.

103.    All publishing advance and royalty payments were retained by the Group and the Group did not object to the manner or computation of such payments, or Another Victory's administration of the copyrights in the Compositions, until this action was filed.

104.    The most recent accounting of writer royalties paid to the Group for the quarter-annual period ending March 30, 2006, rendered on August 31, 2006, totaled $137,245.21.

105.    At various times during the Term of the Agreement, the Group or its representatives confirmed Another Victory's ownership interests and exclusive administration rights in the Compositions.

106.    On November 15, 2005, the Group's manager, John Germanario ("Germanario"), wrote Brummel concerning a request he had made on behalf of the Group to obtain reversion of the Group publishing rights in their Compositions.

> Tony-
>
> Do you think that the source of the request I made to discuss the return of the band's publishing comes from anywhere else but the band themselves?
>
> I'm sorry you are getting annoyed by my requests but I am only doing my job.
>
> Ignoring this issue will not make it go away. This goes beyond the band getting their advance after the master is delivered. The guys want their songs back. After 600,000 units sold they've earned an opportunity to explore this with you.
>
> Can we please talk about this in the morning?
>
> JG

107.    On one occasion, the Group sent Brummel an email dated November 17, 2005 expressing their unjustified disappointment over their contractual and business arrangement with Victory. In that email, they expressly confirm Victory's ownership rights in their Compositions:

> Tony,
>
> We want to start by saying that we are now and have always been fully committed and loyal to Victory Records, both in public and in private. That being said, we are all extremely unsettled by your response in regards to the issue of our publishing....We know in the offers to these UNLOYAL bands, publishing was either fully returned or half returned with an option removed from their deal. We have NEVER attempted to leave Victory!  Why do you reward traitors and not the faithful?
>
> ***
>
> *We want our publishing.*  Its not like we're asking you to give each of us 5 million dollars. *Giving us our publishing costs you no money, but provides us with financial security.*  Doesn't it make YOU mad to know that bands like Underoath, The Starting Line, From First To Last and countless others who have sold far less records than us, make WAY more money than us?  We are insulted by this fact.  We've worked harder than these bands, sold more records, sacrificed more and yet we still live from tour to tour to pay our bills.
>
> Please prove to us that everything you ever said to us about TRUTH, HONOR, and LOYALTY is for real.
>
> Matt, Micah, Casey, JT, Eron (emphasis added)

108.    Brummel responded by reminding the Group that the performance of other Victory artists, and Victory's contractual arrangements with them, are irrelevant to the Group's and, moreover, the Group had profited handsomely from the substantial effort and investment of money made by Victory in their recording projects.  In order to assuage them, and in keeping with Brummel's desire to treat all of Victory's artist's fairly, he offered to double the contractual publishing advance (not required under the Agreement) from $175,000 to $350,000; to liquidate the Group's current publishing reserves prematurely (totaling $107,000); and double the formula

for future publishing advances under paragraph 5 of the Agreement from 25% to 50%. Thus, by the end of November 2005, the Group would have received a total of $527,000.00!

109.    Brummel's email response ended with the prophetic comment: *"Why you would hurt the person that can and has helped you the most defies logic."*

110.    After this exchange of emails, on December 1, 2005, the Group's representative asked Brummel to amend the Agreement so that the Group could recapture the publishing rights in the Compositions. In his email dated December 1, 2005, Germanario communicated the following offer to Brummel on the Group's behalf:

> I'd like to reiterate that Hawthorne Heights is willing to offer up the following in exchange for the full return of their publishing rights:
>
> -A Day In The Life EP (featuring 4 of 5 current HH members-a different title than what's out currently)
> -Hawthorne Heights full line DVD
> -An additional option in the form of a studio EP or live album.
>
> Perhaps your upset yesterday stems from the fact that this offer does not meet your expectations. If so, by all means let us know. Hawthorne Heights would be happy to enter into a negotiation with you to find a mutually acceptable position with regards to their publishing.
>
> Kind Regards
>
> John

## Victory Rights in the HAWTHORNE HEIGHTS trademark.

111.    As the first to sell and distribute sound recordings bearing the name HAWTHORNE HEIGHTS in interstate commerce, beginning in early 2004, Victory is the senior user and exclusive owner of the trademark HAWTHORNE HEIGHTS in connection with such

goods. [3]  Accordingly, Victory has applied to the United States Patent and Trademark office for

registration of the mark in International Classes 9, 16 and 25 (Application No. 78,944,689).

112.    Apart from being the exclusive owner of the HAWTHORNE HEIGHTS

trademark, Victory clearly has the right to use the trade name "Hawthorne Heights" and related

indicia, including the names of the Group members.  In fact consistent with that arrangement, the

Agreement gives *Victory* the right the make and sell Hawthorne Heights merchandise (other than

records) in exchange for a royalty payable to the Group.  In contrast, the Group's rights are

limited to the manufacture of merchandise only "for its own purposes."

**Hawthorne Heights' Recent Tortious Conduct**

113.    On August 3, 2006, Plaintiffs' counsel sent Victory a letter purporting to

terminate the Agreement.  The next day, Victory rejected the purported termination.    The

Plaintiffs commenced this action on August 7, 2006.  But the Group did not content itself with

seeking legal redress.  As part of its campaign to free itself of its contractual obligations, it has

also launched a smear campaign against Victory.

114.    The heart of the smear campaign is a document called "The REAL Manifesto"

which appeared recently at the Group's website, http://www.hawthorneheights.com/:

> The REAL Manifesto
>
> Due to recent events we have decided to leave Victory Records.
> Our departure is anything but amicable.  We have decided to leave
> Victory, in part due to the actions of the man who sits at the head
> of the label, Tony Brummel.  Tony Brummel is a man that cares
> more about his ego and bank account than the Bands themselves.
>
> Many of you are familiar with the greed driven letters sent out by
> Mr. Brummel: his manifesto calling rock supporters to arms and

---

[3] In addition, Victory was the first to sell and distribute related goods bearing the name HAWTHORNE HEIGHTS
in interstate commerce, including clothing and printed materials.  Accordingly, Victory is the senior  user and
exclusive owner of the trademark HAWTHORNE HEIGHTS in connection with such goods.

virtual declaration of war on hip-hop and Ne-Yo done under the guise of a Group message; as well as the "street-team" letter which instructed people to re-arrange our CDs, putting them in higher visibility areas in stores. Unfortunately, the head of street-team, Abby Valentine, who understandably resigned following the incident, took the fall for this.

At the time of the letters we were branded as racists by some, all over a letter we did NOT write, targeting a genre which we have NOTHING against whatsoever. Because of these letters, our second album debuted at #3 on the charts, an incredible feat, which would normally be cause for joy, but now is tainted much like Barry Bonds' statistics.

When questioned about the letters Tony was more upset that we had told the press that he actually wrote the letters (not us) because he was more worried about "rumors" surrounding Taking Back Sunday and Thursday's exoduses being justified than the credibility and reputation of his current biggest Group.

Couple these letters with him threatening the head program director at Q101 in Chicago for putting the new Taking Back Sunday song into rotation to the point in which the program director pulls "Saying Sorry" from rotation and you can see why we would more than question whether or not the head of our label cares about us or his own ego more.

Tony is a man whose greed knows no bounds. After selling more than 1.2 million copies of The Silence In Black and White and If Only You Were Lonely, we have never seen a single dollar in artist royalties from Victory Records. Tony will claim that we have not "recouped," a term used by those in the music business which means the label has spent more money in advertising than has been made by CD sales. In fact questionable accounting practices are the culprit and we are in fact owed substantial amounts of money much like audits from Taking Back Sunday, Thursday and Atreyu have uncovered.

You may be wondering, why now? Why did they wait three years before saying something? Why did they sound happy in that interview??? Like being in an abusive relationship, we let certain things slide as we were afraid, as many of the bands on Victory are, to stick our neck out for fear of being "beaten," in this case represented by the threat of not being promoted as has been the

case with certain bands on the roster. We're done being abused. The reasons stated above represent the final straw in a huge pile of hay that broke our backs.

Undoubtedly Tony will proclaim that we are ungrateful and our success was due solely to "his" promotional efforts. In reality, promotion is only a portion of the equation in a Bands success. Even then, in our case especially, promotional efforts can be attributed the hard work of the Group and staff at Victory, many of whom recently resigned or were fired due to differences with Tony. Non-stop touring, dedicated fans and songs (we challenge Tony to sell over 1 million blank CDs) account for the rest of the equation.

We've accomplished more in three years than most bands do in a lifetime and for that we are extremely grateful and consider ourselves very fortunate. Our situation with Tony Brummel is indicative of issues that all bands on Victory Records encounter on some level or another. We have decided to remove ourselves from the negative situation so that we can continue to do what we love best and focus on writing and playing music to people that care about what we have created.

115.    The "Manifesto" falsely accuses Victory of financial dishonesty, racism, unfair competition and a variety of other tortious and/or criminal conduct and constitute trade libel *per se*. None of the operative allegations directed against Victory or Tony Brummel are true.

116.    The "Manifesto" has been disseminated in whole or in part on numerous websites and in print.

117.    Moreover, the "Manifesto" was issued with either knowledge that the operative accusations were false or with reckless disregard as to their truth or falsity.

118.    The harm flowing from the Group's libelous statements is profound. It has already had an adverse effect on Victory's business operations and reputation, not merely with respect to artists signed to Victory, but also with Victory's staff who have become demoralized by the tenor and content of the Plaintiffs' false and defamatory statements. For example, current

artists signed to Victory have recently questioned Victory's integrity and business practices, solely as a result of the defamatory statements made by the Group in their "Manifesto." Further, Victory believes that other artists who may have otherwise had an interest in signing with Victory may now think twice about doing so as a result of the defamatory statements disseminated by the Plaintiffs. Victory's relationships with its artists are absolutely vital to Victory's ability to conduct business, particularly since those relationships are of such a personal nature and based on trust.

119.    Because Victory is the senior user and owner of the trademark HAWTHORNE HEIGHTS, the Group's recent use of the mark in commerce in International Classes 9, 16 and 25 constitutes infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*  Because the Group knew or had reason to of Victory's ownership of the trademark, its actions are willful, deliberate and fraudulent.

## COUNT I
### (Trade Libel)

120.    Victory repeats and realleges the allegations in Paragraphs 80 through 119 herein.

121.    Under Illinois law, a defendant commits trade libel per se when it assails the corporate plaintiff's financial position or business methods, or accuses it of fraud or mismanagement.

122.    The Plaintiffs' "Manifesto" directly accuses Victory of fraud through its false statements of questionable accounting practices.  It further falsely states, *inter alia*, the following improper business methods:  dishonesty, racism, extortion and intimidation of the Group, other Victory artists and third parties.

123.    These statements, which have been disseminated in the electronic and print media, are false and defamatory *per se*.

124.    The Plaintiffs made these statements with either knowledge of their falsity or reckless disregard of their truth or falsity.  Their sole motivation was to harm Victory.

125.    The Plaintiffs' statements have harmed Victory for the reasons stated above in amounts to be proved at trial.

## COUNT II
### (Declaratory Judgment - Contract)

126.    Victory repeats and realleges the allegations in Paragraphs 80 through 125 herein.

127.    The Agreement is a valid, binding and subsisting contract between Victory and the Plaintiffs.

128.    The Plaintiffs' purported "termination" of the Agreement is in reality an anticipatory breach of, and refusal to perform obligations under, the Agreement.

129.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, authorizes this Court to declare the rights and legal relations of parties to an active controversy under its jurisdiction.

130.    There is an actual, present and existing dispute between the parties concerning the Plaintiffs' duties and obligations under the Agreement.

131.    The Court's determination of the issues presented herein would be final and conclusive, insofar as the declaratory judgment sought by Victory would fully and finally resolve the parties' disputes concerning the Agreement.

## COUNT III
### (Damages for Breach of Contract)

132.    Victory repeats and realleges the allegations in Paragraphs 80 through 131 herein.

133.    The Agreement is a valid, binding and subsisting contract between Victory and the Plaintiffs.

134.    The Plaintiffs' purported "termination" of the Agreement is in reality an anticipatory breach of, and refusal to perform obligations under, the Agreement.

135.    Victory has been damaged by the Plaintiffs' breaches of the Agreement in an amount to be proved at trial.

136.    Hawthorne Heights is a unique musical artist, whose services are of a special, unique, extraordinary and intellectual character, giving them a peculiar value, the loss of which cannot be readily estimated, or adequately compensated for, in monetary damages and would cause Victory substantial and irreparable harm.  Accordingly, Victory is entitled to preliminary and permanent injunctive relief barring the Plaintiffs from furnishing its services to any person or company other than Victory until they have delivered two additional satisfactory full-length albums to Victory and otherwise discharged their duties under the Agreement.

## COUNT IV
### (Trademark Infringement)

137.    Victory repeats and realleges the allegations in Paragraphs 80 through 136 herein.

138.    Victory is the senior user and exclusive owner of the trademark HAWTHORNE HEIGHTS in International Classes 9, 16 and 25.

139.    The Group's right to use of trademark derives from the Agreement.  Because it has repudiated the Agreement, its current use of the trademark is an infringement of Victory's exclusive rights under the Lanham Act.

140.    By reason of the Group's unlawful actions, Victory has suffered and continues to suffer irreparable harm including, but not limited to, detriment and diminution in the value of the

HAWTHORNE HEIGHTS mark, for which there is no adequate remedy at law. Accordingly, Victory is entitled to a preliminary and permanent injunction against the Group, pursuant to 15 U.S.C. §§ 1125(a) and 1116.

141.    Victory has also suffered and continues to suffer injury and is entitled to recover damages sustained by the Group's actions, all profits realized by the Group and the costs of suit, pursuant to 15 U.S.C. §§ 1125(a) and 1117.

142.    The Group knew or had reason to know of Victory's ownership of the HAWTHORNE HEIGHTS mark, and the Group's actions were willful, deliberate and fraudulent, entitling Victory to damages and an award of reasonable attorneys' fees against the Group pursuant to 15 U.S.C. §§ 1125(a) and 1117.

## COUNT V
### (Declaratory Judgment – Copyright in Sound Recordings)

143.    Victory repeats and realleges the allegations in Paragraphs 80 through 142 herein.

144.    Victory is the owner of the copyrights in the albums "The Silence In Black And White" (Registration No. SR-354-165) and "If Only You Were Lonely".

145.    The Plaintiffs have asserted that it owns the copyrights at issue.

146.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, authorizes this Court to declare the rights and legal relations of parties to an active controversy under its jurisdiction.

147.    There is an actual, present and existing dispute between the parties concerning Victory's ownership of the copyrights at issue.

148.    The Court's determination of the issues presented herein would be final and conclusive, insofar as the declaratory judgment sought by Victory would fully and finally resolve the parties' disputes with respect to copyright ownership.[4]

### COUNT VI
**(Declaratory Judgment – Copyright in Musical Compositions)**

149.    Victory repeats and realleges the allegations in Paragraphs 80 through 148 herein.

150.    Victory is the owner of the copyrights in the Compositions embodied on the albums "The Silence In Black And White" and "If Only You Were Lonely" to the extent of the authorship contributions therein by the Group or its individual members.

151.    The Plaintiffs have asserted that it owns the copyrights at issue.

152.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, authorizes this Court to declare the rights and legal relations of parties to an active controversy under its jurisdiction.

153.    There is an actual, present and existing dispute between the parties concerning Victory's ownership of the copyrights at issue.

154.    The Court's determination of the issues presented herein would be final and conclusive, insofar as the declaratory judgment sought by Victory would fully and finally resolve the parties' disputes with respect to copyright ownership.

WHEREFORE, Victory respectfully prays that the Court find in its favor and enter an order and judgment:

a.    For preliminary and permanent injunctive relief, as set forth herein;

b.    For a declaratory judgment concerning the rights and other legal relations between the parties respecting the Agreement, as set forth herein;

---

[4] At present, Victory is not aware that Hawthorne Heights has actually infringed Victory's copyrights. If Victory learns of such infringement, it will amend its counterclaims accordingly.

c.    For a declaratory judgment concerning the rights and other legal relations between the parties respecting the ownership of the copyrights in and to the sound recordings and musical compositions at issue, as set forth herein;

d.    For compensatory damages in an amount to be proved at trial;

e.    For the costs of suit and attorneys fees pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505;

f.    For interest on its damages at the legal rate; and

g.    For such other and further relief that the Court may deem to be just and proper.

Dated: September 8, 2006                  Respectfully submitted,

                                         ROBERT S. MELONI, P.C.


                                         By:    /s/ Robert S. Meloni
                                             Robert S. Meloni (NY Bar No. 1708080)

                                         1350 Avenue of the Americas
                                         Suite 3100
                                         New York, New York 10019
                                         (212) 957-5577

                                         *Attorneys for Defendants Victory Records, Inc.,*
                                         *Another Victory, Inc. and Anthony K. Brummel*


                                         LEVENFELD PEARLSTEIN, LLC



                                         By:    /s/ Christopher S. Griesmeyer
                                             Christopher S. Griesmeyer (IL Bar No. 6269851)
                                             cgriesmeyer@lplegal.com

                                         2 North LaSalle, 13th Floor
                                         Chicago, IL 60602
                                         (312) 476-7574

                                         *Attorneys for Defendants Victory Records, Inc.,*
                                         *Another Victory, Inc. and Anthony K. Brummel*

## **CERTIFICATE OF SERVICE**

To:

**Anthony George Stamato**
Kaye Scholer LLC
70 West Madison Street
Suite 4100
Chicago, IL 60602
(312) 583-2300
astamato@kayescholer.com


**Robert McPherson Spalding**
Kaye Scholer LLC
70 West Madison
Suite 4100
Chicago, IL 60602
(312) 583-2300
rspalding@kayescholer.com

I hereby certify that on September 8, 2006, I electronically filed the foregoing Answer and Counterclaims with the Clerk of the Court using the CM/ECF system.

LEVENFELD PEARLSTEIN, LLC

By:____/s/ Christopher S. Griesmeyer_____
    Christopher S. Griesmeyer (IL Bar No.  6269851)
      cgriesmeyer@lplegal.com
    2 North LaSalle, 13th Floor
    Chicago, IL 60602
    (312) 476-7574

*Attorneys for Defendants Victory Records, Inc.,*
*Another Victory, Inc. and Anthony K. Brummel*

# EXHIBIT D

IMAGED

06CV5985
JUDGE CONLON
MAG.JUDGE BROWN

CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by
law, except as provided by local rules of court. This form isrequired for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE
INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**

Victory Records, Inc., an Illinois corporation

**DEFENDANTS**

Virgin Records America, Inc., a California corporation; and
EMI Music North America, a division of EMI Music, PLC

**(b)** County of Residence of First Listed Plaintiff  Cook
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Robert S. Meloni, PC
1350 Ave. of the Americas
New York, NY 10019

Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602

Attorneys (If Known)

FILED
NOV - 2 2006 LO
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff |
|---|---|

II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only)
(Place an "X" in One Box for Plaintiff and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (excl. vet.) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | ☐ 840 Trademark | ☐ 490 Cable/Satellite TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Inj. | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Security/Commodity/Exch. |
| ☐ 195 Contract Product Liability | **PERSONAL INJURY** | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 362 Personal Injury— Med. Malpractice | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 365 Personal Injury— Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | **PERSONAL PROPERTY** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 370 Other Fraud | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 371 Truth in Lending | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 380 Other Personal Property Damage | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 385 Property Damage Product Liability | | | ☐ 890 Other Statutory Actions |
| **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 442 Employment | Habeas Corpus: | | | |
| ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 445 ADA—Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 446 ADA — Other | ☐ 550 Civil Rights | | | |
| ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

Tortious Interference with Contract
28 U.S.C. Sect. 1332

**VII. PREVIOUS BANKRUPTCY MATTERS** (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Exceeds 10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**IX. This case** ☒ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE  11/2/06

SIGNATURE OF ATTORNEY OF RECORD  Robert S. Meloni

 IMAGED 

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
## ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorne~~~~~ber in good
standing of this Court's general bar or be granted leave
by Local Rules 83.12 through 83.14.

06CV5985
JUDGE CONLON
MAG.JUDGE BROWN

In the Matter of

Victory Records, Inc., an Illinois corporation
vs.
Virgin Records America, Inc., a California corporation and EMI
Music North America, a division of EMI Music, PLC

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Plaintiff, Victory Records, Inc.

FILED

NOV - 2 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| NAME (Type or print) |
|---|
| Ronald W. Adelman |

| SIGNATURE (Use electronic signature if the appearance form is filed electronically) |
|---|
| s/ Ronald W. Adelman |

| FIRM |
|---|
| Robet S. Meloni, P.C. |

| STREET ADDRESS |
|---|
| 1350 Avenue of the Americas, Ste. 3100 |

| CITY/STATE/ZIP |
|---|
| New York, NY 10019 |

| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE NUMBER |
|---|---|
| NY Bar No.: 2356103 | (212) 957-5577 |

| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES ✓ | NO ☐ |
|---|---|---|
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES ☐ | NO ✓ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES ✓ | NO ☐ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES ✓ | NO ☐ |

| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS. |
|---|
| RETAINED COUNSEL ☐      APPOINTED COUNSEL ☐ |




IMAGED

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
### ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave by Local Rules 83.12 through 83.14.

**06CV5985**
**JUDGE CONLON**
**MAG. JUDGE BROWN**

In the Matter of

Victory Records, Inc., an Illinois corporation

vs.

Virgin Records America, Inc., a California corporation and
EMI Music North America, a division of EMI Music, PLC

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Plaintiff, Victory Records, Inc.

**FILED**

NOV – 8 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| NAME (Type or print)<br>Robert S. Meloni | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>s/ Robert S. Meloni | |
| FIRM<br>Robet S. Meloni, P.C. | |
| STREET ADDRESS<br>1350 Avenue of the Americas, Ste. 3100 | |
| CITY/STATE/ZIP<br>New York, NY 10019 | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS)<br>1708080 | TELEPHONE NUMBER<br>(212) 957-5577 |

| | | |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES ☑ | NO ☐ |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES ☐ | NO ☑ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES ☑ | NO ☐ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES ☑ | NO ☐ |

IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.

RETAINED COUNSEL ☐       APPOINTED COUNSEL ☐



IMAGED

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
### ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorne~~~~ ~~~~ ~~ither be a member in good
standing of this Court's general bar or be granted leav~
by Local Rules 83.12 through 83.14.

**06CV5985**
**JUDGE CONLON**
**MAG.JUDGE BROWN**

In the Matter of

Victory Records, Inc., an Illinois corporation
vs.
Virgin Records America, Inc., a California corporation and EMI
Music North America, a division of EMI Music, PLc

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Plaintiff, Victory Records, Inc.

**FILED**

NOV - 2 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| NAME (Type or print) |
|---|
| Christopher S. Griesmeyer |

| SIGNATURE (Use electronic signature if the appearance form is filed electronically) |
|---|
| s/ *[signature]* |

| FIRM |
|---|
| Levenfeld Pearlstein, LLC |

| STREET ADDRESS |
|---|
| 2 N. LaSalle St., Ste. 1300 |

| CITY/STATE/ZIP |
|---|
| Chicago, IL 60602 |

| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE NUMBER |
|---|---|
| 6269851 | (312) 476-7574 |

| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES ☐ | NO ☑ |
|---|---|---|

| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES ☑ | NO ☐ |
|---|---|---|

| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES ☑ | NO ☐ |
|---|---|---|

| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES ☐ | NO ☑ |
|---|---|---|

| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS. |
|---|
| RETAINED COUNSEL ☐      APPOINTED COUNSEL ☐ |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VICTORY RECORDS, INC.,
an Illinois corporation,

        Plaintiffs,

        v.

VIRGIN RECORDS AMERICA, INC.,
a California corporation; and
EMI MUSIC NORTH AMERICA,
a division of EMI MUSIC PLC,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**06CV5985**
**JUDGE CONLON**
**MAG.JUDGE BROWN**

COMPLAINT

JURY TRIAL DEMANDED

**FILED**

NOV - 2 2006  *r Q*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Plaintiff, Victory Records, Inc. ("Victory"), by and through the undersigned attorneys, as and for its Complaint, alleges as follows:

## SUMMARY OF THE CASE

1.    Unfortunately, this case is about an all-too familiar story in the music business: an unknown musical Band, after struggling to be noticed, earns a shot at success by signing a contract with an independent record company. The company devotes huge amounts of money, time and effort and, as a result, the Band achieves commercial and critical success. That success attracts unscrupulous would-be poachers. These poachers, fully aware that the Band is already subject to a contract, induce the Band with visions of greater fame and fortune. The Band, swayed by those inducements, signs with the poacher -- a so-called "major" record company.

2.    This case is a perfect example of that story. The musical group in question, Hawthorne Heights ("Hawthorne Heights" or the "Band"), was unknown until it signed a long term recording artist/publishing/merchandising contract with Victory in

late December 2003 (the "Victory Agreement"). The Victory Agreement, among other things, contained an explicit and binding commitment for four consecutive full-length studio albums. Hawthorne Heights has delivered two albums pursuant to their recording commitment thereunder. Victory funded and manufactured, and aggressively distributed and marketed those albums at the cost of millions of dollars. The Band, in turn, benefited from Victory's investment by making millions of dollars themselves and becoming a music industry success story in a business where it is a rare occurrence.

3.      Hawthorne Heights attracted the attention of one of the few "major" record distribution companies and one of its affiliated labels:  Defendant Virgin Records America, Inc. ("Virgin") and Virgin's parent company Defendant EMI Music North America, an entity of unknown legal status affiliated with EMI Group PLC ("EMI").

4.      Upon information and belief, the Defendants, through two top level executives, Jason Flom (Virgin's President) and Jeffrey Kempler (Virgin's Head of Business Affairs), among others presently unknown, induced the members of Hawthorne Heights to declare themselves free of the Victory Agreement at a time when the Band was not otherwise predisposed to do so.

5.      As late as February 25, 2006, in an article appearing in *Billboard* magazine featuring the Band and Victory, Band member JT Woodruff touted the great job Victory had done for them as they were perched to have their second Victory album debut at No. 1 on the Billboard 200 record charts.  Woodruff was reported to have said the Band had "no interest" in signing with a major at the time, further stating "we're happy where we are.  I don't think we would have seen the success we're seeing on a

2

major." He added that "Rock music is the hardest to debut at No. 1. The little guys need to win one."

6.    By the middle of 2006, as the word spread throughout the music industry of Victory's accomplishment in making Hawthorne Heights and their second album such a success, the Defendants swooped in for the kill. At or about that time, Woodruff and the Band did a complete 180° turn. The reason for this flip-flop has become apparent. Top level executives of the Defendants sold the Band a bill of goods. They intended to persuade them that they were not as happy with Victory as Woodruff proclaimed just a few months earlier, thereby inducing them to abandon the "little guy" that Woodruff had championed just months before, in favor of the greener pastures of a major label.

7.    Upon information and belief, in or about mid-2006, the Band retained a national litigation firm and a public relations company to devise a strategy to extricate the Band from their contractual obligations to Victory. That plan was launched in early August 2006, when Hawthorne Heights announced that they had "left" Victory and commenced an action in this Court seeking judicial approval of their actions. The filing of that lawsuit was contemporaneous with a public relations campaign and other actions to obtain the maximum exposure of the Band's unfounded and scurrilous claims against Victory, in what could be described as a "shock and awe" campaign intended to impugn the integrity and credibility of Victory and its founder, Tony Brummel, throw Victory back on its heels and force it to relent to the Band's unlawful demands to move to Virgin and/or EMI (together "EMI-Virgin").

8.    This campaign fell flat on its face as Victory did not capitulate. But the damage was already done: the Band had become so alienated from Victory that repairing

3

the relationship with Victory may prove to be impossible, even if Victory succeeded in the litigation filed by the Band (discussed in further detail below).

9.    At or about the same time, as a direct result of Defendants' efforts, Hawthorne Heights entered into an exclusive recording artist contract with EMI-Virgin (the "EMI-Virgin Contract"). This occurred despite the Band's pre-existing, and currently extant, contractual obligations to Victory for the identical services.

10.    EMI-Virgin unquestionably was aware of the Victory Agreement (a copy of which, upon information and belief, was provided to EMI-Virgin in advance of their signing with EMI-Virgin).

11.    Nevertheless, EMI-Virgin induced Hawthorne Heights to repudiate the Victory Agreement as a predicate to entering into a new one.

12.    The continuing validity and binding nature of the Victory Agreement is not subject to a good-faith dispute. In an Order dated October 17, 2006, in a related action titled Bucciarelli-Tieger, et al. v. Victory Records, Inc. Case No. 06-CV-4258 (the "Hawthorne Heights Action"), this Court, among other things, emphatically dismissed Hawthorne Heights' claim that the Victory Agreement was terminated, rejecting the Band's assertion that they were free from their contractual obligations to Victory. In fact, it described that claim as "absurd," and added that any dealings between the Band and another record company calling for their recording artist services would be at "their peril."

13.    Despite the clear and unambiguous terms of the Victory Agreement and the Court's Order, Hawthorne Heights continues to act in repudiation of that Agreement. These actions include the execution of the EMI-Virgin Contract. The Defendants are the

moving force behind the Band's conduct. As a result, they are liable for tortious interference with the Victory Agreement.

## PARTIES, JURISDICTION AND VENUE

14.    Victory is an Illinois corporation. Its principal place of business is at 346 N. Justine Street, Chicago, Illinois 60607.

15.    Virgin Records America, Inc. is a California corporation. Its principal place of business is at 150 Fifth Avenue, New York, New York 10011.

16.    EMI Music North America is an entity of unknown legal status with its principal place of business located at 150 Fifth Avenue, New York, New York 10011. It is affiliated with EMI Group PLC, a corporation registered in the United Kingdom.

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The citizenship of Victory is fully diverse from that of both Defendants, and the amount in controversy exceeds $75,000, exclusive of interest.

18.    This Court has personal jurisdiction over the Defendants because both Defendants conduct business continuously and systematically in Illinois, including maintaining offices and employees at 2850 W. Golf Road, Suite 301, Rolling Meadows, Illinois 60008, for the purpose of engaging in, inter alia, marketing and promotional activities pertaining to the sale of sound recordings. In addition, the Defendants knowingly and deliberately intended their tortious conduct to cause harm and otherwise affect interests in Illinois.

19.    Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATEMENT OF FACTS

20.    Prior to December 2003, the Band was a group of unknowns who were looking for their first record deal, specifically targeting Victory. At the time, they stated that Victory was their favorite record label since they had grown up listening to Victory's records.

21.    On or about December 11, 2003, Hawthorne Heights entered into the Victory Agreement. The Agreement was amended on or about April 28, 2004. The original Agreement and the amendment are attached as Exhibit A to the Complaint.[1]

For purposes of this action and therefore this motion, the most significant provisions are contained in Paragraph 1 (emphasis added):

> 1. Terms:
>
> 4 Album deal with option on second, third and fourth album.
>
> The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. *Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period.* During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". In order for Company to exercise option on the fourth

---

[1] Exhibit A contains a copy of the executed Agreement and, because that copy is not clearly legible, a legible unexecuted copy.

Album, Artist must have cumulative sales of at least 60,000 units. As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

Company shall release and distribute albums within 4 months of the completion of each full-length master recording and delivery of all parts necessary to manufacture unless otherwise agreed to between Company and Artist.

22.     In that short period of time, Hawthorne Heights has been under contract to Victory, they went from being complete unknowns to celebrities, having made millions of dollars as well as receiving the satisfaction that comes with artistic and financial success—a rare commodity for new artists in the record business.

23.     Victory is an independent, self-financed record company with a proven model and track record for developing and building careers for undiscovered, non-mainstream artists. For many years, independent record labels have been the "farm system" of the major record distribution companies, such as EMI, Universal, Sony BMG and Warner Music Group. These so-called "majors" depend almost entirely on this farm system to acquire new musical talent, since they have become less and less capable of – or interested in – doing it themselves. Victory is one such independent label; however, the point is that these artist acquisitions should be accomplished through voluntary agreements with the independents, not tortious conduct such as poaching and other nefarious activities by the major label. The latter is what occurred here.

7

24.   For the first two Hawthorne Heights albums, Victory's investment, in pure dollar terms, has been well over $5 million.[2]  It has also resulted in the Band's receiving millions of dollars from ancillary sources such as live tours and concerts, and endorsements from sponsors. Since September 27, 2006, Hawthorne Heights has been on one such tour called the "Nintendo Fusion Tour".[3]  Victory made it possible for the Band to earn these substantial sums, since Victory's efforts in developing the Band and aggressively promoting their music are responsible. However, Victory does not participate in any of these revenues. 100% of those monies are retained by the Band.

25.   In other words, the Band had no reason to be unhappy with Victory or otherwise predisposed to repudiate the Victory Agreement. This, not merely because the Band profited handsomely from their relationship with Victory, but also because Victory devoted significant time, money and resources to aggressively developing and marketing the Band, a non-mainstream musical artist, which is something major record companies would normally be reluctant to do.

26.   In exchange for the lucrative benefits the members of Hawthorne Heights have received under the Victory Agreement, Victory expects that the Band will live up to its obligations. Until recently, the Band appeared to be doing so. Then, on August 3, 2006, Victory received a letter from the Band's counsel purporting to repudiate the

---

[2] Direct expenses included advances paid to the Band, record and music video production costs, manufacturing costs, marketing and promotion costs, and tour support.

[3] The plaintiffs' website, *http://www.hawthorneheights.com*, indicates their tour began on September 27, 2006 and will run through November 11, 2006 for at least 37 concerts. A conservative estimate is that the Band will realize at least $370,000 to $500,000 in revenues from the tour, assuming an average fee of $15,000 per show. That does not count merchandise sales and "perks" from Nintendo, the tour sponsor. Typically, sales of merchandise at concert venues of this type can generate gross revenues ranging from $10,000 to $20,000 per night, which would add an additional $370,000-$740,000 in revenue. Thus, the Band could earn in excess of $1 million from this Tour alone.

Victory Agreement. The Band commenced the Hawthorne Heights Action four days

later. At about the same time, they posted a defamatory notice on their website claiming

that that they were no longer under contract with Victory and, for good measure,

maliciously maligning Victory and Mr. Brummel in the process.

27.    On information and belief, in or about 2006 at some point prior to early

August, executives from EMI-Virgin contacted the Band and/or one or more of the

Band's representatives to inquire about the Band's interest in joining the EMI-Virgin

roster of recording artists. Of course, that required that the Band enter into an exclusive

recording artist agreement with EMI-Virgin, even though EMI-Virgin knew of the

essential terms of the Victory Agreement.

28.    Upon information and belief, during the past year or so, Virgin's

President, Jason Flom and/or his associates, as part of their efforts to solicit new musical

talent, claimed that Virgin would become the major label version of Victory for rock acts.

29.    EMI-Virgin's efforts caused the Band to repudiate the Victory Agreement,

as described in more detail above.

30.    On September 7, 2006, Victory learned from various EMI-Virgin

executives, including David Munns (EMI's Chairman and CEO), Ivan Gavin (EMI's

COO), and Jason Flom (Virgin's Chairman and CEO), that Hawthorne Heights had

entered into a contract with EMI and/or Virgin for the recording artist services of

Hawthorne Heights (the "EMI-Virgin Contract").

31.    In an effort to avoid this lawsuit, Victory initially made extensive efforts

to obtain EMI-Virgin's cooperation by divulging to Victory the terms of the EMI-Virgin

Contract. Following EMI-Virgin's refusal to cooperate voluntarily, Victory served a

9

subpoena on EMI-Virgin in the Hawthorne Heights Action, demanding any documents concerning the EMI-Virgin Contract. EMI-Virgin refused to comply with the subpoena. This lawsuit was then filed shortly thereafter.

32.    Neither EMI-Virgin nor the Band were willing to divulge any information about the EMI-Virgin Contract, apart from the fact that one existed Therefore, Victory does not know its precise terms, other than the fact that it required the Band to render their recording artist services to EMI-Virgin during the term of the Victory Agreement. However, the impropriety of executing a contract that covers the identical subject matter of the Victory Agreement, i.e., the recording artist and songwriting services of the Band, is patently obvious.

33.    It is apparent that the execution of the EMI-Virgin Contract was the culmination of a campaign orchestrated by EMI-Virgin to induce Hawthorne Heights to breach the Victory Agreement by, among other methods, repudiating it so openly and notoriously. The commencement of the Hawthorne Heights Action and related events were essential elements of that campaign.

34.    The campaign did not go as planned, because this Court dismissed Hawthorne Heights' claim that it was not bound by the Victory Agreement. A copy of the minute order and the transcript of the Court's ruling from the bench are attached as Exhibit B. The Court held that the Band's claim was "absurd" and "not sustainable" as a matter of both contract law and common sense.

35.    Despite the Court's ruling, Hawthorne Heights continues to act as though the Victory Agreement is not binding, and thus to repudiate it. The existence of the

10

contract with EMI-Virgin Contract is the reason the Band continues to flout the Victory Agreement, and now this Court's order.

36.     The motives for EMI-Virgin's tortious interference are obvious. If the poacher has no scruples about interfering in a binding contractual relationship, there is no reason for it to spend time and money developing a promising musical artist when it can poach one much more easily from a competitor. The fact that the competing record label (i.e., Victory) is harmed in the process is an equally tempting incentive for the poacher. This is particularly true in this case, since neither EMI nor Virgin have any business relationship with Victory.

37.     Victory has suffered significant harm from the Defendants' tortious interference and the resulting repudiation by Hawthorne Heights of the Victory Agreement.

38.     The process of establishing (or "breaking") an unknown artist requires tremendous up-front costs. With a successful debut album, a record company would normally expect to reap even greater rewards from follow-up albums, building on the momentum established by the initial record release. As a result, recording artist contracts typically have a commitment of six or more albums. The four-album commitment in the Victory Agreement, although relatively short, is nevertheless essential to the economic viability of that agreement and the assets which flow therefrom, including the sound recordings delivered thereunder and the musical compositions contained thereon.

39.     Assuming that the Band's next two albums would have sold at the same rate as the first two – but for the Defendants' interference – Victory stands to lose profits of million of dollars.

11

40.    Equally important is the false perception that such a public repudiation creates with consumers of Victory's products, music industry participants, and new unsigned artists who are seeking deals with records labels: that potential poachers should consider Victory an easy target for their greed and unscrupulous conduct, or that Victory is a pariah label who mistreats its artists and should therefore be avoided at all costs. Of course, such perception is completely at odds with the truth but, in the music business, perception is sometimes mistaken for reality.

41.    In an industry where fame is fleeting and reputations are easily destroyed by scurrilous public relations campaigns, with the resultant scandals and unfounded rumor-mongering, it is sometimes impossible to put the toothpaste back in the tube for the victims of such conduct. Victory is one such victim.

42.    This lawsuit is intended to correct the false impression of Victory as well as remedy the other harm it has suffered.


## CLAIM FOR RELIEF
### (Tortious Interference With Contractual Relations)

43.    Victory repeats and realleges the allegations of Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.    The Victory Agreement is a valid and binding contract between Victory and Hawthorne Heights.

45.    At all times relevant to this action, the Defendants knew that there was a contractual relationship between Victory and Hawthorne Heights and, further, knew of the four-album commitment under the Victory Agreement.

46.    By inducing Hawthorne Heights to repudiate the Victory Agreement and by entering into a new purportedly superseding contract with the Band, the Defendants deliberately and without justification interfered with the contractual relationship between Victory and Hawthorne Heights.

47.    By inducing Hawthorne Heights to act as it did, the Defendants were the direct and proximate cause of the Band's repudiation and breach of the Victory Agreement.

48.    Victory has been damaged by the Defendants' tortious conduct.

**WHEREFORE**, Victory respectfully prays that the Court find in its favor and enter an order and judgment:

   a.    For compensatory damages in an amount to be proved at trial, but not less than $10,000,000;

   b.    For punitive damages of not less than $10,000,000;

   c.    For the costs of suit and attorneys fees;

   d.    For interest on its damages at the legal rate; and

   e.    For such other and further relief that the Court may deem to be just and proper.

13



## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Victory demands a trial by jury of all issues which are so triable.

Dated: November 2, 2006

ROBERT S. MELONI, P.C.

By:_____
    Robert S. Meloni
    Ronald W. Adelman
1350 Avenue of the Americas
Suite 3100
New York, New York 10019
Tel: (212) 957-5577
robert@robertmeloni.com
radelman@robertmeloni.com

LEVENFELD PEARLSTEIN, LLC

By:_____
    Christopher S. Griesmeyer (IL Bar No. 6269851)

2 North LaSalle, 13th Floor
Chicago, IL 60602
Tel: (312) 476-7574
cgriesmeyer@lplegal.com

*Attorneys for Plaintiff Victory Records, Inc.*

14

# EXHIBIT A

12/12/2003  11:08    3126558555              VICTORY RECORDS                    PAGE  02

12/12/2003  10:21    3144697114            DANIEL R FRIEDMAN                   PAGE . 03/06

12/11/03  12:37 FAX 1 987 898 9844        KINKOS FOX AVE                        ⓩ002



**VICTORY RECORDS
DEAL MEMO**

346 N. Justine Street, Chicago, IL 60607
Phone: (312) 666.8661 / Fax: (312) 873.3399
Tony@victoryrecords.com

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipient(s) specifically listed in addressed spaces. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not an intended recipient, please contact the sender via telephone and destroy all copies of the original message. Also, due to the susceptibility of electronic communications to corruption, the sender warrants neither the accuracy nor the completeness of this communication.

Revised 12/10/03

12/11/03 Revisions in BLUE

# ARTIST: HAWTHORNE HEIGHTS

**1. Terms:**
4 Album deal with option on second, third and fourth albums.

The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period. During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". In order for Company to exercise option on the fourth Album, Artist must have cumulative sales of at least 60,000 units. As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

Company shall release and distribute albums within 4 months of the completion of each 8-length master recording and delivery of all parts necessary to manufacture, unless otherwise agreed to between Company and Artist.

**2. Territory:**
Worldwide.

**3. Royalty Breakdowns:**
If above $12.98 SLRP:
LP1: 11% of SLRP after 50,000 units sold +1%
LP2: 12% of SLRP after 50,000 units sold +1%
LP3: 13% of SLRP after 50,000 units sold +1%

A⁴B

LP: 14% of SLRP after 50,000 units sold +1%

If any Album is priced below $12.98 SLRP:
The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

15% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any licensing will be split 50/50 between Company and Artist.

Canada: 90% of the basic royalty rate.
Japan, U.K. and Europe: 50% 75% of the basic royalty rate (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australia (Australia, New Zealand): 66% 75% of the basic royalty rate.
All other Territories: 50% of the basic royalty rate.

4. Mechanical Royalties:
75% 85% of the current statutory rate not to be paid on more than eleven Compositions per full length record. 100% of the current statutory rate after 50,000 units.

5. Publishing
$5,000.00 fully recoupable advance for publishing deal Another Victory Inc. (ASCAP) half of which will be paid upon signing of this deal memo, the other half upon release of LP1.

Future publishing advances will be based on 25% of the # of units sold on previous release 18 months after U.S. release date and be paid upon delivery of the corresponding Album to Company. For example, if LP1 sells 30,000 units in its first 18 months of release the publishing advance on LP2 would be $12,500.00. The minimum advance for any album will be no less than $5,000.00. Only the Compositions recorded during the term of this agreement and/or the Compositions that are released by Company will be included as part of the publishing agreement.

6. Recording Advance
$15,000.00. Future advances will be based on 75% of the # of units sold of previous album 18 months after release date. For example, if LP1 sells 50,000 units in its first 18 months of release the advance on LP2 would be $37,500.00. The minimum recording advance for any subsequent albums will be $15,000.00.

7. Recoupable Costs:
Recording Advance: 100%
Co-Op Advertising: 50%
Outside Promotion Services: 50%
Video Production and Manufacturing: 100% 75%
Extraneous Artwork Charges: 100%

8. Merchandising
Artist agrees to allow Victory Records to manufacture merchandise designs. Artist receive (10%) (20%) of wholesale cost of merchandise. Artist retains the right to manufacture merchandise for its own purposes.

9. Accounting / Payments
Royalty statements will be issued quarterly, 60 days after quarter end. Royalties will be paid only on sales for which Victory Records have been paid for. A reserve for returns will be set at 25%, liquidated as follows: 50% of each reserve (4) quarterly accounting periods after such reserve is established and 50% of each such reserve (8) quarterly accounting periods after such reserve is established.

2

12/12/2003  11:88    3126668565         VICTORY RECORDS                    PAGE  04

12/12/2003  18:31    3144697114         DANIEL R FRIEDMAN                  PAGE  05/06

12/11/03  22:55 FAX 1 897 885 9344      XIUZDS FOR AVE                     ⓘ004

**10. Artistic Input**
Artist has 100% artistic input in the design of all musical products, advertisements and promotional materials. Company will seek Artist's approval not to be unreasonably withheld or in a manner which is unreasonably detrimental to the sales or promotional potential of the Artist.

**11. Territories of Release:**
All territories where Company is currently distributed.

**12. Radio Single:**
Victory agrees to manufacture a radio single for each album to be serviced to Commercial and Commercial Specialty programs. Company and Artist will mutually agree in good faith regarding the of cover single.

**13. Commitments:**
Company commits to allocating the following for each album: (this would be included in the contract in a 'commitment clause')
(a) Co-Op Advertising: $10,500.00. (Advertising done with retailers and distributors)
(b) Consumer Advertising: $5,000.00. (Advertising done in consumer publications promoting the record)
(c) Street Promotions: $10,000.00.
(d) Outside Radio Promotion: up to $4,000.00 $10,000.00.
(e) Video Budget: $6,000.00.

**14. Additional Commitments:**
If sales of any Album exceed 50,000 units in the first 12 months of release Artist will receive a non-recoupable bonus of $7,500.00.

Company will make two types of promotional posters- tour and retail.

**15. Bonus:**
If any record enters the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $5,000.00 bonus for each album. Notwithstanding the foregoing, if any record enters the top 100 positions of the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $20,000.00 bonus.

**16. Touring:**
Artist agrees that it will tour in support of full-length recording to the best of its ability. Company agrees to assist Artist in the form of a Tour Support Fund not to exceed $15,000.00 for each album from which Artist can request fully recoupable advances. This fund becomes active upon signing of this deal memo. Advance requests are not to exceed $1,500.00 per 30-day period unless agreed upon between Company and Artist. $2,000.00 from the Tour Support Fund can be immediately used as a down payment on a new tour vehicle.

**17. CD Sales on Tour:**
Company will sell the Artist copies of its full length CD for sales on tour at $5.00 per CD. Such sales will be at half the royalty rate and free of mechanical royalties.

**18. Attorney's Fees:**
Company will, immediately upon the execution of this deal memo pay attorney's fees of $1,000.00 to Daniel L. Friedman Esq. Such monies shall be treated as a fully recoupable advance to Artist.

DATED AND EXECUTED in Chicago, Illinois, on the day and the year first above written.

VICTORY RECORDS
(hereinabove called "Company")

A&B

1

12/12/2003  11:08    3126668565        VICTORY RECORDS                    PAGE  05

12/12/2003  10:31    3144697114        DANIEL R FRIEDMAN           PAGE  05/05

12/11/03  22:34 FAX 1 637 808 8964     KINKOS FOR AYE              005

By _____
Anthony K. Brummel / President- Victory Records Inc.

Members of the musical group HAWTHORNE HEIGHTS:

_____
Bryn Buczkowski (Social Security # 1XX-XX-6XXD)

_____
Casey Calvert (Social Security # 2XX-XX-X3XXD)

_____
Micah Carli (Social Security # 2X7-XX-13XXD)

_____
Matt Ridenour (Social Security # 3X7-XX-3X3XD)

_____
JT Woodruff (Social Security # 3XX-XX-3X3XD)

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipients specifically listed in addressed above. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and destroy all copies of the original message. Also, due to the irregularity of electronic communications in a workplace, the sender warrants neither the accuracy nor the completeness of this communication.

4

Victory Records Inc.
346 N. Justine Street
Chicago, Illinois 60607

Dated as of: April 28, 2004

Eron Bucciarelli-Tieger, Casey Calvert,
Micah Carli, Matt Ridenour, and JT Woodruff
p/k/a Hawthorne Heights
106 Devonhurst Drive, Apt. E
Kettering, Ohio 45429

Re:   Amendment to the Victory Records Deal Memo By and Between Victory
      Records Inc. and Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt
      Ridenour, and JT Woodruff p/k/a Hawthorne Heights

Dear Eron, Casey, Micah, Matt, and JT:

      Reference is hereby made to that certain Victory Records Deal Memo by and between
Victory Records Inc. ("Company") and you ("you" or "Artist") dated as of the eleventh (11th)
day of December, 2003, as amended (the "Deal Memo").

      Notwithstanding anything to the contrary implied or expressed in the Deal Memo, the
Deal Memo is hereby amended and modified as follows:

      Section 3 of the Deal Memo is hereby deleted in its entirety and replaced with the
following:

      "3.    Royalty Breakdowns: If above $12.98 SLRP:
      LP1: 11% of SLRP; after 50,000 units sold +1%
      LP2: 12% of SLRP; after 50,000 units sold +1%
      LP3: 13% of SLRP; after 50,000 units sold +1%
      LP4: 14% of SLRP; after 50,000 units sold +1%

      If any Album is priced below $12.98 SLRP:
      The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

      Notwithstanding anything contrary contained herein, in the event that Artist enters into a
producer agreement (or a mixer agreement or similar agreement) that allows for the
producer (or mixer or otherwise) to receive a percentage of SRLP, such percentage of
SRLP shall be added onto the Artist's royalty percentages of SRLP set forth herein (so
that Artist will receive no less than the royalty percentages of SRLP set forth herein).

Notwithstanding the foregoing, or anything contrary contained herein, with regard to LP1, Artist intends to enter into a producer agreement with Sean O'Keefe in which Sean O'Keefe will be entitled to 2% of SRLP; as such Artist's royalty in connection with LP1 will be increased to 13% of SRLP; after 50,000 units sold +1%.

In the event that any producer (or mixer or otherwise) is entitled to royalties pursuant to a producer agreement (or mixer agreement or similar agreement), Artist may execute and deliver to Company a customary letter of direction authorizing and directing Company to pay royalties directly to such producer (or mixer or otherwise) and to send such producer (or mixer or otherwise) appropriate statements of account therewith, at the same times as Company pays royalties (and renders accountings) to Artist. In the event that Artist sends to Company a customary letter of direction as set forth herein, Company shall pay royalties and send appropriate statements of account in accordance with such letter of direction.

15% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any licensing will be split 50/50 between Company and Artist.

Canada: 80% of the basic royalty rate.
Japan, U.K. and Europe: 75% of the basic royalty rate (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australasia (Australia, New Zealand): 75% of the basic royalty rate.
All other Territories: 50% of the basic royalty rate."

Each and every term of the Deal Memo not hereby modified or amended shall remain in full force and effect as set forth therein. Unless indicated to the contrary hereinabove, all terms used herein shall have the same meanings ascribed to them in the Deal Memo.

-2-

04/28/2004  09:57   3144697114           DANIEL R FRIEDMAN              PAGE  05/05

If the foregoing accurately reflects your understanding of the subject matter hereof, please so indicate your acceptance by signing where indicated below.

Very truly yours,

VICTORY RECORDS INC.

By: _____

Anthony K. Brummel, President

AGREED TO AND ACCEPTED:

ERON BUCCIARELLI-TIEGER, CASEY CALVERT, MICAH CARLI, MATT RIDENOUR, AND JT WOODRUFF P/K/A HAWTHORNE HEIGHTS

_____
Name: Eron Bucciarelli-Tieger
Soc. Sec. No.: 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

_____
Name: Casey Calvert
Soc. Sec. No.: 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

_____
Name: Micah Carli
Soc. Sec. No.: 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

_____
Name: Matt Ridenour
Soc. Sec. No.: 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

_____
Name: JT Woodruff
Soc. Sec. No.: 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

- 3 -



## VICTORY RECORDS
## DEAL MEMO

346 N. Justine Street, Chicago, IL. 60607
Phone: (312) 666.8661 / Fax: (312) 873.3889
Tony@victoryrecords.com

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipients specifically listed as addressed above. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender via telephone and destroy all copies of the original message. Also, due to the susceptibility of electronic communication to corruption, the sender warrants neither the accuracy nor the completeness of this communication.

Revised 12/10/03

12/11/03 Revisions in BLUE

# ARTIST: HAWTHORNE HEIGHTS

**1. Terms:**
4 Album deal with option on second, third and fourth album.

The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period. During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". In order for Company to exercise option on the fourth Album, Artist must have cumulative sales of at least 60,000 units. As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

Company shall release and distribute albums within 4 months of the completion of each full-length master recording and delivery of all parts necessary to manufacture unless otherwise agreed to between Company and Artist.

**2. Territory:**
Worldwide.

**3. Royalty Breakdown:**
If above $12.98 SLRP:
LP1: 11% of SLRP after 50,000 units sold +1%
LP2: 12% of SLRP after 50,000 units sold +1%
LP3: 13% of SLRP after 50,000 units sold +1%

1

LP4: 14% of SLRP after 50,000 units sold +1%

If any Album is priced below $12.98 SLRP:
The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

15% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any licensing will be split 50/50 between Company and Artist.

Canada: 80% of the basic royalty rate.
Japan, U.K. and Europe: ~~70%~~ 75% of the basic royalty rate (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australasia (Australia, New Zealand): ~~65%~~ 75% of the basic royalty rate.
All other Territories: 50% of the basic royalty rate.

**4. Mechanical Royalties:**
~~75%~~ 85% of the current statutory rate not to be paid on more than eleven Compositions per full length record. 100% of the current statutory rate after 50,000 units.

**5. Publishing:**
$5,000.00 fully recoupable advance for publishing deal Another Victory Inc. (ASCAP) half of which will be paid upon signing of this deal memo, the other half upon release of LP1.

Future publishing advances will be based on 25% of the # of units sold on previous release 18 months after U.S. release date and be paid upon delivery of the corresponding Album to Company. For example, if LP1 sells 50,000 units in its first 18 months of release the publishing advance on LP2 would be $12,500.00. The minimum advance for any album will be no less than $5,000.00. Only the Compositions recorded during the term of this agreement and/or the Compositions that are released by Company will be included as part of the publishing agreement.

**6. Recording Advance:**
$15,000.00. Future advances will be based on 75% of the # of units sold of previous album 18 months after release date. For example, if LP1 sells 50,000 units in its first 18 months of release the advance on LP2 would be $37,500.00. The minimum recording advance for any subsequent albums will be $15,000.00.

**7. Recoupable Costs:**
Recording Advance: 100%
Co-Op Advertising: 50%
Outside Promotion Services: 50%
Video Production and Manufacturing: ~~100%~~ 75%
Extraneous Artwork Charges: 100%

**8. Merchandising:**
Artist agrees to allow Victory Records to manufacture merchandise designs. Artist receives ~~(15%)~~ (20%) of wholesale cost of merchandise. Artist retains the right to manufacture merchandise for its own purposes.

**9. Accounting / Payment:**
Royalty statements will be issued quarterly, 60 days after quarter end. Royalties will be paid only on sales for which Victory Records have been paid for. A reserve for returns will be set at 25%, liquidated as follows: 50% of each reserve (4) quarterly accounting periods after such reserve is established and 50% of each such reserve (8) quarterly accounting periods after such reserve is established.

2

**10. Artistic Input**
Artist has 100% artistic input in the design of all musical products, advertisements and promotional materials. Company will seek Artist's approval not to be unreasonably withheld or in a manner which is unreasonably detrimental to the sales or promotional potential of the Artist.

**11. Territories of Release:**
All territories where Company is currently distributed.

**12. Radio Single:**
Victory agrees to manufacture a radio single for each album to be serviced to Commercial and Commercial Specialty programs. Company and Artist will mutually agree in good faith regarding the chosen single.

**13. Commitments:**
Company commits to allocating the following for each album: (this would be included in the contract in a 'commitment clause')
(a) Co-Op Advertising: $10,000.00. (Advertising done with retailers and distributors)
(b) Consumer Advertising: $5,000.00. (Advertising done in consumer publications promoting the record)
(c) Street Promotions: $10,000.00.
(d) Outside Radio Promotion: up to $6,000.00 $10,000.00.
(e) Video Budget: $5,000.00.

**14. Additional Commitments:**
If sales of any Album exceed 50,000 units in its first 12 months of release Artist will receive a non-recoupable bonus of $7,500.00.

Company will make two types of promotional posters- tour and retail.

**15. Bonus:**
If any record enters the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $5,000.00 bonus for each album. Notwithstanding the foregoing, if any record enters the top 100 positions of the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $10,000.00 bonus.

**16. Touring:**
Artist agrees that it will tour in support of full-length recording to the best of its ability. Company agrees to assist Artist in the form of a Tour Support Fund not to exceed $15,000.00 for each album from which Artist can request fully recoupable advances. This fund becomes active upon signing of this deal memo. Advance requests are not to exceed $1500.00 per 30-day period unless agreed upon between Company and Artist. $5,000.00 from the Tour Support Fund can be immediately used as a down payment on a new tour vehicle.

**17. CD Sales on Tour:**
Company will sell the Artist copies of its full length CD for sales on tour at $5.00 per CD. Such sales will be at half the royalty rate and free of mechanical royalties.

**18. Attorney's Fees:**
Company will, immediately upon the execution of this deal memo pay attorney's fees of $2,000.00 to Daniel L. Friedman Esq. Such monies shall be treated as a fully recoupable advance to Artist.


DATED AND EXECUTED in Chicago, Illinois, on the day and the year first above written.

VICTORY RECORDS
(hereinabove called "Company")

3

By_____
Anthony K. Brummel / President- Victory Records Inc.


Members of the musical group HAWTHORNE HEIGHTS:


_____
Eron Bucciarelli (Social Security # _ _ _ - _ _ - _ _ _ _)


_____
Casey Calvert (Social Security # _ _ _ - _ _ - _ _ _ _)


_____
Micah Carli (Social Security # _ _ _ - _ _ - _ _ _ _)


_____
Matt Ridenour (Social Security # _ _ _ - _ _ - _ _ _ _)


_____
JT Woodruff (Social Security # _ _ _ - _ _ - _ _ _ _)

NOTICE: Information contained in this document may contain privileged and confidential information.  It is intended only for the use and view of the intended recipients specifically listed as addressed above.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender via telephone and destroy all copies of the original message.  Also, due to the susceptibility of electronic communication to corruption, the sender warrants neither the accuracy nor the completeness of this communication.

4

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 2.5
### Eastern Division

Eron Bucciarelli–Tieger, et al.

                                    Plaintiff,

v.                                                      Case No.: 1:06–cv–04258
                                                        Honorable James B. Moran

Victory Records, Inc., et al.

                                    Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 18, 2006:

　　　　MINUTE entry before Judge Milton I. Shadur :Motion to dismiss [27]is granted as to count 1, 2 and 9 and the remainder of the motion is entered and continued before Judge Moran. MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tonyq K. Brummel for leave to file *Reply Brief*[36] is granted.In court notice(srn, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov.*

1

2                   IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                            EASTERN DIVISION

4

5   ERON BUCCIARELLI-TIEGER, et al.,     ) DOCKET NO. 06 C 4258
                                         )
6                          Plaintiffs,)
                                         )
7        vs.                             )
                                         )
8   VICTORY RECORDS, INC., et al.,       ) Chicago, Illinois
                                         ) October 18, 2006
9                          Defendants.) 9:15 o'clock a.m.

10        TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
                     MILTON I. SHADUR, Judge
11

12

13

14  APPEARANCES:

15  For the Plaintiffs:     MR. ROBERT M.SPALDING

16
    For the Defendants:
17                          MR. CHRISTOPHER S. GRIESMEYER

18

19                      JESSE ANDREWS
           Official Court Reporter – U. S. District Court
20                    219 S. Dearborn Street
                      Chicago, Illinois  60604
21                       (312) 435-6899

22             *     *     *     *     *     *

23

24

25

2

1    THE CLERK:  06 C 4258, Bucciarelli vs. Victory
2  Records.
3    MR. SPALDING:  Good morning, your Honor.  Robert
4  Spalding on behalf of plaintifs-counter-defendants.
5    MR. GRIESMEYER:  Good morning, your Honor.
6  Christopher Griesmeyer, G-r-i-e-s-m-e-y-e-r, on behalf of the
7  defendants.
8    THE COURT:  Well, I appreciate your patience.
9    MR. GRIESMEYER:  Certainly.  No problem, Judge.
10    THE COURT:  My motion call never goes like this.  But
11  as it happened the jury injure came back with a verdict
12  yesterday, so that all we had was the motion call.
13    Why don't you sit down and let me tell you where I am
14  coming from.  And then I will hear from each side after I have
15  done that.  Okay.  So you don't have to be standing up shifting
16  from heel to heel while I am talking.
17    When I first started to review these papers, I was
18  somewhat in despair, because I had as I saw it in two different
19  places a really illegible contract.  Thank goodness it turns
20  out that Exhibit B to the Friedman affidavit turned out to have
21  something that was legible so I could find out what the parties
22  had really said in this contract that they entered into.
23    And it was apparent to me, you know up until then --
24  by the way, it was really very difficult to understand which
25  side was really presenting the thing in an appropriate manner

1  because I didn't know precisely what the contract read.  I read

2  what the parties had said about the contract, but I didn't have

3  the contract.

4        When I read the contract it was plain that a

5  purported termination on the ground that this was a contract

6  that was terminable at will was really a nonsustainable

7  position.  It cannot be said, given the form of that contract,

8  including the options that were involved and the rights that

9  were involved, that it was within the power of the party that

10  had the ultimate interest and the intellectual property to

11  essentially cut the legs out from the defendants here in the

12  situation in which the consequence of that would be either the

13  (or both) the inability to deal with the matter as an asserted

14  copyright infringer or as an asserted trademark infringer.

15        I read the Walthal case.  But as often happens in my

16  business serendipity strikes in an extraordinary number of

17  situations.  It's quite right that our Court of Appeals came

18  down just a month ago with this Automation by Design against

19  Raybestos Products decision that made clear the scope of what

20  Walthal did or did not stand for.  And the consequence of that

21  decision is to make it plain -- to make really two things

22  plain.  One, that the kind of claim that is made here is one

23  that -- by the plaintiffs -- is one that depends on the notion

24  that there is no termination provision in the contract.  And

25  that in the absence of a termination provision in the contract

1  you fall back to the common law of terminability at will.

2       In this situation the facts of what the ongoing

3  rights are that were given to Victory Records are such that

4  that has built into it a notion of continuity that prevents it

5  from being terminable at will.

6       There is another interesting component of the

7  decision in Automation by Design -- and that is, as I read

8  through the thing and I got to page 21 of the slip opinion by

9  Judge Rovner, she commented about the contract that was there

10 as saying, "Similarly the economic realities of the agreement

11 favor treating the license as perpetual rather than terminable

12 at will."

13      Now in that situation the economic realities went

14 into perpetual existence.  I am not suggesting that here.  But

15 what I am suggesting is that the Court of Appeals has very

16 sensibly said, "When we construe contracts of this kind, we

17 also look at the economic realities."  The economic realities

18 here would negate any notion that the plaintiffs here would be

19 in a position in which they have an obligation to deliver, for

20 example, an added work to the defendant, but then the defendant

21 can't use it.  It's absurd, frankly.  It's just not

22 sustainable.  It's not sustainable as a matter of contract law.

23 It's not sustainable as matter of common sense.

24      Now that doesn't mean that that calls for the

25 outright dismissal of Count 9.  The reason that I say that is

1  that -- and incidentally, you are going to be ultimately doing

2  this before Judge Moran, I am glad to say.  But this is the

3  kind of case that I love to keep, but I am not going to.  I am

4  not making a ruling about "exclusivity" as a matter of law.

5  That is I am not making a ruling, for example, which is a kind

6  of unique issue about whether these entertainers would be in a

7  position to essentially create by creating another record or

8  album to create essentially a competitive situation in which

9  their they conduct somehow could be charged or challenged by

10  Victory Records as violating the purpose of the agreement.  I

11  am not expressing any indication about that.  One that is

12  ultimately for Judge Moran to determine.

13         That's why I said I am not dismissing Count 9.  But

14  what I am ruling is that the main thrust of the motion which

15  respect to Count 9, the one that claims terminability at will

16  is not legally sound.

17         Now with that being the case -- and I should add one

18  thing, you know, as long I have talked about not expressing a

19  view on that.  If plaintiffs intended to take such action,

20  essentially they would be operating at their peril.  That is,

21  if they engage in that and it turns out to be unlawful under in

22  terms of contract law and they are therefore causing harm to

23  Victory Records that's something that will be tried out before

24  Judge Moran.  And I am not suggesting a ruling either way.  I

25  am simply making plain that the scope of the ruling that I am

1   announcing this morning is one that knocks out the claim based

2   upon terminability at will.

3        Now that then carries with it the idea that Counts 1

4   and 2, which are the claim of copyright infringement and

5   trademark infringement respectfully, that those have to fall

6   because they depend entirely on the notion of a valid

7   termination. And I've just indicate that termination which is

8   e grounded on the notion of terminability at will, will not

9   fly.

10       I am not indicating a ruling on Count 3, which is

11  essentially the federal law of unfair competition, you know

12  Section 1125. That may or may not be sustainable in light of

13  the things that I have said. Nor am I making a determination

14  about Count 4 as to whether it is appropriate to look at Ohio

15  or law or Illinois law. We leave that again for Judge Moran to

16  determine.

17       So far as Count 5 is concerned that's one is

18  asserting -- wait a minute. Let me see my notes on that. oh,

19  Count 3 is a fraud claim. That one does not seem to me to be

20  sustainable. And the reason is that it like very much like a

21  breach of contract claim that is sought to be dressed up as

22  fraud. That is, if in fact Victory Records was not accounting

23  appropriately for royalties or whatever that is, the notion

24  that that somehow converts it to a tort instead of a contract

25  really is not consistent with at least Seventh Circuit law.

1   That may -- might -- present a question about whether you look

2   at Ohio law or Illinois law.  And I don't think that the

3   parties have given full attention on how that choice impacts on

4   that claim.  But certainly in fraud terms, at least the law

5   that we are accustomed to dealing with here would not support

6   that.

7           Count 6, that's the one "interferes with business

8   relationship."  I have got to tell you that despite the fact

9   park that we live in notice pleading regime, the way that I

10  read that one it doesn't seem to that it's got enough meat on

11  the bones.  I think in order to sustain that kind of claim more

12  would have to be alleged that would support the idea, justing

13  saying it doesn't make it so.  That's the old Lincoln line, you

14  know.  When he posed the question, "If you call a dog's tail a

15  leg, how many legs does the dog have?"  When the answer came

16  back "Five," he said, "No.  Calling a tail a leg doesn't make

17  it so."  Well that sort of same that applies here.

18          So on that one I am just giving you an indication

19  that I believe that in order to sustain such a claim of

20  business interference, which looks awfully in candor, that

21  would really have to be amended to do a better job that has

22  been done here.

23          So far as Count 7 is concerned, which is recision, if

24  what is really meant is recision, it's always been my

25  understanding that the party that seeks to rescind has an

8

1  obligation to return what has been derived under the contract.

2  And I don't see any suggestion that these people would like to

3  give back the million of dollars that they have gotten in order

4  to justify recision as relief.

5          Now that I have read it, and I am not sure that

6  recision is exactly what you are talking about as contrasted

7  maybe with revocation. But if it's revocation, then it goes

8  back to the point that I was making about terminability at

9  will. But you'd better take a fresh look at that. Because if

10 you are really talking recision, what you better do is to

11 tender, that's always a condition of recision.

12          Then the, let's see. What's 8? Oh, 8 is unjust

13 enrichment. Well, that one as you know or at least under

14 Illinois law, you cannot assert an unjust enrichment claim if

15 you have got a contract. You can't argue quantum meruit if the

16 parties have a contract. And so again I don't think that

17 anybody submitted, if Ohio law is applicable, anybody submitted

18 anything on that. So again I am not in a position to rule

19 ultimately if Ohio law were to govern. And if Ohio law were

20 different, maybe Count 8 could be supported, but certainly not

21 in Illinois.

22          Anyway, let me see if I have got anything else here.

23 No. I guess that all that I had just in the way of short

24 scrawled notes for myself. And obviously as I indicate, I am

25 not dealing ultimately with the case here. That remains for

9

1  Judge Moran.  But I did feel that it was appropriate to knock

2  out at least the things that I had mentioned at the outset.

3  And that had do with to terminability at will with the

4  necessary adjuncts to that which are Count 1 and 2.

5        Is there anything about what I have said that's not

6  clear?  I am not asking whether you agree with it, but is there

7  anything that's not clear?

8        MR. GRIESMEYER:  No, Judge.  I think it's well

9  thought out and reasoned approach.  I guess I am just curious

10  as to what exactly the ruling is today, given the fact that you

11  have indicated that Judge Moran.

12        THE COURT:  I have indicated what my rulings --

13        MR. GRIESMEYER:  Okay.

14        THE COURT:  I have said the three things that are

15  definitely my rulings.  And that is, I am granting the motion

16  to dismiss Count 9 to the extent that the motion is based upon

17  the nonterminability at will of the contract.  I am also

18  granting the motion to dismiss Counts 1 and 2 that are

19  necessarily hooked to that.  With respect to the others, Count

20  3 might well fall with that.  But I am not ruling on that

21  because you may want to develop further as to whether that can

22  survive, notwithstanding the fact that the terminability at

23  will not -- isn't going to fly.

24        The others I was simply giving you my views rather

25  than my ultimate rulings for the reasons that I had indicated

10

1    as limiting what I was dealing with.  But I felt that the

2    terminability at will really had to be dealt with at out the

3    outset because so much of the case hinges on that.

4          And I don't know.  Is there anything else that is not

5    clear about what I have dealt with?

6          MR. SPALDING:  I don't think so.  I this that

7    clarifies for me the scope of the answer.  I take the Court is

8    not going to be issuing a written opinion on this?

9          THE COURT:  That's right.  I have just given you my

10   ruling.

11         MR. SPALDING:  That's fine.

12         THE COURT:  I have trouble enough keeping up with two

13   sets of motion calls without also committing a lot of rulings

14   to papers.

15         MR. GRIESMEYER:  Certainly.

16         THE COURT:  Okay.

17         MR. SPALDING:  Thank you, your Honor.

18         MR. GRIESMEYER:  Thank you, your Honor.

19         (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
         THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

20

21

22

23

24

25

11

C E R T I F I C A T E

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the report of proceedings in the above-entitled cause.

JESSE ANDREWS, CSR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
DATED: October 18, 2006

# EXHIBIT E

*℔*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ERON BUCCIARELLI-TIEGER, an ) 
individual; CASEY CALVERT, an ) 
individual; MICAH CARLL, an ) 
individual; MATT RIDENOUR, an ) 
individual; JT WOODRUFF, an ) 
individual, collectively professionally ) 
known as "Hawthorne Heights"; and ) 
HAWTHORNE HEIGHTS, LLC, an ) 
Ohio limited liability company, ) 
                           ) 
       Plaintiffs, ) 
                           ) 
       vs.                   )    No. 06 C 4258
                           ) 
VICTORY RECORDS, INC., an ) 
Illinois corporation; ANOTHER ) 
VICTORY, INC., an Illinois corporation, ) 
ANTHONY K. "TONY" BRUMMEL, ) 
an individual; and DOES 1 through 25, ) 
                           ) 
       Defendants. ) 

## MEMORANDUM OPINION AND ORDER

       The parties have expressed an interest in an early resolution of pending motions to

dismiss and to bifurcate, and for expedited discovery with respect to Count IX, and this court

noted that I would be away during January and was uncertain about being able to rule before

departure. And I do not rule, at least not on all pending matters, but I have reviewed the

briefs and Judge Shadur's rulings, and I can provide some guidance.

       I agree with Judge Shadur. The contract is not terminable at-will, and plaintiffs do

have an obligation to deliver the four records unless their performance is excused by the

conduct of the defendant in material breach of contract. The economic realities are that the

No. 06 C 4258                                                                                    Page 2

obligation is seriously weakened if plaintiffs can peddle the same record to others,[1] or can

inhibit defendants' marketing of the records. That means that plaintiffs' burden of persuasion

is considerable, although we are not sure, at this juncture, that the matter can be resolved on

a motion to dismiss.

Other matters can wait, although we agree that Illinois law does not permit a claim for

unjust enrichment if the claim refers, as it does here, to an express contract; fraud customarily

in Illinois is not interchangeable with a breach of contract claim; and plaintiffs appear to be

seeking termination for cause (and if it is not adequately pled at the moment, it certainly can

be), not rescission.

Plaintiffs ask for bifurcation and expedited discovery in Count IX. That motion is, for

now, denied. It is not at all clear that the claim there can be neatly separated from the other

claims. Plaintiffs may choose to focus their early discovery on that claim, but that is a matter

of choice. We can revisit the matter at a status hearing on February 8, 2007, at 9:15 a.m.

                                                    _____
                                                    **JAMES B. MORAN**
                                                    Senior Judge, U. S. District Court

January 10 , 2007.

---

[1]We recognize that plaintiffs may be talking about a different recording, which is possibly a different
issue.

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERON BUCCIARELLI-TIEGER, an individual; CASEY CALVERT, an individual; MICAH CARLI, an individual; MATT RIDENOUR, an individual; JT WOODRUFF, an individual, collectively professionally known as "Hawthorne Heights"; and HAWTHORNE HEIGHTS, LLC, an Ohio limited liability company, | ) ) ) ) ) ) ) ) ) ) | No. 06-C-4258 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| VICTORY RECORDS, INC., an Illinois corporation; ANOTHER VICTORY, INC., an Illinois corporation; ANTHONY K. "TONY" BRUMMEL, an individual; and DOES 1 through 25, | ) ) ) ) ) ) ) | Judge James B. Moran Magistrate Judge Morton Denlow |
| Defendants. | ) ) | |

**NOTICE OF MOTION**

TO:    See Attached Service List

On **February 8, 2007 at 9:15 a.m.**, or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge James Moran, in the courtroom usually occupied by him in Room 1843 of the Dirksen Federal Building-219 S. Dearborn St., Chicago, Illinois and present **Defendant's Motion to Consolidate Related Cases**, a copy of which is attached hereto and served upon you.

**VICTORY RECORDS, INC.,
ANOTHER VICTORY, INC. AND
ANTHONY K. BRUMMEL**

By:/s/ Christopher M. Heintskill

Christopher S. Griesmeyer (ARDC No 6269851)
Christopher M. Heintskill (ARDC No. 6272391)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602
T: (312) 476-7574
F: (312) 346-8434
LP 1193083.1 \ 34636-67227

Robert S. Meloni
Ronald W. Adelman
ROBERT S. MELONI, P.C.
1350 Avenue of the Americas
Ste. 3100
T: (212) 957-5577

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

**Anthony George Stamato**
Kaye Scholer LLC
70 West Madison Street
Suite 4100
Chicago, IL 60602
(312) 583-2300
astamato@kayescholer.com

**Robert McPherson Spalding**
Kaye Scholer LLC
70 West Madison
Suite 4100
Chicago, IL 60602
(312) 583-2300
rspalding@kayescholer.com

and I hereby certify that I have mailed by United States Postal Service the document to

the following non CM/ECF participant:

**Rhonda Trotter**
Kaye Scholer, LLP
1999 Avenue of the Stars
Ste. 1700
Los Angeles, CA 90067
(312) 788-1000
*Atty for Hawthorne Heights*

**Andrew H. Bart**
Clark S. Tomashefsky
Jenner & Block, LLP
919 Third Ave.
37th Floor
New York, NY 10022
*Atty for Virgin Records America, Inc.*
***VIA EMAIL TRANSMISSION AND U.S. MAIL***

Levenfeld Pearlstein, LLC

By:    /s/ Christopher M. Heintskill
Christopher M. Heintskill (IL Bar No. 6272391)
cheintskill@lplegal.com
2 North LaSalle, 13th Floor
Chicago, IL 60602
(312) 476-7574
*Attorneys for Defendants Victory Records, Inc.,
Another Victory, Inc. and Anthony K. Brummel*

LP 1193083.1 \ 34636-67227

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERON BUCCIARELLI-TIEGER, an individual; CASEY CALVERT, an individual; MICAH CARLI, an individual; MATT RIDENOUR, an individual; JT WOODRUFF, an individual, collectively professionally known as "Hawthorne Heights"; and HAWTHORNE HEIGHTS, LLC, an Ohio limited liability company, | ) ) ) ) ) ) ) ) | No. 06-C-4258 |
| Plaintiffs, | ) ) ) | Judge James B. Moran |
| v. | ) ) | Magistrate Judge Morton Denlow |
| VICTORY RECORDS, INC., an Illinois corporation; ANOTHER VICTORY, INC., an Illinois corporation; ANTHONY K. "TONY" BRUMMEL, an individual; and DOES 1 through 25, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION TO CONSOLIDATE RELATED CASES

Defendants, Victory Records, Inc. ("Victory"), Another Victory, Inc., and Anthony K. "Tony" Brummel (collectively, "Defendants"), by their undersigned counsel, and pursuant to Fed.R.Civ.P. 42, hereby move this Court for an Order consolidating Case No. 06-C-5985, *Victory Records, Inc. v. Virgin Records America, Inc. and EMI Music North America* ("Case No. 06-C-5985"), with this action. In support of their Motion, Defendants state as follows:

1.      Plaintiffs are individual members of the rock band Hawthorne Heights ("Plaintiffs").

2.      In December of 2003, Plaintiffs signed a long-term-recording-artist/publishing/ merchandising contract with Victory (the "Victory Agreement"). The Victory Agreement, among other things, contained an explicit, binding commitment for four consecutive full-length-

1

studio albums from Plaintiffs. Two albums into the Victory Agreement, however, Plaintiffs attempted to break it. And to facilitate their efforts, Plaintiffs filed this case accusing Defendants of trying to extort over $1 million from them.

3.     Plaintiffs' Complaint accuses Defendants of trying to breach the Victory Agreement (even though Plaintiffs did not assert a claim for breach of contract, they nonetheless attached the Victory Agreement to their Complaint as a basis for their claim). Moreover, in granting portions of Defendants' Motion to Dismiss, this Court has stated that the Victory Agreement controls the Parties' relationship. Consequently, Plaintiffs now concede that the Victory Agreement controls, but argue that they are not obligated to record four consecutive albums for Defendants, but rather four non-consecutive albums.

4.     Meanwhile, even though they were still under contract with Defendants, Plaintiffs nonetheless surreptitiously signed a separate record deal with Virgin Records America, Inc. ("Virgin") and its affiliate, EMI Music North America ("EMI") (the "EMI-Virgin Contract") on June 8, 2006 -- two months before they filed this current lawsuit against Defendants. Therefore, it is clear that Plaintiffs are using this lawsuit as a means to circumvent their obligations that they owe to Defendants under the Victory Agreement.

5.     To that end, in an effort to protect its rights under the Victory Agreement and to prohibit Virgin and EMI from wrongfully interfering with the Victory Agreement, Victory filed a separate action in this judicial district entitled *Victory Records, Inc. v. Virgin Records America, Inc. and EMI Music North America*, Case No. 06-C-5985. In that case Defendants asserted one claim for tortious interference with contractual relations based upon the Victory Agreement. A copy of Victory's Complaint against Virgin and EMI is attached hereto as *Exhibit A*.

2

6.      Therefore, both this case and Victory's case against Virgin and EMI are premised upon the same contract -- the Victory Agreement -- and both should be litigated as a consolidated case.

### STANDARDS FOR CONSOLIDATION

7.      Case No. 06-C-5985 should be consolidated into this case and both litigated simultaneously.

8.      Both cases are pending before the Northern District of Illinois (Case No. 06-C-5985 against Virgin and EMI is pending before Judge Conlon).

9.      Both cases involve a common party -- Victory Records -- which is sufficient for purposes of consolidation under Fed.R.Civ.P. 42. *See, Post v. Gilmore*, 111 F.3d 556 (7th Cir. 1997) (courts should consolidate cases with one or more shared parties); *see also, Attala Hydratane Gas, Inc. v. Lowry Tims Company*, 41 F.R.D. 164 (N.D. Miss. 1966) (consolidation of actions is not limited to actions involving identical parties).

10.     Both this case and Case No. 06-C-5985 involve common issues of law -- the alleged breach and tortious interference of the Victory Agreement.

11.     There is no risk of prejudice or possible confusion that would accompany consolidation. Consolidation would conserve judicial resources and reduce the time and expense of litigating related legal claims -- claims based upon Plaintiffs' efforts to circumvent their obligations under the Victory Agreement and Virgin and EMI's efforts to undermine, subvert, and wrongfully interfere with Victory's rights under the Victory Agreement.

12.     Thus, the consolidation of Case No. 06-C-5985 with this case will accommodate all Parties and provide one judicial forum in which to litigate their overlapping legal issues and claims, rather than forcing them to litigate in separate forums.

3

13.    Accordingly, Defendants' Motion to Consolidate Related Cases should be granted and an Order consolidating Case No. 06-C-5985 with this case should be issued.

WHEREFORE, Defendants, Victory Records, Inc., Another Victory, Inc., and Anthony K. "Tony" Brummel, respectfully request an Order consolidating Case No. 06-C-5985 with this case, and for such further relief that this Court deems just and appropriate.

Dated: February 6, 2007                    Respectfully submitted,

                                           ROBERT S. MELONI, P.C.

                                           By:_____
                                                Robert S. Meloni (NY Bar No. 1708080)

                                                1350 Avenue of the Americas
                                                Suite 3100
                                                New York, New York 10019
                                                (212) 957-5577

                                           *Attorneys for Defendants Victory Records, Inc.,*
                                           *Another Victory, Inc. and Anthony K. Brummel*

                                                    - and -

                                           LEVENFELD PEARLSTEIN, LLC

                                           By:___/s/ Christopher S. Griesmeyer_____
                                                Christopher S. Griesmeyer (IL Bar No.  6269851)
                                                cgriesmeyer@lplegal.com
                                                2 North LaSalle, 13th Floor
                                                Chicago, IL 60602
                                                T: (312) 476-7574

                                           *Attorneys for Defendants Victory Records, Inc.,*
                                           *Another Victory, Inc. and Anthony K. Brummel*

1189848_1

4

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

**Anthony George Stamato**
Kaye Scholer LLC
70 West Madison Street
Suite 4100
Chicago, IL 60602
(312) 583-2300
astamato@kayescholer.com

**Robert McPherson Spalding**
Kaye Scholer LLC
70 West Madison
Suite 4100
Chicago, IL 60602
(312) 583-2300
rspalding@kayescholer.com

and I hereby certify that I have mailed by United States Postal Service the document to

the following non CM/ECF participant:

| | |
|---|---|
| **Rhonda Trotter** | **Andrew H. Bart** |
| Kaye Scholer, LLP | Clark S. Tomashefsky |
| 1999 Avenue of the Stars | Jenner & Block, LLP |
| Ste. 1700 | 919 Third Ave. |
| Los Angeles, CA 90067 | 37th Floor |
| (312) 788-1000 | New York, NY 10022 |
| *Atty for Hawthorne Heights* | *Atty for Virgin Records America, Inc.* |
| | ***VIA EMAIL TRANSMISSION AND U.S. MAIL*** |

Levenfeld Pearlstein, LLC

By:___/s/ Christopher M. Heintskill_____
Christopher M. Heintskill (IL Bar No. 6272391)
cheintskill@lplegal.com
2 North LaSalle, 13th Floor
Chicago, IL 60602
(312) 476-7574
*Attorneys for Defendants Victory Records, Inc.,*
*Another Victory, Inc. and Anthony K. Brummel*

2

# EXHIBIT A

RECEIVED

NOV 0 2 2006

MI... L W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VICTORY RECORDS, INC.,<br>an Illinois corporation,<br><br>            Plaintiffs,<br><br>     v.<br><br>VIRGIN RECORDS AMERICA, INC.,<br>a California corporation; and<br>EMI MUSIC NORTH AMERICA,<br>a division of EMI MUSIC PLC,<br><br>            Defendants. | Case No. **06C 5985**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>JUDGE CONLON<br><br>**MAGISTRATE JUDGE<br>GERALDINE SOAT BROWN** |

Plaintiff, Victory Records, Inc. ("Victory"), by and through the undersigned attorneys, as and for its Complaint, alleges as follows:

### SUMMARY OF THE CASE

1. Unfortunately, this case is about an all-too familiar story in the music business: an unknown musical Band, after struggling to be noticed, earns a shot at success by signing a contract with an independent record company. The company devotes huge amounts of money, time and effort and, as a result, the Band achieves commercial and critical success. That success attracts unscrupulous would-be poachers. These poachers, fully aware that the Band is already subject to a contract, induce the Band with visions of greater fame and fortune. The Band, swayed by those inducements, signs with the poacher -- a so-called "major" record company.

2. This case is a perfect example of that story. The musical group in question, Hawthorne Heights ("Hawthorne Heights" or the "Band"), was unknown until it signed a long term recording artist/publishing/merchandising contract with Victory in

late December 2003 (the "Victory Agreement"). The Victory Agreement, among other things, contained an explicit and binding commitment for four consecutive full-length studio albums. Hawthorne Heights has delivered two albums pursuant to their recording commitment thereunder. Victory funded and manufactured, and aggressively distributed and marketed those albums at the cost of millions of dollars. The Band, in turn, benefited from Victory's investment by making millions of dollars themselves and becoming a music industry success story in a business where it is a rare occurrence.

3.     Hawthorne Heights attracted the attention of one of the few "major" record distribution companies and one of its affiliated labels: Defendant Virgin Records America, Inc. ("Virgin") and Virgin's parent company Defendant EMI Music North America, an entity of unknown legal status affiliated with EMI Group PLC ("EMI").

4.     Upon information and belief, the Defendants, through two top level executives, Jason Flom (Virgin's President) and Jeffrey Kempler (Virgin's Head of Business Affairs), among others presently unknown, induced the members of Hawthorne Heights to declare themselves free of the Victory Agreement at a time when the Band was not otherwise predisposed to do so.

5.     As late as February 25, 2006, in an article appearing in *Billboard* magazine featuring the Band and Victory, Band member JT Woodruff touted the great job Victory had done for them as they were perched to have their second Victory album debut at No. 1 on the Billboard 200 record charts. Woodruff was reported to have said the Band had "no interest" in signing with a major at the time, further stating "we're happy where we are. I don't think we would have seen the success we're seeing on a

major." He added that "Rock music is the hardest to debut at No. 1. The little guys need to win one."

6.   By the middle of 2006, as the word spread throughout the music industry of Victory's accomplishment in making Hawthorne Heights and their second album such a success, the Defendants swooped in for the kill. At or about that time, Woodruff and the Band did a complete 180° turn. The reason for this flip-flop has become apparent. Top level executives of the Defendants sold the Band a bill of goods. They intended to persuade them that they were not as happy with Victory as Woodruff proclaimed just a few months earlier, thereby inducing them to abandon the "little guy" that Woodruff had championed just months before, in favor of the greener pastures of a major label.

7.   Upon information and belief, in or about mid-2006, the Band retained a national litigation firm and a public relations company to devise a strategy to extricate the Band from their contractual obligations to Victory. That plan was launched in early August 2006, when Hawthorne Heights announced that they had "left" Victory and commenced an action in this Court seeking judicial approval of their actions. The filing of that lawsuit was contemporaneous with a public relations campaign and other actions to obtain the maximum exposure of the Band's unfounded and scurrilous claims against Victory, in what could be described as a "shock and awe" campaign intended to impugn the integrity and credibility of Victory and its founder, Tony Brummel, throw Victory back on its heels and force it to relent to the Band's unlawful demands to move to Virgin and/or EMI (together "EMI-Virgin").

8.   This campaign fell flat on its face as Victory did not capitulate. But the damage was already done: the Band had become so alienated from Victory that repairing

3

the relationship with Victory may prove to be impossible, even if Victory succeeded in
the litigation filed by the Band (discussed in further detail below).

9.     At or about the same time, as a direct result of Defendants' efforts,
Hawthorne Heights entered into an exclusive recording artist contract with EMI-Virgin
(the "EMI-Virgin Contract"). This occurred despite the Band's pre-existing, and currently
extant, contractual obligations to Victory for the identical services.

10.    EMI-Virgin unquestionably was aware of the Victory Agreement (a copy
of which, upon information and belief, was provided to EMI-Virgin in advance of their
signing with EMI-Virgin).

11.    Nevertheless, EMI-Virgin induced Hawthorne Heights to repudiate the
Victory Agreement as a predicate to entering into a new one.

12.    The continuing validity and binding nature of the Victory Agreement is
not subject to a good-faith dispute.  In an Order dated October 17, 2006, in a related
action titled Bucciarelli-Tieger, et al. v. Victory Records, Inc. Case No. 06-CV-4258 (the
"Hawthorne Heights Action"), this Court, among other things, emphatically dismissed
Hawthorne Heights' claim that the Victory Agreement was terminated, rejecting the
Band's assertion that they were free from their contractual obligations to Victory.  In fact,
it described that claim as "absurd," and added that any dealings between the Band and
another record company calling for their recording artist services would be at "their
peril."

13.    Despite the clear and unambiguous terms of the Victory Agreement and
the Court's Order, Hawthorne Heights continues to act in repudiation of that Agreement.
These actions include the execution of the EMI-Virgin Contract.  The Defendants are the

4

moving force behind the Band's conduct. As a result, they are liable for tortious interference with the Victory Agreement.

## PARTIES, JURISDICTION AND VENUE

14. Victory is an Illinois corporation. Its principal place of business is at 346 N. Justine Street, Chicago, Illinois 60607.

15. Virgin Records America, Inc. is a California corporation. Its principal place of business is at 150 Fifth Avenue, New York, New York 10011.

16. EMI Music North America is an entity of unknown legal status with its principal place of business located at 150 Fifth Avenue, New York, New York 10011. It is affiliated with EMI Group PLC, a corporation registered in the United Kingdom.

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The citizenship of Victory is fully diverse from that of both Defendants, and the amount in controversy exceeds $75,000, exclusive of interest.

18. This Court has personal jurisdiction over the Defendants because both Defendants conduct business continuously and systematically in Illinois, including maintaining offices and employees at 2850 W. Golf Road, Suite 301, Rolling Meadows, Illinois 60008, for the purpose of engaging in, inter alia, marketing and promotional activities pertaining to the sale of sound recordings. In addition, the Defendants knowingly and deliberately intended their tortious conduct to cause harm and otherwise affect interests in Illinois.

19. Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District.

5

## STATEMENT OF FACTS

20.     Prior to December 2003, the Band was a group of unknowns who were looking for their first record deal, specifically targeting Victory. At the time, they stated that Victory was their favorite record label since they had grown up listening to Victory's records.

21.     On or about December 11, 2003, Hawthorne Heights entered into the Victory Agreement. The Agreement was amended on or about April 28, 2004. The original Agreement and the amendment are attached as Exhibit A to the Complaint.[1]

For purposes of this action and therefore this motion, the most significant provisions are contained in Paragraph 1 (emphasis added):

> 1. Terms:
>
> 4 Album deal with option on second, third and fourth album.
>
> The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. *Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period.* During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". In order for Company to exercise option on the fourth

---

[1] Exhibit A contains a copy of the executed Agreement and, because that copy is not clearly legible, a legible unexecuted copy.

6

Album, Artist must have cumulative sales of at least 60,000 units. As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

Company shall release and distribute albums within 4 months of the completion of each full-length master recording and delivery of all parts necessary to manufacture unless otherwise agreed to between Company and Artist.

22.     In that short period of time, Hawthorne Heights has been under contract to Victory, they went from being complete unknowns to celebrities, having made millions of dollars as well as receiving the satisfaction that comes with artistic and financial success—a rare commodity for new artists in the record business.

23.     Victory is an independent, self-financed record company with a proven model and track record for developing and building careers for undiscovered, non-mainstream artists. For many years, independent record labels have been the "farm system" of the major record distribution companies, such as EMI, Universal, Sony BMG and Warner Music Group. These so-called "majors" depend almost entirely on this farm system to acquire new musical talent, since they have become less and less capable of – or interested in – doing it themselves. Victory is one such independent label; however, the point is that these artist acquisitions should be accomplished through voluntary agreements with the independents, not tortious conduct such as poaching and other nefarious activities by the major label. The latter is what occurred here.

7

24.     For the first two Hawthorne Heights albums, Victory's investment, in pure dollar terms, has been well over $5 million.[2] It has also resulted in the Band's receiving millions of dollars from ancillary sources such as live tours and concerts, and endorsements from sponsors. Since September 27, 2006, Hawthorne Heights has been on one such tour called the "Nintendo Fusion Tour".[3] Victory made it possible for the Band to earn these substantial sums, since Victory's efforts in developing the Band and aggressively promoting their music are responsible. However, Victory does not participate in any of these revenues. 100% of those monies are retained by the Band.

25.     In other words, the Band had no reason to be unhappy with Victory or otherwise predisposed to repudiate the Victory Agreement. This, not merely because the Band profited handsomely from their relationship with Victory, but also because Victory devoted significant time, money and resources to aggressively developing and marketing the Band, a non-mainstream musical artist, which is something major record companies would normally be reluctant to do.

26.     In exchange for the lucrative benefits the members of Hawthorne Heights have received under the Victory Agreement, Victory expects that the Band will live up to its obligations. Until recently, the Band appeared to be doing so. Then, on August 3, 2006, Victory received a letter from the Band's counsel purporting to repudiate the

_____

[2] Direct expenses included advances paid to the Band, record and music video production costs, manufacturing costs, marketing and promotion costs, and tour support.

[3] The plaintiffs' website, *http://www.hawthorneheights.com*, indicates their tour began on September 27, 2006 and will run through November 11, 2006 for at least 37 concerts. A conservative estimate is that the Band will realize at least $370,000 to $500,000 in revenues from the tour, assuming an average fee of $15,000 per show. That does not count merchandise sales and "perks" from Nintendo, the tour sponsor. Typically, sales of merchandise at concert venues of this type can generate gross revenues ranging from $10,000 to $20,000 per night, which would add an additional $370,000-$740,000 in revenue. Thus, the Band could earn in excess of $1 million from this Tour alone.

8

Victory Agreement. The Band commenced the Hawthorne Heights Action four days later. At about the same time, they posted a defamatory notice on their website claiming that that they were no longer under contract with Victory and, for good measure, maliciously maligning Victory and Mr. Brummel in the process.

27.    On information and belief, in or about 2006 at some point prior to early August, executives from EMI-Virgin contacted the Band and/or one or more of the Band's representatives to inquire about the Band's interest in joining the EMI-Virgin roster of recording artists. Of course, that required that the Band enter into an exclusive recording artist agreement with EMI-Virgin, even though EMI-Virgin knew of the essential terms of the Victory Agreement.

28.    Upon information and belief, during the past year or so, Virgin's President, Jason Flom and/or his associates, as part of their efforts to solicit new musical talent, claimed that Virgin would become the major label version of Victory for rock acts.

29.    EMI-Virgin's efforts caused the Band to repudiate the Victory Agreement, as described in more detail above.

30.    On September 7, 2006, Victory learned from various EMI-Virgin executives,  including David Munns (EMI's Chairman and CEO), Ivan Gavin (EMI's COO), and Jason Flom (Virgin's Chairman and CEO),  that Hawthorne Heights had entered into a contract with EMI and/or Virgin for the recording artist services of Hawthorne Heights (the "EMI-Virgin Contract").

31.    In an effort to avoid this lawsuit, Victory initially made extensive efforts to obtain EMI-Virgin's cooperation by divulging to Victory the terms of the EMI-Virgin Contract. Following EMI-Virgin's refusal to cooperate voluntarily, Victory served a

9

subpoena on EMI-Virgin in the Hawthorne Heights Action, demanding any documents concerning the EMI-Virgin Contract. EMI-Virgin refused to comply with the subpoena. This lawsuit was then filed shortly thereafter.

32.    Neither EMI-Virgin nor the Band were willing to divulge any information about the EMI-Virgin Contract, apart from the fact that one existed Therefore, Victory does not know its precise terms, other than the fact that it required the Band to render their recording artist services to EMI-Virgin during the term of the Victory Agreement. However, the impropriety of executing a contract that covers the identical subject matter of the Victory Agreement, i.e., the recording artist and songwriting services of the Band, is patently obvious.

33.    It is apparent that the execution of the EMI-Virgin Contract was the culmination of a campaign orchestrated by EMI-Virgin to induce Hawthorne Heights to breach the Victory Agreement by, among other methods, repudiating it so openly and notoriously. The commencement of the Hawthorne Heights Action and related events were essential elements of that campaign.

34.    The campaign did not go as planned, because this Court dismissed Hawthorne Heights' claim that it was not bound by the Victory Agreement. A copy of the minute order and the transcript of the Court's ruling from the bench are attached as Exhibit B. The Court held that the Band's claim was "absurd" and "not sustainable" as a matter of both contract law and common sense.

35.    Despite the Court's ruling, Hawthorne Heights continues to act as though the Victory Agreement is not binding, and thus to repudiate it. The existence of the

10

contract with EMI-Virgin Contract is the reason the Band continues to flout the Victory Agreement, and now this Court's order.

36.     The motives for EMI-Virgin's tortious interference are obvious. If the poacher has no scruples about interfering in a binding contractual relationship, there is no reason for it to spend time and money developing a promising musical artist when it can poach one much more easily from a competitor. The fact that the competing record label (i.e., Victory) is harmed in the process is an equally tempting incentive for the poacher. This is particularly true in this case, since neither EMI nor Virgin have any business relationship with Victory.

37.     Victory has suffered significant harm from the Defendants' tortious interference and the resulting repudiation by Hawthorne Heights of the Victory Agreement.

38.     The process of establishing (or "breaking") an unknown artist requires tremendous up-front costs. With a successful debut album, a record company would normally expect to reap even greater rewards from follow-up albums, building on the momentum established by the initial record release. As a result, recording artist contracts typically have a commitment of six or more albums. The four-album commitment in the Victory Agreement, although relatively short, is nevertheless essential to the economic viability of that agreement and the assets which flow therefrom, including the sound recordings delivered thereunder and the musical compositions contained thereon.

39.     Assuming that the Band's next two albums would have sold at the same rate as the first two – but for the Defendants' interference – Victory stands to lose profits of million of dollars.

11

40.    Equally important is the false perception that such a public repudiation creates with consumers of Victory's products, music industry participants, and new unsigned artists who are seeking deals with records labels: that potential poachers should consider Victory an easy target for their greed and unscrupulous conduct, or that Victory is a pariah label who mistreats its artists and should therefore be avoided at all costs. Of course, such perception is completely at odds with the truth but, in the music business, perception is sometimes mistaken for reality.

41.    In an industry where fame is fleeting and reputations are easily destroyed by scurrilous public relations campaigns, with the resultant scandals and unfounded rumor-mongering, it is sometimes impossible to put the toothpaste back in the tube for the victims of such conduct. Victory is one such victim.

42.    This lawsuit is intended to correct the false impression of Victory as well as remedy the other harm it has suffered.

## CLAIM FOR RELIEF
### (Tortious Interference With Contractual Relations)

43.    Victory repeats and realleges the allegations of Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.    The Victory Agreement is a valid and binding contract between Victory and Hawthorne Heights.

45.    At all times relevant to this action, the Defendants knew that there was a contractual relationship between Victory and Hawthorne Heights and, further, knew of the four-album commitment under the Victory Agreement.

12

46. By inducing Hawthorne Heights to repudiate the Victory Agreement and by entering into a new purportedly superseding contract with the Band, the Defendants deliberately and without justification interfered with the contractual relationship between Victory and Hawthorne Heights.

47. By inducing Hawthorne Heights to act as it did, the Defendants were the direct and proximate cause of the Band's repudiation and breach of the Victory Agreement.

48. Victory has been damaged by the Defendants' tortious conduct.

**WHEREFORE**, Victory respectfully prays that the Court find in its favor and enter an order and judgment:

a. For compensatory damages in an amount to be proved at trial, but not less than $10,000,000;

b. For punitive damages of not less than $10,000,000;

c. For the costs of suit and attorneys fees;

d. For interest on its damages at the legal rate; and

e. For such other and further relief that the Court may deem to be just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Victory demands a trial by jury of all issues which are so triable.

Dated: November 2, 2006

ROBERT S. MELONI, P.C.

By: _____
     Robert S. Meloni
     Ronald W. Adelman
1350 Avenue of the Americas
Suite 3100
New York, New York 10019
Tel: (212) 957-5577
robert@robertmeloni.com
radelman@robertmeloni.com

LEVENFELD PEARLSTEIN, LLC

By: _____
    Christopher S. Griesmeyer (IL Bar No. 6269851)

2 North LaSalle, 13th Floor
Chicago, IL 60602
Tel: (312) 476-7574
cgriesmeyer@lplegal.com

*Attorneys for Plaintiff Victory Records, Inc.*

14

# EXHIBIT A



**VICTORY RECORDS
DEAL MEMO**

346 N. Justine Street, Chicago, IL. 60607
Phone: (312) 666-8661 / Fax: (312) 873-9889
Tony@victoryrecords.com

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipients specifically hereof as indicated above. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender via telephone and destroy all copies of the original message. Also, due to the susceptibility of electronic communication to corruption, the sender herewith neglects any warranty nor the acceptance of this communication.

POWERED TXTTOUCH

12/11/03 Revisions to BLUE

# ARTIST: HAWTHORNE HEIGHTS

**1. Term:**
4 Album deal with option on second, third and fourth album.

The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period. During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Album required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". In order for Company to exercise option on the fourth Album, Artist must have cumulative sales of at least 60,000 units. As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the initial Contract Period would otherwise expire.

Company shall release and distribute albums within 6 months of the completion of each full-length master recording and delivery of all parts necessary to manufacture unless otherwise agreed to between Company and Artist.

**2. Territory:**
Worldwide.

**3. Royalty Breakdown:**
Albums $12.00 SLRP:
LP1: 11% of SLRP after 50,000 units sold +1%
LP2: 12% of SLRP after 50,000 units sold +1%
LP3: 13% of SLRP after 70,000 units sold +1%

AB

1

LP4: 14% of DLRP over 50,000 units sold +.1%

If my Album is priced below $12.96 SLRP:
The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

10% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any Ringtones will be split 50/50 between Company and Artist.

Consider 50% of the beats royalty rate.
Japan, U.K. and Europe: 70%-75% of the beats royalty rate (excluding Yugoslavia, Iceland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australasia (Australia, New Zealand): 60% 75% of the beats royalty rate.
All other Territories: 50% of the beats royalty rate.

**4. Mechanical Royalties:**
75%-85% of the current statutory rate not to be paid on more than eleven Compositions per full length record. 100% of the current statutory rate after 50,000 units.

**5. Publishing:**
$5,000.00 fully recoupable advance for publishing deal Auntie Victory Inc. (ASCAP) half of which will be paid upon signing of this deal memo, the other half upon release of LP1.

Future publishing advances will be based on 25% of the # of units sold on previous release 18 months after U.S. release date and be paid upon delivery of the corresponding Album to Company. For example, if LP1 sells 50,000 units in the first 18 months of release the publishing advance on LP2 would be $12,500.00. The minimum advance for any album will be no less than $5,000.00. Only the Compositions recorded during the term of this agreement and/or the Compositions that are released by Company will be included as part of the publishing agreement.

**6. Recording Advance:**
$15,000.00. Future advances will be based on 75% of the # of units sold of previous album 18 months after release date. For example, if LP1 sells 50,000 units in its first 18 months of release the advance on LP2 would be $37,500.00. The minimum recording advance for any subsequent albums will be $15,000.00.

**7. Recoupable Costs:**
Recording Advance: 100%
Co-Op Advertising: 50%
Outside Promotion Services: 50%
Video Production and Manufacturing: 100%-75%
Extraneous Artwork Charges: 100%

**8. Merchandising:**
Artist agrees to allow Victory Records to manufacture merchandise designs. Artist receives 50%50-20% of wholesale cost of merchandise. Artist retains the right to manufacture the designs for his own purpose.

**9. Accounting / Payments:**
Royalty statements will be issued quarterly, 60 days after quarter end. Royalties will be paid only on sales for which Victory Records have been paid for. A reserve for returns will be set at 25%, liquidated as follows: 50% of each reserve (4) quarterly accounting periods after such reserve is established and 50% of each such reserve (8) quarterly accounting periods after such reserve is established.

MB

2

**10. Artistic Input**
Artist has 100% artistic input in the design of all musical product, advertisements and promotional materials. Company will seek Artist's approval not to be unreasonably withheld or in a manner which is unreasonably detrimental to the sales or promotional potential of the Artist.

**11. Territories of Release**
All territories where Company is currently distributed.

**12. Radio Single**
Victory agrees to manufacture a radio single for each album to be serviced to Commercial and Commercial Specialty programs. Company and Artist will mutually agree in good faith regarding the choices made.

**13. Commitments**
Company commits to allocating the following for each album (this would be included in the contract in a "Recoupment clause")
(a) Trade Advertising: $10,000.00. (Advertising done with retailers and distributors)
(b) Consumer Advertising: $5,000.00. (Advertising done to consumer publications projecting the record)
(c) Street Promotions: $10,000.00.
(d) Outside Radio Promotion: up to $5,000.00 $10,000.00.
(e) Video Budget: $5,000.00.

**14. Additional Commitments**
If sales of any Album exceed 50,000 units in the first 12 months of release Artist will receive a non-recoupable bonus of $7,500.00.

Company will make two types of promotional posters - tour and retail.

**15. Bonus**
If any record enters the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $5,000.00 bonus for each release. Notwithstanding the foregoing, if any record enters the top 100 positions of the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $10,000.00 bonus.

**16. Touring**
Artist agrees that it will tour in support of full-length recording to the best of its ability. Company agrees to make Artist to the first of a Tour Support Fund not to exceed $14,000.00 for each album from which Artist can request fully recoupable advances. This fund becomes active upon signing of this deal memo. Advances requests are not to exceed $1,000.00 per 30-day period unless agreed upon between Company and Artist. $4,000.00 from the Tour Support Fund can be immediately used as a down payment on a new tour vehicle.

**17. CD Sales on Tour**
Company will sell the Artist copies of the full length CD for sales on tour at $4.00 per CD. Each sales will be at half the royalty rate and free of mechanical royalties.

**18. Attorney's Fees**
Company will, immediately upon the execution of this deal memo pay attorney's fees of $2,000.00 to Daniel L. Friedman Esq. Such monies shall be treated as a fully recoupable advance to Artist.

DATED AND EXECUTED in Chicago, Illinois, on the day and the year first above written.

VICTORY RECORDS
(hereinafter called "Company")

A.L.B

3

By _____
Anthony K. Broccoli / Franchise - Victory Eleventh Inn

Members of the musical group EASTERING PENGUIN:

_____ ███████████████████
Bryan Passibuelli

_____ ███████████████████
Georg Calvert

_____ ███████████████████
Micah Carl

_____ ███████████████████
Nate MKeever

_____████████ ███████████████████
J T Wimbush

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipients specifically listed at addressed herein. If you are not the intended recipient, or the employees or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender via telephone and destroy all copies of the original message. Also, due to the unreliability of electronic communications to recipient, the sender therewith neither the severity nor the completeness of this communication.

4



**VICTORY RECORDS
DEAL MEMO**

346 N. Justine Street, Chicago, IL. 60607
Phone: (312) 666.8661 / Fax: (312) 873.3889
Tony@victoryrecords.com

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipients specifically listed as addressed above. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender via telephone and destroy all copies of the original message. Also, due to the susceptibility of electronic communication to corruption, the sender warrants neither the accuracy nor the completeness of this communication.

Revised 12/10/03

12/11/03 Revisions in BLUE

# ARTIST: HAWTHORNE HEIGHTS

1. Terms:
4 Album deal with option on second, third and fourth album.

The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period. During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". In order for Company to exercise option on the fourth Album, Artist must have cumulative sales of at least 60,000 units. As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

Company shall release and distribute albums within 4 months of the completion of each full-length master recording and delivery of all parts necessary to manufacture unless otherwise agreed to between Company and Artist.

2. Territory:
Worldwide.

3. Royalty Breakdown:
If above $12.98 SLRP:
LP1: 11% of SLRP after 50,000 units sold +1%
LP2: 12% of SLRP after 50,000 units sold +1%
LP3: 13% of SLRP after 50,000 units sold +1%

1

LP4: 14% of SLRP after 50,000 units sold +1%

If any Album is priced below $12.98 SLRP:
The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

15% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any licensing will be split 50/50 between Company and Artist.

Canada: 80% of the basic royalty rate.
Japan, U.K. and Europe: 70% 75% of the basic royalty rate (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australasia (Australia, New Zealand): 65% 75% of the basic royalty rate.
All other Territories: 50% of the basic royalty rate.

4. Mechanical Royalties:
75% 85% of the current statutory rate not to be paid on more than eleven Compositions per full length record. 100% of the current statutory rate after 50,000 units.

5. Publishing:
$5,000.00 fully recoupable advance for publishing deal Another Victory Inc. (ASCAP) half of which will be paid upon signing of this deal memo, the other half upon release of LP1.

Future publishing advances will be based on 25% of the # of units sold on previous release 18 months after U.S. release date and be paid upon delivery of the corresponding Album to Company. For example, if LP1 sells 50,000 units in its first 18 months of release the publishing advance on LP2 would be $12,500.00. The minimum advance for any album will be no less than $5,000.00. Only the Compositions recorded during the term of this agreement and/or the Compositions that are released by Company will be included as part of the publishing agreement.

6. Recording Advance:
$15,000.00. Future advances will be based on 75% of the # of units sold of previous album 18 months after release date. For example, if LP1 sells 50,000 units in its first 18 months of release the advance on LP2 would be $37,500.00. The minimum recording advance for any subsequent albums will be $15,000.00.

7. Recoupable Costs:
Recording Advance: 100%
Co-Op Advertising: 50%
Outside Promotion Services: 50%
Video Production and Manufacturing: 100% 75%
Extraneous Artwork Charges: 100%

8. Merchandising:
Artist agrees to allow Victory Records to manufacture merchandise designs. Artist receives (15%) (20%) of wholesale cost of merchandise. Artist retains the right to manufacture merchandise for its own purposes.

9. Accounting / Payment:
Royalty statements will be issued quarterly, 60 days after quarter end. Royalties will be paid only on sales for which Victory Records have been paid for. A reserve for returns will be set at 25%, liquidated as follows: 50% of each reserve (4) quarterly accounting periods after such reserve is established and 50% of each such reserve (8) quarterly accounting periods after such reserve is established.

2

10. Artistic Input
Artist has 100% artistic input in the design of all musical products, advertisements and promotional materials. Company will seek Artist's approval not to be unreasonably withheld or in a manner which is unreasonably detrimental to the sales or promotional potential of the Artist.

11. Territories of Release:
All territories where Company is currently distributed.

12. Radio Single:
Victory agrees to manufacture a radio single for each album to be serviced to Commercial and Commercial Specialty programs. Company and Artist will mutually agree in good faith regarding the chosen single.

13. Commitments:
Company commits to allocating the following for each album: (this would be included in the contract in a 'commitment clause')
(a) Co-Op Advertising: $10,000.00. (Advertising done with retailers and distributors)
(b) Consumer Advertising: $5,000.00. (Advertising done in consumer publications promoting the record)
(c) Street Promotions: $10,000.00.
(d) Outside Radio Promotion: up to $6,000.00 $10,000.00.
(e) Video Budget: $5,000.00.

14. Additional Commitments:
If sales of any Album exceed 50,000 units in its first 12 months of release Artist will receive a non-recoupable bonus of $7,500.00.

Company will make two types of promotional posters- tour and retail.

15. Bonus:
If any record enters the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $5,000.00 bonus for each album. Notwithstanding the foregoing, if any record enters the top 100 positions of the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $10,000.00 bonus.

16. Touring:
Artist agrees that it will tour in support of full-length recording to the best of its ability. Company agrees to assist Artist in the form of a Tour Support Fund not to exceed $15,000.00 for each album from which Artist can request fully recoupable advances. This fund becomes active upon signing of this deal memo. Advance requests are not to exceed $1500.00 per 30-day period unless agreed upon between Company and Artist. $5,000.00 from the Tour Support Fund can be immediately used as a down payment on a new tour vehicle.

17. CD Sales on Tour:
Company will sell the Artist copies of its full length CD for sales on tour at $5.00 per CD. Such sales will be at half the royalty rate and free of mechanical royalties.

18. Attorney's Fees:
Company will, immediately upon the execution of this deal memo pay attorney's fees of $2,000.00 to Daniel L. Friedman Esq. Such monies shall be treated as a fully recoupable advance to Artist.

DATED AND EXECUTED in Chicago, Illinois, on the day and the year first above written.

VICTORY RECORDS
(hereinabove called "Company")

3

By_____
Anthony K. Brummel / President- Victory Records Inc.


Members of the musical group HAWTHORNE HEIGHTS:


Eron Bucciarelli _____

Casey Calvert _____

Micah Carli _____

Matt Ridenour _____

JT Woodruff _____

NOTICE: Information contained in this document may contain privileged and confidential information. It is intended only for the use and view of the intended recipients specifically listed as addressed above. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender via telephone and destroy all copies of the original message. Also, due to the susceptibility of electronic communication to corruption, the sender warrants neither the accuracy nor the completeness of this communication.

4

Victory Records Inc.
346 N. Justine Street
Chicago, Illinois 60607

Dated as of: April 28, 2004

Eron Bucciarelli-Tieger, Casey Calvert,
Micah Carli, Matt Ridenour, and JT Woodruff
p/k/a Hawthorne Heights
106 Devonhurst Drive, Apt. E
Kettering, Ohio 45429

Re:  Amendment to the Victory Records Deal Memo By and Between Victory
Records Inc. and Eron Bucciarelli-Tieger, Casey Calvert, Micah Carli, Matt
Ridenour, and JT Woodruff p/k/a Hawthorne Heights

Dear Eron, Casey, Micah, Matt, and JT:

Reference is hereby made to that certain Victory Records Deal Memo by and between
Victory Records Inc. ("Company") and you ("you" or "Artist") dated as of the eleventh (11th)
day of December, 2003, as amended (the "Deal Memo").

Notwithstanding anything to the contrary implied or expressed in the Deal Memo, the
Deal Memo is hereby amended and modified as follows:

Section 3 of the Deal Memo is hereby deleted in its entirety and replaced with the
following:

"3.   Royalty Breakdowns: If above $12.98 SLRP:
LP1: 11% of SLRP; after 50,000 units sold +1%
LP2: 12% of SLRP; after 50,000 units sold +1%
LP3: 13% of SLRP; after 50,000 units sold +1%
LP4: 14% of SLRP; after 50,000 units sold +1%

If any Album is priced below $12.98 SLRP:
The royalty will be 10% of SLRP. This applies to any Album in the Agreement.

Notwithstanding anything contrary contained herein, in the event that Artist enters into a
producer agreement (or a mixer agreement or similar agreement) that allows for the
producer (or mixer or otherwise) to receive a percentage of SRLP, such percentage of
SRLP shall be added onto the Artist's royalty percentages of SRLP set forth herein (so
that Artist will receive no less than the royalty percentages of SRLP set forth herein),

Notwithstanding the foregoing, or anything contrary contained herein, with regard to LP1, Artist intends to enter into a producer agreement with Sean O'Keefe in which Sean O'Keefe will be entitled to 2% of SRLP; as such Artist's royalty in connection with LP1 will be increased to 13% of SRLP; after 50,000 units sold +1%.

In the event that any producer (or mixer or otherwise) is entitled to royalties pursuant to a producer agreement (or mixer agreement or similar agreement), Artist may execute and deliver to Company a customary letter of direction authorizing and directing Company to pay royalties directly to such producer (or mixer or otherwise) and to send such producer (or mixer or otherwise) appropriate statements of account therewith, at the same times as Company pays royalties (and renders accountings) to Artist. In the event that Artist sends to Company a customary letter of direction as set forth herein, Company shall pay royalties and send appropriate statements of account in accordance with such letter of direction.

15% free goods deduction.

Company does not take packaging deductions.

Royalties for digital downloads and any licensing will be split 50/50 between Company and Artist.

Canada: 80% of the basic royalty rate.
Japan, U.K. and Europe: 75% of the basic royalty rate (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and Czechoslovakia).
Australasia (Australia, New Zealand): 75% of the basic royalty rate.
All other Territories: 50% of the basic royalty rate."

Each and every term of the Deal Memo not hereby modified or amended shall remain in full force and effect as set forth therein. Unless indicated to the contrary hereinabove, all terms used herein shall have the same meanings ascribed to them in the Deal Memo.

-2-

If the foregoing accurately reflects your understanding of the subject matter hereof, please so indicate your acceptance by signing where indicated below.

Very truly yours,

VICTORY RECORDS INC.

By: _____

Anthony K. Brummel, President

AGREED TO AND ACCEPTED:

ERON BUCCIARELLI-TIEGER,
CASEY CALVERT, MICAH CARLI,
MATT RIDENOUR, AND JT WOODRUFF
P/K/A HAWTHORNE HEIGHTS

Name: Eron Bucciarelli-Tieger

Name: Casey Calvert

Name: Micah Carli

Name: Matt Ridenour

Name: JT Woodruff

- 3 -

EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 2.5
## Eastern Division

Eron Bucciarelli−Tieger, et al.

Plaintiff,

v.

Case No.: 1:06−cv−04258
Honorable James B. Moran

Victory Records, Inc., et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, October 18, 2006:

MINUTE entry before Judge Milton I. Shadur :Motion to dismiss [27]is granted as to count 1, 2 and 9 and the remainder of the motion is entered and continued before Judge Moran. MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tonyq K. Brummel for leave to file *Reply Brief*[36] is granted.In court notice(srn, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov.*

1

1

2

3                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
4                         EASTERN DIVISION

5  ERON BUCCIARELLI-TIEGER, et al.,      ) DOCKET NO. 06 C 4258
                                         )
6                         Plaintiffs,)
                                         )
7        vs.                             )
                                         )
8  VICTORY RECORDS, INC., et al.,        ) Chicago, Illinois
                                         ) October 18, 2006
9                         Defendants.)    9:15 o'clock a.m.

10
         TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
11                    MILTON I. SHADUR, Judge

12

13

14 APPEARANCES:

15 For the Plaintiffs:
                    MR. ROBERT M.SPALDING
16
   For the Defendants:
17                  MR. CHRISTOPHER S. GRIESMEYER

18

19                    JESSE ANDREWS
        Official Court Reporter - U. S. District Court
20                219 S. Dearborn Street
                  Chicago, Illinois  60604
21                    (312) 435-6899

22            *     *     *     *     *     *

23

24

25

2

1          THE CLERK:  06 C 4258, Bucciarelli vs. Victory
2     Records.
3          MR. SPALDING:  Good morning, your Honor.  Robert
4     Spalding on behalf of plaintifs-counter-defendants.
5          MR. GRIESMEYER:  Good morning, your Honor.
6     Christopher Griesmeyer, G-r-i-e-s-m-e-y-e-r, on behalf of the
7     defendants.
8          THE COURT:  Well, I appreciate your patience.
9          MR. GRIESMEYER:  Certainly.  No problem, Judge.
10         THE COURT:  My motion call never goes like this.  But
11    as it happened the jury injure came back with a verdict
12    yesterday, so that all we had was the motion call.
13         Why don't you sit down and let me tell you where I am
14    coming from.  And then I will hear from each side after I have
15    done that.  Okay.  So you don't have to be standing up shifting
16    from heel to heel while I am talking.
17         When I first started to review these papers, I was
18    somewhat in despair, because I had as I saw it in two different
19    places a really illegible contract.  Thank goodness it turns
20    out that Exhibit B to the Friedman affidavit turned out to have
21    something that was legible so I could find out what the parties
22    had really said in this contract that they entered into.
23         And it was apparent to me, you know up until then --
24    by the way, it was really very difficult to understand which
25    side was really presenting the thing in an appropriate manner

1  because I didn't know precisely what the contract read.  I read

2  what the parties had said about the contract, but I didn't have

3  the contract.

4          When I read the contract it was plain that a

5  purported termination on the ground that this was a contract

6  that was terminable at will was really a nonsustainable

7  position.  It cannot be said, given the form of that contract,

8  including the options that were involved and the rights that

9  were involved, that it was within the power of the party that

10  had the ultimate interest and the intellectual property to

11  essentially cut the legs out from the defendants here in the

12  situation in which the consequence of that would be either the

13  (or both) the inability to deal with the matter as an asserted

14  copyright infringer or as an asserted trademark infringer.

15          I read the Walthal case.  But as often happens in my

16  business serendipity strikes in an extraordinary number of

17  situations.  It's quite right that our Court of Appeals came

18  down just a month ago with this Automation by Design against

19  Raybestos Products decision that made clear the scope of what

20  Walthal did or did not stand for.  And the consequence of that

21  decision is to make it plain -- to make really two things

22  plain.  One, that the kind of claim that is made here is one

23  that -- by the plaintiffs -- is one that depends on the notion

24  that there is no termination provision in the contract.  And

25  that in the absence of a termination provision in the contract

4

1   you fall back to the common law of terminability at will.

2          In this situation the facts of what the ongoing
3   rights are that were given to Victory Records are such that
4   that has built into it a notion of continuity that prevents it
5   from being terminable at will.

6          There is another interesting component of the
7   decision in Automation by Design -- and that is, as I read
8   through the thing and I got to page 21 of the slip opinion by
9   Judge Rovner, she commented about the contract that was there
10  as saying, "Similarly the economic realities of the agreement
11  favor treating the license as perpetual rather than terminable
12  at will."

13         Now in that situation the economic realities went
14  into perpetual existence. I am not suggesting that here. But
15  what I am suggesting is that the Court of Appeals has very
16  sensibly said, "When we construe contracts of this kind, we
17  also look at the economic realities." The economic realities
18  here would negate any notion that the plaintiffs here would be
19  in a position in which they have an obligation to deliver, for
20  example, an added work to the defendant, but then the defendant
21  can't use it. It's absurd, frankly. It's just not
22  sustainable. It's not sustainable as a matter of contract law.
23  It's not sustainable as matter of common sense.

24         Now that doesn't mean that that calls for the
25  outright dismissal of Count 9. The reason that I say that is

5

1    that -- and incidentally, you are going to be ultimately doing
2    this before Judge Moran, I am glad to say.  But this is the
3    kind of case that I love to keep, but I am not going to.  I am
4    not making a ruling about "exclusivity" as a matter of law.
5    That is I am not making a ruling, for example, which is a kind
6    of unique issue about whether these entertainers would be in a
7    position to essentially create by creating another record or
8    album to create essentially a competitive situation in which
9    their they conduct somehow could be charged or challenged by
10   Victory Records as violating the purpose of the agreement.  I
11   am not expressing any indication about that.  One that is
12   ultimately for Judge Moran to determine.

13          That's why I said I am not dismissing Count 9.  But
14   what I am ruling is that the main thrust of the motion which
15   respect to Count 9, the one that claims terminability at will
16   is not legally sound.

17          Now with that being the case -- and I should add one
18   thing, you know, as long I have talked about not expressing a
19   view on that.  If plaintiffs intended to take such action,
20   essentially they would be operating at their peril.  That is,
21   if they engage in that and it turns out to be unlawful under in
22   terms of contract law and they are therefore causing harm to
23   Victory Records that's something that will be tried out before
24   Judge Moran.  And I am not suggesting a ruling either way.  I
25   am simply making plain that the scope of the ruling that I am

6

1 announcing this morning is one that knocks out the claim based
2 upon terminability at will.
3          Now that then carries with it the idea that Counts 1
4 and 2, which are the claim of copyright infringement and
5 trademark infringement respectfully, that those have to fall
6 because they depend entirely on the notion of a valid
7 termination.  And I've just indicate that termination which is
8 e grounded on the notion of terminability at will, will not
9 fly.
10          I am not indicating a ruling on Count 3, which is
11 essentially the federal law of unfair competition, you know
12 Section 1125.  That may or may not be sustainable in light of
13 the things that I have said.  Nor am I making a determination
14 about Count 4 as to whether it is appropriate to look at Ohio
15 or law or Illinois law.  We leave that again for Judge Moran to
16 determine.
17          So far as Count 5 is concerned that's one is
18 asserting -- wait a minute.  Let me see my notes on that.  oh,
19 Count 3 is a fraud claim.  That one does not seem to me to be
20 sustainable.  And the reason is that it like very much like a
21 breach of contract claim that is sought to be dressed up as
22 fraud.  That is, if in fact Victory Records was not accounting
23 appropriately for royalties or whatever that is, the notion
24 that that somehow converts it to a tort instead of a contract
25 really is not consistent with at least Seventh Circuit law.

1   That may -- might -- present a question about whether you look
2   at Ohio law or Illinois law.  And I don't think that the
3   parties have given full attention on how that choice impacts on
4   that claim.  But certainly in fraud terms, at least the law
5   that we are accustomed to dealing with here would not support
6   that.
7           Count 6, that's the one "interferes with business
8   relationship."  I have got to tell you that despite the fact
9   park that we live in notice pleading regime, the way that I
10  read that one it doesn't seem to that it's got enough meat on
11  the bones.  I think in order to sustain that kind of claim more
12  would have to be alleged that would support the idea, justing
13  saying it doesn't make it so.  That's the old Lincoln line, you
14  know.  When he posed the question, "If you call a dog's tail a
15  leg, how many legs does the dog have?"  When the answer came
16  back "Five," he said, "No.  Calling a tail a leg doesn't make
17  it so."  Well that sort of same that applies here.
18          So on that one I am just giving you an indication
19  that I believe that in order to sustain such a claim of
20  business interference, which looks awfully in candor, that
21  would really have to be amended to do a better job that has
22  been done here.
23          So far as Count 7 is concerned, which is recision, if
24  what is really meant is recision, it's always been my
25  understanding that the party that seeks to rescind has an

8

1  obligation to return what has been derived under the contract.
2  And I don't see any suggestion that these people would like to
3  give back the million of dollars that they have gotten in order
4  to justify recision as relief.

5           Now that I have read it, and I am not sure that
6  recision is exactly what you are talking about as contrasted
7  maybe with revocation. But if it's revocation, then it goes
8  back to the point that I was making about terminability at
9  will. But you'd better take a fresh look at that. Because if
10  you are really talking recision, what you better do is to
11  tender, that's always a condition of recision.

12           Then the, let's see. What's 8? Oh, 8 is unjust
13  enrichment. Well, that one as you know or at least under
14  Illinois law, you cannot assert an unjust enrichment claim if
15  you have got a contract. You can't argue quantum meruit if the
16  parties have a contract. And so again I don't think that
17  anybody submitted, if Ohio law is applicable, anybody submitted
18  anything on that. So again I am not in a position to rule
19  ultimately if Ohio law were to govern. And if Ohio law were
20  different, maybe Count 8 could be supported, but certainly not
21  in Illinois.

22           Anyway, let me see if I have got anything else here.
23  No. I guess that all that I had just in the way of short
24  scrawled notes for myself. And obviously as I indicate, I am
25  not dealing ultimately with the case here. That remains for

9

1  Judge Moran.  But I did feel that it was appropriate to knock

2  out at least the things that I had mentioned at the outset.

3  And that had do with to terminability at will with the

4  necessary adjuncts to that which are Count 1 and 2.

5          Is there anything about what I have said that's not

6  clear?  I am not asking whether you agree with it, but is there

7  anything that's not clear?

8          MR. GRIESMEYER:  No, Judge.  I think it's well

9  thought out and reasoned approach.  I guess I am just curious

10  as to what exactly the ruling is today, given the fact that you

11  have indicated that Judge Moran.

12          THE COURT:  I have indicated what my rulings --

13          MR. GRIESMEYER:  Okay.

14          THE COURT:  I have said the three things that are

15  definitely my rulings.  And that is, I am granting the motion

16  to dismiss Count 9 to the extent that the motion is based upon

17  the nonterminability at will of the contract.  I am also

18  granting the motion to dismiss Counts 1 and 2 that are

19  necessarily hooked to that.  With respect to the others, Count

20  3 might well fall with that.  But I am not ruling on that

21  because you may want to develop further as to whether that can

22  survive, notwithstanding the fact that the terminability at

23  will not -- isn't going to fly.

24          The others I was simply giving you my views rather

25  than my ultimate rulings for the reasons that I had indicated

1 as limiting what I was dealing with. But I felt that the

2 terminability at will really had to be dealt with at out the

3 outset because so much of the case hinges on that.

4      And I don't know. Is there anything else that is not

5 clear about what I have dealt with?

6      MR. SPALDING: I don't think so. I this that

7 clarifies for me the scope of the answer. I take the Court is

8 not going to be issuing a written opinion on this?

9      THE COURT: That's right. I have just given you my

10 ruling.

11      MR. SPALDING: That's fine.

12      THE COURT: I have trouble enough keeping up with two

13 sets of motion calls without also committing a lot of rulings

14 to papers.

15      MR. GRIESMEYER: Certainly.

16      THE COURT: Okay.

17      MR. SPALDING: Thank you, your Honor.

18      MR. GRIESMEYER: Thank you, your Honor.

19    (WHICH WERE ALL OF THE PROCEEDINGS HAD AT THE HEARING OF
THE ABOVE-ENTITLED CAUSE ON THE DAY AND DATE AFORESAID.)

20

21

22

23

24

25

11

C E R T I F I C A T E

I HEREBY CERTIFY that the foregoing is a true and correct
transcript from the report of proceedings in the above-entitled
cause.

_____

JESSE ANDREWS, CSR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
DATED: October 18, 2006

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.0
### Eastern Division

Eron Bucciarelli–Tieger, et al.

Plaintiff,

v.

Case No.: 1:06–cv–04258
Honorable James B. Moran

Victory Records, Inc., et al.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, April 3, 2007:

    MINUTE entry before Judge James B. Moran :Defendants move to consolidate, as a related case, Victory Records vs Virgin Records America, Inc. and EMI Music North America, 06 C 5985 now pending before Judge Conlon. We deny, for now the motion to consolidate, [56] but we find that it is a related case pursuant to Local Rule 40.4 and request the Executive Committee for its reassignment. Both cases arise out of the same fight, and having one Judge handling both may likely result in a substantial saving of judicial time and effort. It is, however, premature to consolidate the cases for a single trial, although they may indeed be susceptible of disposition in a single proceeding. But that we leave to another day. Mailed notice(ldg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT H

TG

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ERON BUCCIARELLI-TIEGER, an individual; et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 06 C 4258 |
| | ) | |
| VICTORY RECORDS, INC., an Illinois corporation; et al., | ) | ) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, individually and collectively, as Hawthorne Heights ("HH"), a musical group, filed this action on August 7, 2006, against defendants, Victory Records, a record company, its CEO, Anthony Brummel, and the company's publishing arm, Another Victory, alleging willful copyright and trademark violations; unfair competition, in violation of the Lanham Act; and several state law claims. The complaint also seeks a declaratory judgment as to the nature of the agreement between plaintiffs and defendants. On August 28, 2006, plaintiffs filed a motion pursuant to Federal Rule of Civil Procedure 42(b), to bifurcate the declaratory judgment claim from the others, and for expedited discovery as to that claim. Defendants filed their answer on September 8, 2006, along with several counterclaims. On September 22, 2006, defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(c). Preliminary determinations were made on this motion by Judge Shadur sitting in our stead on October 18, 2006 (*see* def. mo. for ruling, exh. B) On January 10, 2007, we offered further guidance, without ruling (docket no. 55). Today we rule in full on defendants' motion, granting it in part and denying it in part.

## BACKGROUND

The following facts are taken generally from the pleadings. Where the facts are contested, we draw, where possible, from the exhibits accompanying the pleadings. Plaintiffs are all residents of Ohio and comprise a musical band called Hawthorne Heights. On or about December 11, 2003, HH entered into an agreement with defendants – which was amended on or about April 29, 2004 (collectively referred to as "the agreement") – for a four-album deal, with irrevocable consecutive options granted to defendants for the second, third and fourth albums. Plaintiffs were to be paid royalties corresponding to album sales, and the agreement included a number of other terms, including territory, publishing, recording advances, recoupable costs, merchandising, touring, and accounting procedures. Pursuant to the agreement, HH delivered both audio and visual records to defendants for two albums which were released on June 8, 2004, and February 28, 2006, respectively. A DVD was released in or about January 2006.

Prior to the release of the second album in February 2006, a member of defendants' staff sent an e-mail to the street team for plaintiffs' album.[1] This e-mail encouraged the team members to move plaintiffs' album to more prominent locations in record stores, and to move a competing artist's album to less prominent locations – or hiding copies of such album. On March 1, 2006, the staff member sent another e-mail to the street team telling them the previous e-mail had been a joke.

On August 3, 2006, plaintiffs sent a letter to defendants, purporting to terminate the agreement, including the purported termination of any licenses defendants possessed for plaintiffs' recordings. In plaintiffs' letter, they alleged that they were permitted to terminate

---

[1]A street team is a group of people used to generate publicity for a record company's artists.

the agreement and the licenses because defendants had (1) failed to account for certain
royalties under the agreement, applied wrong percentages to royalty rates and mis-charged
advertising costs; (2) engaged in outrageous conduct by way of the street team e-mail; (3)
drafted a "Manifesto" which was falsely attributed to the band, portraying it as in a war with
artists in other genres; (4) physically threatened professional music industry figures, as well
as HH's personal manager; (5) damaged HH's relationship with producers and other industry
professionals by failing to account for or pay royalties under the agreement; and (5)
intentionally interfered with HH's relationship with retailers with respect to HH merchandise.
Plaintiffs' letter purported to rescind the agreement.  Subsequent to receipt of this letter,
defendants continued to manufacture and market plaintiffs' albums.    On August 7, 2006,
plaintiff filed the instant action.

Plaintiffs' complaint alleges that the agreement between plaintiffs and defendants was
a non-exclusive agreement for performance, granting defendants a non-exclusive implied
license to manufacture and market plaintiffs' albums, and the use of plaintiffs' name.
Plaintiffs allege that the duty to perform, and the license, were nullified when plaintiffs sent
their letter of termination because the agreement and the license were terminable at-will.
Alternatively, plaintiffs allege that the agreement and license were non-exclusive, making the
license terminable at the will of the licensor.  Plaintiffs seek a declaratory judgment with
regards to the characterization of the agreement and any licenses found therein. Plaintiffs
allege that since the license was terminated, defendants infringed plaintiffs' copyright and
trademark when they continued to market plaintiffs' albums and use plaintiffs' name in
violation of 17 U.S.C. § 501 *et seq.* and 15 U.S.C. § 1125(a). Plaintiffs further allege defendants
engaged in unfair competition through these same actions, in violation of the Lanham Act. 15

U.S.C. § 1125(a). Plaintiffs also allege a number of state law claims arising out of defendants' conduct, including the tort of false light, fraud, interference with business relations, rescission and unjust enrichment.

On August 28, 2006, plaintiffs filed a motion to bifurcate claims and expedite discovery with regard to the declaratory judgment claim. Defendants filed their answer and counterclaims on September 8, 2006, and filed their motion to dismiss pursuant to Rule 12(c) on September 22, 2006. Because plaintiffs sought expedited ruling on the declaratory judgment, the motion to dismiss was set before Judge Shadur, sitting in this court's stead, on October 18, 2006. Judge Shadur orally dismissed Count IX for declaratory judgment to the extent that it was premised upon the agreement being terminable at-will (def. mo. for ruling, exh. B) – he held that a reading of the agreement negated such a finding. He dismissed Counts I and II for copyright and trademark infringement to the extent that they, too, were based on the agreement being terminable at-will. Plaintiffs then filed a motion for reconsideration or clarification on October 31, 2006. On November 7, 2006, Judge Shadur orally clarified his order, stating that he had not dismissed Counts I, II and IX in their entirety, just to the extent they relied on the agreement being terminable at-will (def. mo. to rule, exh. C). He clarified that he was not ruling as to the exclusivity of the agreement or on a termination-for-cause theory.

On January 10, 2007, knowing we would be absent from court during the month of January, we offered guidance to the parties regarding the motion to dismiss, but did not make any substantive rulings (docket no. 55). We did, however, deny plaintiffs' motion to bifurcate claims and expedite discovery. *Id.* We now take up the portions of the motion to dismiss that have not already been addressed.

## ANALYSIS

This court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b).  We have supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise out of a common nucleus of operative fact. <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 724 (1966).  We also have subject matter jurisdiction pursuant to 28 U.S.C. §1332 – plaintiffs are residents of Ohio, defendants are residents of Illinois, and the amount in controversy exceeds $75,000.

The standard of review for motions to dismiss made pursuant to Rule 12(c), is the same as for Rule 12(b)(6). <u>Olson v. Wexford Clearing Serv. Corp.</u>, 297 F.3d 488, 490 (7th Cir. 2005). Dismissal is proper only when it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).    The well-pleaded allegations of the complaint must be accepted as true, and the court must draw all reasonable inferences in favor of plaintiff. <u>McMillan v. Collection Prof'ls, Inc.</u>, 455 F.3d 754, 758 (7th Cir. 2006).  However, a copy of any written instrument which is an exhibit to a complaint is considered to be a part of the pleadings (Rule 10(c)), and as a general principle, when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations. <u>Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.</u>, 927 F.2d 988, 991 (7th Cir. 1999). Furthermore, we are not obliged to accept as true plaintiffs' legal conclusions or unsupported conclusions of fact.  <u>County of McHenry v. Ins. Co. of the West</u>, 438 F.3d 813, 818 (7th Cir. 2006).

## Count IX - Declaratory Judgment

The declaratory judgment plaintiffs seek in Count IX can be broken down into two parts.  First, plaintiffs seek a judgment that the agreement does not bind them to record

exclusively for defendants.  Second, plaintiffs seek a judgment that they own the copyrights

to the first two albums and that any license they may have granted defendants to those albums

by way of the agreement was non-exclusive and, therefore, terminable at any time. We take

each of these parts in turn.

Exclusivity of Services

Defendants argue that the agreement requires plaintiffs to record exclusively for

defendants during the life of the agreement.  Defendants argue that any other interpretation

would be untenable because it would be absurd to think plaintiffs could record albums for

defendants while simultaneously re-recording new versions of the same albums for another

company.

Plaintiffs argue that by "non-exclusive," they do not mean they could deliver the same

albums to two different companies, but that they are free to record other albums with other

companies while they carry out their obligations to defendants.

Both parties agree that the agreement is not ambiguous and, in fact, cite the same case

for the proposition that the court will not look beyond the language of the agreement in such

situations. Palda v. General Dynamics Corp., 47 F.3d 872, 874 (7th. Cir. 1995).  Despite this,

in the very next section of its memorandum, defendants point this court to a well-known music

industry publication which states that the industry standard is for recording agreements to

require exclusive performance.  Defendants attached selected pages from the book as an

exhibit to their motion to dismiss. Such exhibits, however, cannot be considered on this motion

without converting it to a motion for summary judgment under Rule 12(c).  Additionally, to

consider these exhibits would not only require us to convert the motion, but would require us

to find that the agreement is indeed ambiguous, since we would be looking beyond the four

corners of the agreement. This would in turn mean its interpretation is not a matter for a motion to dismiss. Dawson v. General Motors Corp., 977 F.2d 369, 373 (7th Cir. 1992). Defendants clearly do not believe this is so.[2]

We find that the agreement is unambiguous as to this point, and that plaintiffs' services to defendants during the term of the recording agreement are not exclusive. The agreement contains no exclusivity provision, nor does any of its language appear to prevent plaintiffs from recording elsewhere during the life of the agreement.

We also do not see how this interpretation would be commercially absurd. Our interpretation does not mean plaintiffs can market the same albums to another record company, or even re-record the same tracks, and plaintiff clarified that this was not their argument. It simply means plaintiffs are free to record other albums or tracks for another record company during the life of the agreement with defendants. Defendants even admit in their motion that within the industry standard there are exceptions to the rule of exclusivity. Therefore, defendants' motion as to plaintiffs' exclusivity of services under the agreement is denied.

---

[2]Even if we were to consider defendants' exhibit, it would not change our finding here. While it may be industry standard for recording agreements to be exclusive as to performance, this is generally because exclusivity provisions are put into the agreements. See 6 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 30.03(a) and Form 30.03(a)(1) (2006). Further, defendants point to no case which allows for exclusive services without an explicit provision, and we have found none. In fact, all the cases we have been able to find requiring exclusive services have derived such a finding from the language of the agreement itself. See e.g. T.E.A.M. Entm't, Inc. v. Douglas, 361 F. Supp. 2d 362, 364 (S.D.N.Y. 2005)(agreement provided that Ashanti would provide her personal services exclusively to T.E.A.M. for the duration of the agreement); Frost Belt Int'l Recording Enterprises, Inc. v. Cold Chillin' Records, 758 F. Supp. 131, 133 (S.D.N.Y. 1990)("During each Contract Period you will provide exclusive Artist's services to Tuff City"); Croce v. Kurnit, 565 F. Supp. 884, 887 (S.D.N.Y. 1982)(agreement provided that Croce would perform and record exclusively for CP&W); Bertolino v. Italian Line, 414 F. Supp. 279, 284 (S.D.N.Y. 1976)(agreement called for plaintiff to devote his services exclusively); Phillips v. Audio Active Ltd., 2005 WL 3309652, *1(S.D.N.Y. 2005)(plaintiff agreed to provide "his exclusive services as a recording artist" to defendant); EMI Latin v. Bautista, 2003 WL 470333, *2(S.D.N.Y. 2003)(agreement that manager would provide the exclusive services of the Kumbia Kings as recording artists).

**Copyright Ownership and Licensing**

Defendants argue that we should dismiss plaintiffs' claim that they are the rightful owners of the copyrights, or in the alternative, if we find plaintiffs to be the owners of the copyrights, we should dismiss plaintiffs' claim that any license was non-exclusive because the agreement can only be interpreted as granting an exclusive license.

Defendants first argue that they own the copyrights to the two albums and the DVD, either because they were a "work-for-hire," or because the rights were assigned to defendants in the agreement. We address each in turn.

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). There is an exception, however, for "works made for hire." In such situations "the employer or other person for whom the work was prepared is considered to be the author" and owns the copyright, unless there is a written agreement stating otherwise. The Act provides that there are two ways a work can be for hire:

> (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

Sound recordings are notably exempt from the list of works that can be specially commissioned as works-for-hire. *See* In re Napster, Inc., 2004 U.S. Dist. LEXIS 7236, *23-24 (N.D. Cal. 2004)(recalling recording industry's attempt and failure to add sound recordings to the list). Therefore, the only way this can be a work-for-hire is if plaintiffs are employees of defendants.

In order to determine whether a party is an employee or an independent contractor, we turn to the general rules of agency. <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 751 (1989). We consider numerous factors, such as

> the hiring party's right to control the manner and means by which the product is accomplished ... the skill required, the source of the instrumentalities and tools, the location of the work, the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, the hired party's role in hiring and paying assistants, whether the work is part of the regular business of the hiring party, whether the hiring party is in business, the provision of employee benefits and the tax treatment of the hired party.

*Id.*

This determination is necessarily fact-intensive, and on this motion to dismiss we certainly do not have all the facts before us. We are unable to decide on the pleadings that plaintiffs are or are not employees of defendants, and therefore cannot say that plaintiffs have failed to state a claim upon which relief can be granted.

Because we cannot decide ownership of the works on this motion, it follows that we cannot decide the nature of any licenses to the works. Therefore, we deny defendants' motion to dismiss Count IX of the complaint.

## Counts I, II, and III - Copyright and Trademark Infringement

Counts I and II of the complaint allege willful copyright and trademark infringement, in violation of 17 U.S.C. § 501 *et seq.* and 15 U.S.C. § 1125(a), respectively. Count III alleges unfair competition in violation of the Lanham Act. 15 U.S.C. § 1125(a). Because we are unable to determine on this motion who is the rightful owner of the copyrights in question, we must necessarily accept plaintiffs' allegations as true that they own the copyrights. Therefore, defendants would have to provide evidence that they in fact own the copyrights in order for

Case 1:08-cv-00314-DKC   Document 11-6   Filed 04/17/2008   Page 13 of 26

us to grant their motion to dismiss. This they have not done. Therefore, we deny defendants'

motion to dismiss Counts I through III, as they are necessarily predicated on a determination

of ownership, although whether or not the contractual relationship continues will have a major

impact on the rights and obligations of the parties.

## Count IV - Invasion of Privacy - False Light

Defendants argue that Count IV of the complaint should be dismissed. They first argue

that Ohio law applies, and Ohio law does not recognize the tort of false light. Defendants

argue that Ohio law applies to this case because the tort of false light is analogous to that of

defamation. In defamation cases, Illinois uses the victim's domicile as the deciding factor with

regard to choice of law. Thus, argues defendants, the victim's domicile should also control

choice of law in this false light claim, and Ohio law should be applied. They argue that since

Ohio does not recognize the false light tort, plaintiffs' claim should be dismissed.

We agree with defendants that Ohio does not currently recognize the tort of false light.

The Ohio Supreme Court made this clear in <u>Yeager v. Local Union 20, Teamsters</u>, 453 N.E.2d

666, 669-70 (Ohio 1983), and, when faced with the opportunity to revisit the issue in <u>M.J.

DiCorpo, Inc. v. Sweeney</u>, 69 Ohio St. 3d 497 (Ohio 1994), the court declined to do so.[3]

This fact makes little difference, however, because we find that Illinois law applies to

plaintiffs' claim. A federal court deciding pendent state law claims, or sitting in diversity,

---

[3]Plaintiffs argue that a number of Ohio appellate courts have recognized the tort of false light since
then. We do not agree. Four of the cases cited by plaintiffs merely set out the four privacy torts, including
false light, but then go on to analyze one of the others. *See* Peterman v. Stewart, 2006 WL 2590072 (Ohio
App. Ct. 2006); James v. Bob Ross Buick, Inc., 855 N.E.2d 119 (Ohio App. Ct. 2006); Henson v. Henson, 2005
WL 3193841 (Ohio App. Ct. 2005); Piro v. Franklin Twp., 656 N.E.2d 1035 (Ohio App. Ct. 1995). Only one
case actually has any discussion of false light, and there the court merely states that the facts do not support a
false light claim. *See* Brooks v. Lady Foot Locker, 2005 WL 1163018 (Ohio App. Ct. 2005). Notably, the
authority for the proposition in all of plaintiffs' cases that a false light is one of the privacy torts in Ohio can
be traced back to a case that plaintiff also cites, Killilea v. Sears, Roebuck & Co., 499 N.E.2d 1291, 1294
(Ohio App. Ct. 1985), which states the exact opposite – that Ohio does not recognize a false light claim. That
case derives its authority directly from <u>Yeager</u>. *Id.*

applies the choice of law rules of the state in which it sits.  In re Bridgestone/Firestone, Inc.,

288 F.3d 1012, 1015 (7th Cir. 2002); Erickson v. Baxter Healthcare, Inc., 94 F. Supp. 2d 907,

910 (N.D. Ill. 2000).  In determining choice of law for tort actions, Illinois uses the "most

significant relationship" approach of the Restatement (Second) of Conflicts of Law. Esser v.

McIntyre, 169 Ill. 2d 292, 661 N.E.2d 1138 (Ill. 1996). Illinois also recognizes false light as one

of the privacy torts. Lovgren v. Citizens First Nat'l Bank, 126 Ill. 2d 411 (Ill. 1989).

Defendants argue that false light is analogous to defamation, and therefore, under

Illinois choice-of-law provisions, plaintiffs' domicile controls.  While it is true that Illinois uses

the domicile of the victim as the deciding factor for choice of law in defamation actions,

defendants cite no authority for an analogy between defamation and false light claims, and we

find none.  In the absence of such authority, we apply the full "most significant relationship"

test to determine choice of law. See Harman v. Gist, 2003 WL 22053591 (N.D.Ill.

2003)(separating choice-of-law determination for defamation from determination of privacy

claim).

The factors considered in determining choice of law are (1) the place of the injury, (2)

the place where the injury-causing conduct occurred, (3) the domicile of the parties, and (4)

the place where the relationship between the parties is centered. In re Trans Union Corp.

Privacy Ltg., 211 F.R.D. 328, 343 (N.D. Ill. 2000).  We also consider the interests and public

policies of potentially concerned states as they relate to the transaction. *Id.*  The injury and

the injury-causing conduct in this case occurred in Illinois – that is where Victory Records'

principle place of business is located, where defendant Brummel claims residence, and from

where the Victory employee sent the offending e-mail to the street team. See Grudoff v.

American Airlines, Inc., 1991 WL 208890 (N.D. Ill. 1991). The domicile of the parties is evenly

split between Illinois and Ohio, but the place where the relationship was centered was in Illinois, as that is where plaintiffs delivered the recordings and where the marketing for plaintiffs' recordings was developed.    Illinois law applies to this action and, therefore, defendants' motion to dismiss is denied as to Count IV.

<u>Count V - Fraud</u>

Next, defendants claim that Count V, plaintiffs' fraud claim, should be dismissed because it is merely a breach of contract using the language of fraud. We agree. A breach of contract is not sufficient to find fraud. <u>Perlman v. Zell</u>, 185 F.3d 850, 853 (7th Cir. 1999). Under both Illinois and Ohio law, injury from fraud must be more than just damages arising from a breach of contract. <u>Avery v. State Farm Mut. Auto. Ins. Co.</u>, 216 Ill. 2d 100, 100-102(Ill. 2005); <u>Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.</u>, 212 F.3d 332, 339 (6th Cir. 2000). Here, plaintiffs have not pled anything more than a breach of contract.

In their complaint, plaintiffs allege that defendants issued a series of fraudulent royalty statements that were required under the terms of the agreement. They allege that defendants knew that the royalty statements were fraudulent and intended that plaintiffs rely on them as accurate and continue to perform under the agreement, which plaintiffs did. This is no more than a breach of contract claim dressed up in the language of fraud. Plaintiffs have made no allegations that they were induced to take any action (such as contract), or refrain from taking any action (such as terminate a contract that they had the right to terminate) because of these allegedly fraudulent royalty statements, nor could they – they were already bound by the agreement. Furthermore, the option clause in the agreement was not construed to plaintiffs' benefit, it was solely exercisable by defendants. Thus, plaintiffs were at all times required to perform under the agreement in the absence of a breach. Because plaintiffs' allegations do not

rise above the level of a breach of contract, Count V is dismissed.

## Count VI - Interference with Business Relations

Defendants argue that Count VI of plaintiffs' complaint, alleging interference with business relations, should be dismissed for failure to state a claim. We agree. While it is true that plaintiffs need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief" (Rule 8(a)(2)), plaintiffs' allegations here do not rise even to that level. In Count VI, plaintiffs have alleged only the barest of legal conclusions – merely parroting the language of the elements required for a claim. Plaintiffs allege an expectancy of a valid business relationship with a merchandise retailer, "Hot Topic," but nowhere in their entire complaint, neither in this count nor in their background facts, do they ever mention this or any relationship with them. Nor do they give any information as to how defendants' "knew of and intentionally interfered with this expectancy." Federal notice pleading does not require much beyond bare legal conclusions, but we think defendants are entitled to a bit more notice of the nature of plaintiffs' claims. Conley v. Gibson, 355 U.S. 41, 47 (U.S. 1957). Therefore, we dismiss Count VI, but with leave to amend.

## Count VII - Rescission

Defendants argue that plaintiffs' rescission claim, Count VII, should be dismissed. "Rescission" is an extraordinary remedy that involves the judicial termination of a party's contractual obligation. It is a court-ordered "unwinding" of the contract with the goal to return the parties to their positions prior to contracting. Jones v. Infocure Corp., 310 F.3d 529, 535 (7th Cir. 2002). Because both states' laws are similar, we need not engage in a choice-of-law discussion. See International Admrs., Inc. v. Life Ins. Co., 753 F.2d 1373, 1376 (7th Cir. 1985). Under both Illinois and Ohio law, rescission is generally granted only for fraud, mutual

mistake or breaches of contract so material that they go to the very root of the contract. Mor-Wood Contractors, Inc. V. Ottinger, 205 Ill. App. 3d 132, 141-42 (Ill. App. Ct. 1990); Miller v. Bieghler, 123 Ohio St. 227, 233 (Ohio 1931); Wannemacher v. Cavalier, 2004 Ohio 4020, *45 (Ohio Ct. App. 2004). In both states, a claim of rescission generally requires the rescinding party restore the other party to the status quo ante. Mor-Wood, 205 Ill. App. 3d at 141-42; England v. O'Flynn, 2002 Ohio 103 (Ohio Ct. App. 2002). Plaintiffs here have made no claims that they would restore defendants to the status quo ante, nor do we see how they could do so.

Plaintiffs argue that failure to be able to restore the parties to the status quo ante is not a precondition of rescission, at least not under Illinois law. See International Ins. Co. v. Sargent & Lundy, 242 Ill. App. 3d 614, 629-30, 609 N.E.2d 842 (1st Dist. 1993). The case that plaintiffs rely on, however, itself relies on another case which expounds on this notion. In Hakala v. Illinois Dodge City Corp., 64 Ill. App. 3d 114, 120 (Ill. App. Ct. 1978), the court found that

> rescission is an equitable doctrine and as stated in 77 Am. Jur. 2d Vendor and Purchaser § 565 (1975):

>> As in other cases of rescission, the vendee is ordinarily required to restore the status quo, insofar as he has received any benefit, as a condition of his right to rescind; but he is not required to put the other party in the same situation in which he was before the contract, where the latter has rendered it impossible by the nature of his fraud or other act, or where from the nature of the land and the purpose for which it was purchased, it is impossible to restore the status quo, as where the purchase was of timberland and the purchaser had cut timber thereon; in such a case all that the purchaser can be required to do is to reimburse the vendor for the value of the timber removed.

Thus, while plaintiffs are correct that it would be impossible for them to "unrecord" their albums and impossible for defendants to "unsell" them, in order for plaintiffs to maintain a

claim for rescission they must be willing to reimburse defendants for the benefits plaintiffs

derived under the agreement. We do not find such willingness in plaintiffs' complaint and

therefore they cannot maintain a claim for rescission.[4] Count VII is dismissed.

## Count VIII - Unjust Enrichment

Defendants argue that plaintiffs' unjust enrichment claim, Count VIII, should be

dismissed. The theory of unjust enrichment is based on a contract implied in law. *People ex*

*rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 497 (Ill. 1992). To recover under this

theory, plaintiffs must show that defendant voluntarily accepted a benefit that would be

inequitable for him to retain without payment. *Id.* Under both Illinois and Ohio law, where

there is a specific contract that governs the relationship of the parties, the doctrine of unjust

enrichment has no application. *Id.*; *Bumbera v. Hollensen*, 2000 Ohio App. LEXIS 1000 (Ohio

Ct. App. 2000).

Plaintiffs' claim for unjust enrichment fails for two reasons. First, here plaintiffs have

alleged a contractual agreement between the parties. They then incorporated the existence of

that contractual agreement into their unjust enrichment claim. While plaintiffs are entitled

to plead alternative theories under Rule 8(e)(2), it is well-settled that plaintiffs' unjust

enrichment claim must not include allegations of the existence of a specific contract. *See* Team

Impressions, Inc. v. Chromas Technologies Canada, Inc., 2003 WL 355647, *4 (N.D.Ill. 2003);

---

[4] Even if plaintiffs were willing, we are not at all certain that the facts here support rescission. As we have noted above, plaintiffs have failed to make out a claim for fraud. The breaches, then, that plaintiffs complain of as being "so material as to go to the root of the contract," are the underpayment (not the non-payment) of royalties. Numerous courts in circuits more familiar with these types of cases have held that the underpayment of royalties (absent fraud or the total lack of payment) does not support the extreme remedy of rescission. *See* Nolan v. Sam Fox Publishing Co., 499 F.2d 1394, 1399 (2d Cir. 1974)(partial royalty payments distinguished case from one warranting rescission); *see also* Cafferty v. Scotti Bros. Records, 969 F. Supp. 193, 205 (S.D.N.Y. 1997); Vestron, Inc. v. National Geographic Soc., 750 F. Supp. 586, 594 (S.D.N.Y. 1990); Peterson v. Highland Music, 1995 U.S. Dist. LEXIS 22008, *9-10 (C.D. Cal. 1995).

Cole-Haddon, Ltd. v. Drew Philips Corp., 454 F. Supp. 2d 772, 777 (N.D. Ill. 2006).

Secondly, plaintiffs' claim must fail because the allegations are merely injuries plaintiffs suffered from defendants' alleged breach of its contractual obligations.  Plaintiffs argue in their response that the complaint alleges the termination of the agreement, and that they are claiming unjust enrichment through defendants' continued exploitation of plaintiffs' property after termination.  There is no allegation in Count VIII regarding unjust enrichment after the termination of the agreement.  Plaintiffs' claims center specifically around defendants' alleged "fraudulent accounting and failure to pay HH royalties and fees for the sale and other exploitation" of plaintiffs' recordings and merchandise.  Because all of these allegations are wrapped up in the terms of a specific contract, which plaintiffs allege exists, plaintiffs cannot claim unjust enrichment.  Therefore, Count VIII is dismissed.

Termination for Cause

Finally, defendants argue that plaintiffs cannot claim a cause of action for termination for cause because they strategically decided not to claim such action in their complaint.  Defendants argue that plaintiffs' attempt to create such a cause of action in their response memorandum is an improper attempt to amend their complaint through their response to a motion to dismiss.  We do not agree.  Under the federal rules, plaintiffs are not required to plead specific legal theories as long as the facts of their complaint support such theories. Young v. Sheahan, 2000 WL 288516, *1 (N.D. Ill. 2000).  Here, the facts of plaintiffs' complaint support an inference of termination for cause.  Plaintiffs' letter purporting to terminate their agreement with defendants states as much.[5]  Therefore, we find that plaintiffs are not barred

---

[5]The relevant portion of plaintiffs' letter states in pertinent part, "you should be aware that Hawthorne Heights does, in fact, have more than ample cause to terminate the licenses and rescind the Agreement because of, among other things, the following outrageous and egregious acts by you and Victory:

No. 06 C 4258                                                              Page 17

from claiming termination for cause and are permitted to amend their complaint to include

such a cause of action.

## CONCLUSION

For the foregoing reasons, we grant defendants' motion to dismiss as to Counts V, VI,

VII and VIII of plaintiffs' complaint, and deny the motion as to Counts I, II, III, IV and IX.


                                        _James B. Moran_
                                         **JAMES B. MORAN**
                                    Senior Judge, U. S. District Court

_____March 1_____, 2007.

---

(listing acts)." (plf. cplt, exh. B).

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERON BUCCIARELLI-TIEGER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 06 C 4258 |
| | ) | |
| VICTORY RECORDS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants move this court to reconsider or clarify its memorandum opinion and order of March 1, 2007, in which the court, in relevant part, denied defendants' motion to dismiss plaintiff's complaint to the extent that plaintiff's allegations rested on the recording contract being non-exclusive. We found nothing in the contract that required plaintiffs to record exclusively for defendants during the life of the contract. Defendants now seek reconsideration or clarification of that interpretation. We deny defendants' motion.

## BACKGROUND

Plaintiffs, members of a band named "Hawthorne Heights," entered into a recording contract with defendant, Victory Records, which created an initial contract period in which plaintiffs would record a sufficient number of masters to constitute a record. Victory was granted four "separate, consecutive, and irrevocable options" to extend the contract term for further "option periods" in which plaintiffs would record additional albums. The initial contract period was set to expire 18 months after the plaintiffs' delivery of the first album. Victory executed its option for a second album within that time frame, and plaintiffs delivered a second album. This second option period was to expire 12 months after plaintiffs' delivery

of their second album. After delivery of the second album, a dispute arose between plaintiffs and Victory. Plaintiffs purported to terminate their contract with Victory, and Victory subsequently exercised its third option. Plaintiffs brought suit against defendants claiming, among other things, that plaintiffs were not bound under the contract to deliver another two albums to Victory, because the agreement was terminable at-will, or, in the alternative, because the plaintiffs terminated the agreement for cause. Plaintiffs also sought a declaration that the contract was non-exclusive. Defendants filed a motion to dismiss, which was granted in part and denied in part by Judge Shadur (sitting in this court's stead), and this court. Defendants seek reconsideration of the March 1, 2007, order to the extent that the contract between plaintiffs and Victory was found to be non-exclusive.

## ANALYSIS

A motion to reconsider is appropriate where (1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; (3) the court has made an error not of reasoning but of apprehension; (4) there has been a controlling or significant change in law since the submission of the issue to the court; or (5) there has been a controlling or significant change in the facts since the submission of the issue to the court. *Id.*; Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990). Motions for reconsideration are not vehicles for rehashing old arguments that have already been rejected. Oto v. Metropolitan Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000).

Defendants argue that the court made an error of apprehension by not considering the "plain language" of paragraph 1 of the agreement in which, defendant argues, plaintiffs agreed to record four consecutive albums for Victory. Defendants argue that the word

"consecutive" in the agreement modifies the *albums* that plaintiffs must record, and thus the agreement must be exclusive to the extent that it requires plaintiffs to tender their next two recorded albums to Victory. We disagree. The plain language of the agreement states:

> Artist grants to Company four (4) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period.

It is clear from this language that what is consecutive are the options granted to Victory, not the albums to be recorded. As we have construed the contract, during each option period plaintiffs must record one album for Victory. Plaintiffs are free to record other albums for other recording labels, or for themselves, during this time, as long as they complete a sufficient number of masters to constitute a record deliverable to Victory during the option period.

Defendants argue that this interpretation renders the contract illusory because there is no time limit in which plaintiffs must record the album for Victory, and thus plaintiffs will continue to put off their Victory album indefinitely. Defendants argue this would not be a commercially feasible contract if interpreted in this way because bands have a finite shelf life and a record company would not create a contract that permitted a band to put off its recording obligations while recording for other labels.

First, as we noted in our previous opinion, defendants could have contracted for the exclusive services of plaintiffs. We cited several cases in which "exclusive services" were required. Second, defendants, as parties to this contract, could have negotiated a limited amount of time for the delivery of the albums. A number of cases indicate where time limits were placed on artists requiring them to record an album, or several albums, within a certain time frame. MCA Records, Inc. v. Newton-John, 90 Cal. App. 3d 18 (Cal. Ct. App. 1979)(two

albums per year); EMI Latin v. Bautista, 2003 U.S. Dist. LEXIS 2612, 2003 WL 470333
(S.D.N.Y. 2003)(album within first three months, subsequent albums within year of first
album); Three Degrees Enterprise, Inc. v. Three Degrees Worldwide, Inc., 1989 U.S. Dist.
LEXIS 12016, 1989 WL 119697 (E.D. Pa. 1989)(one album per year). That defendants did not
negotiate such a clause here does not mean we must interpret plaintiffs' services as exclusive
to defendants. Further, we disagree that our interpretation renders the contract illusory. "It
is well settled in Illinois that where a contract is silent as to when performance will be
completed, a reasonable time for performance will be implied." Murphy v. Roppolo-
Prendergast Builders, Inc., 117 Ill. App. 3d 415, 418 (Ill. App. Ct. 1983). Ohio law similarly
holds. Oil Chem. & Atomic Workers Int'l Union, Local Union No. 3-689 v. Martin Marietta
Energy Sys., 97 Ohio App. 3d 364, 369 (Ohio Ct. App. 1994)("The law implies that performance
is to take place within a reasonable time, and that the parties so intended and agreed."). What
constitutes a reasonable time is a factual determination, looking at the totality of the
circumstances. Id. Plaintiffs agree that they are required to deliver an album to Victory during
the third option period within a reasonable time. Under the present interpretation of the
contract, plaintiffs are required to deliver an album to Victory within a reasonable time, and
if at some point Victory believes that plaintiffs have unreasonably delayed their obligations,
defendants are free to pursue their remedies.[1] This is not a commercially unreasonable
outcome. See Ahern v. Scholz, 85 F.3d 774, 779 (1st Cir. 1996)(noting that band was earlier sued

---

[1]Defendants argue that it is clear from plaintiffs' own statements that they do not intend to record
any albums for Victory. Defendants point to the Hawthorne Heights website which states that the band has
terminated its relationship with Victory. We note that among the remaining issues in this case is whether
plaintiffs properly terminated their agreement with Victory for cause. If it is found they did, then they would
be released from any further obligation to Victory. If, on the other hand, plaintiffs were found to not have
properly terminated the agreement for cause, then their obligations remain and plaintiffs' failure to satisfy
those obligations would permit Victory to require them to perform.

No. 06 C 4258                                                                              Page 5

for failure to timely deliver albums).

<b><u>CONCLUSION</u></b>

For the foregoing reasons, defendants' motion for reconsideration is denied.


                                                        *James B. Moran*
                                                    **JAMES B. MORAN**
                                          **Senior Judge, U. S. District Court**

_____May 16____, 2007.

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ERON BUCCIARELLI-TIEGER, et al.,    )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )    No. 06 C 4258
                                    )
VICTORY RECORDS, INC., et al.,      )
                                    )
            Defendants.             )

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs move for a preliminary injunction preventing defendants from interfering with Hawthorne Heights' rights to record new material with a producer, or a record label of its choosing. Defendants counter-move for a preliminary injunction prohibiting Hawthorne Heights from making, manufacturing, distributing or selling musical records, directly or through its agents or representatives other than Victory, during the pendency of this action. For the following reasons we grant plaintiffs' motion and deny defendants' motion.

On March 1, 2007, the court entered a memorandum opinion and order granting in part and denying in part defendants' motion to dismiss plaintiffs' complaint. Among other things, the court found that the contract between plaintiffs and Victory was non-exclusive, and, by its lack of exclusivity, permitted plaintiffs to record with other record labels during the term of the contract. Defendants sought reconsideration of that order, arguing that the term "consecutive" in paragraph 1 of the contract modified the albums plaintiffs had to record for defendants, and thus the contract was *de facto* exclusive. We found this argument to be without merit, and ruled on May 16, 2007, that the term "consecutive" modified the options granted to defendant to extend the contract term, but did not require plaintiffs to record four

No. 06 C 4258                                                                                              Page 2

consecutive albums for defendants.

Plaintiffs seek a preliminary injunction against defendants' interference with plaintiffs' attempt to record outside of the Victory contract. Plaintiffs attempted to negotiate a working arrangement with a record producer, Howard Benson. Plaintiffs claim that defendants have sent a threatening and misleading letter to Benson to prevent him from working with the band. The letter states, in part, that per the order of this court the band is currently bound by the recording contract to produce two more albums for Victory. While the letter does not specifically say that those albums must be produced before the band can record elsewhere, the tone of the letter as a whole permits that inference. The letter threatens Benson with tortious interference if he agrees to work with the band on an album that is not one to be produced for Victory. Plaintiffs also cite to an additional letter authored by defendants' counsel, this time directed at MySpace.com. This letter clearly alleges that "Hawthorne Heights remains obligated under the agreement to deliver their next two albums to Victory." Plaintiffs argue that based on the court's March 1, 2007, order, defendants should be enjoined from interfering with plaintiffs' right to record new material with a producer or label of their choosing. They further allege that the contract entitles plaintiffs to full creative control over all musical decisions, including choosing a producer. Defendants cross-move for a preliminary injunction, seeking to prevent plaintiffs from recording at all, unless it is with Victory and with Victory's approval.[1] Defendants included in their cross-motion a declaration from defendant Brummel,

---

[1]Defendants argument centers mostly on the same points it raised in its motion for reconsideration. Now, however, instead of requesting this court to modify its holding that the contract is non-exclusive, defendants assert that the court already held that the contract was exclusive:

> The real issue requiring this Court's intervention now is whether the Band can record and release its New Album with a record label other than Victory. Clearly, the answer is no, simply because the Band remains contractually obligated to delivery its next two studio albums to Victory, as this Court has already ruled.

Defendants further state that this court's ruling holds that "Hawthorne Heights is obligated to release the New Album on Victory or not at all." That defendants have so misconstrued our order is troubling.

the CEO of Victory.  Plaintiffs object to this declaration.

<u>ANALYSIS</u>

A party seeking a preliminary injunction must first demonstrate some likelihood of success on the merits, and that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. <u>Abbott Laboratories v. Mead Johnson & Co.</u>, 971 F.2d 6, 11-12 (7th Cir. 1992) citing <u>Lawson Prods., Inc. v. Avnet, Inc.</u>, 782 F.2d 1429, 1433 (7th Cir. 1986). If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. *Id.*  If, however, the moving party clears both thresholds, the court must consider the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied.  We must also consider the effect of the injunction on the interests of the public, meaning the consequences of granting or denying the injunction to non-parties. *Id.*

We begin with Brummel's declaration.  Plaintiffs object that the declaration does not assert that it is based on personal knowledge and therefore should be dismissed as a whole. They argue that it is replete with hearsay, speculation, and legal conclusions because defendants merely cut-and-paste parts of their cross-motion, numbered the paragraphs, and had the witness sign it as a declaration.  We are aware of the striking similarities between the declaration and the cross-motion, though we cannot say that none of the statements in the declaration was made on the personal knowledge of Brummel; indeed, some were. But to the extent that certain declaratory statements lack foundation, are speculative, irrelevant, or constitute inadmissible hearsay or improper legal conclusions, we have disregarded them.

_____

Regardless, we reject these duplicate arguments for the reasons cited in our May 16, 2007, opinion and order.

We move on to defendants' motion. Defendants argue that they are likely to succeed on the merits of their claim that plaintiffs are bound to record their next two albums for Victory. They argue that when one carefully reads the terms of the contract it is clear that "consecutive" modifies the albums plaintiffs must record. This argument is the same one we rejected in our denial of defendants' motion to reconsider. There we found that the term "consecutive" modifies the options granted to Victory, not the albums plaintiffs must record, and thus plaintiffs are not bound by the terms of the contract to exclusively record for Victory. It follows that defendants have no likelihood of succeeding on the merits of this claim. Because defendants are unable to satisfy the first prerequisite of a preliminary injunction, our inquiry ends here and we deny defendants' motion.

We then turn to plaintiff's motion. Defendants argue that plaintiffs have not tied their motion for a preliminary injunction to a claim in their complaint. However, it is clear that plaintiffs' motion stems from their claim for declaratory relief as to the exclusive nature of the contract. Defendants argue that plaintiffs cannot premise a motion for preliminary injunction on a claim for declaratory relief. They cite no authority for this proposition and we find none. Plaintiffs correctly point out that numerous courts have issued preliminary injunctive relief in actions involving claims for declaratory judgement. *See e.g.* Buckhanon v. Percy, 708 F.2d 1209, 1211 (7th Cir. 1983); Precision Shooting Equipment Co. v. Allen, 646 F.2d 313, 314 (7th Cir. 1981); Kelly Services, Inc. v. Johnson, 542 F.2d 31, 32 (7th Cir. 1976). It is also worth noting that though not specifically stated, defendants apparently relied on their claim for declaratory relief as the basis for their preliminary injunction motion.[2]

---

[2]Defendants also argue that our awarding of a preliminary injunction would be an "end-run" around our earlier orders denying plaintiffs' motions to bifurcate and expedite discovery on the declaratory judgment claim. This argument is unavailing. We have already determined that the contract is non-exclusive, and awarding a preliminary injunction as to this issue alone is not tantamount to delivering an expedited ruling on plaintiff's entire declaratory judgment claim. That claim involves other issues not

Plaintiffs argue that they demonstrate a likelihood of success on the merits with regards to their declaration that the contract is non-exclusive. The threshold for determining likelihood of success is a low one. Reoland Mach Co. V. Dresser Indus., Inc., 749 F.2d 380, 387 (7th Cir. 1984). To demonstrate it, a party must show that its chances of success on the merits of its claim are better than negligible. Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895-96 (7th Cir. 2001). This court has already found that the contract did not call for the exclusive services of plaintiffs. Thus, plaintiffs' chances of succeeding on the merits of this claim are more than negligible.[3]

Plaintiffs argue that they will suffer irreparable harm if an injunction is not entered. Both plaintiffs and defendants concur that bands have a short shelf-life. Plaintiffs argue that if no injunction is put in place to prevent defendants' interference, plaintiffs will be unable to record new albums independent of Victory during the pendency of the action, which could force the band to lose its momentum. Defendants argue that a denial of an injunction will not prevent plaintiffs from recording, but simply prevent them from recording with anyone but Victory. Further, defendants argue that plaintiffs will still be able to make money through the sale of their current records, tours, and merchandise, much of which does not involve Victory and from which Victory receives no money. But plaintiffs' ability to generate revenue is not the core of plaintiffs' alleged harm. Plaintiffs argue that they are unable to record new material with the producer and label that they desire because of defendants' interference. This

---

implicated in this motion, such as copyright ownership.

[3] Plaintiffs also argue that they are likely to succeed on the merits of their claim that they have complete creative control over musical decisions, including the choosing of a producer. Because we find that the contract is non-exclusive, we need not deal with this argument at this time. The provisions of the contract dealing with creative control over musical decisions is one that only applies to music being recorded for Victory. To the extent that plaintiffs are seeking a producer or other creative control over music to be recorded and distributed outside of the Victory contract, the terms of that contract do not apply. This logic also extends to the copyright ownership of material recorded outside of the agreement.

court has ruled that plaintiffs are not bound by the contract to exclusively record with Victory. For this reason, and because it appears that if no injunction is put in place, Victory will continue to send cease-and-desist letters to any producer, record company or other entity that plaintiffs attempt to work with, we find that plaintiffs have demonstrated irreparable harm.[4]

Having ruled that the threshold requirements have been satisfied, we must balance the harm defendants will suffer if preliminary relief is granted against the harm to plaintiffs if relief is denied. Defendants argue that they will suffer irreparable injury if an injunction is granted. First, they argue that as the copyright owner of all of the band's recordings created within the scope of the agreement, any unauthorized reproduction or sale of those recordings would harm defendants. We note that ownership of the copyrights of the band's already-recorded works, and other works to be recorded with Victory, is an issue yet to be settled. Further, plaintiffs are not seeking an injunction permitting them to reproduce and sell their previous albums without interference from Victory, but one permitting them to record new albums without such interference. Defendants also argue that permitting an injunction will cause the band to record albums outside of the Victory contract, and they will put off their recording for Victory indefinitely, making the contract illusory. Again, we addressed this argument in defendants' motion to reconsider and found that the non-exclusive nature of the contract will not permit plaintiffs to defer their obligations to Victory indefinitely, but that they will be required to record for Victory within a reasonable time. Thus, balancing the hardship to plaintiffs against that of defendants, we find the balance tips in favor of plaintiffs.

---

[4]Defendants argue that a finding of irreparable harm here would render all recording artist contracts unenforceable as it would create a precedent that any interference with an artist's right to record constitutes irreparable harm. That is not the case. We find irreparable harm here because the recording contract is non-exclusive. Victory's attempt to prevent the band from recording elsewhere is a clear interference with the rights granted to the band by the contract. This outcome would have no effect on recording contracts where the artist's services are exclusive to the record company.

Finally, we address the effect on the public.  To the extent that public interest is implicated in this proceeding, we agree with plaintiffs that it favors the awarding of an injunction.  Defendants argue that there is a public interest in enforcing valid contracts. <u>Baskin-Robbins, Inc. v. Patel</u>, 264 F. Supp 2d 607 (N.D. Ill. 2003).  We agree, but find that this interest also seeks to enforce a contract by its terms, and here those terms do not include an exclusivity provision.  Thus, we find that the public interest weighs in favor of an injunction.

<u>CONCLUSION</u>

For the foregoing reasons, we grant plaintiffs' motion for preliminary injunction preventing defendants from interfering with Hawthorne Heights' rights to record new material with a producer or a record label of its choosing, and deny defendants' cross-motion for preliminary injunction.


_____
JAMES B. MORAN
Senior Judge, U. S. District Court

_____May 17____, 2007.

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORY RECORDS, INC.,<br>an Illinois corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06-CV-5985 |
| | ) | |
| - against - | ) | Honorable James B. Moran |
| | ) | |
| VIRGIN RECORDS AMERICAN, INC., | ) | **STIPULATION OF DISMISSAL** |
| a California corporation; and EMI MUSIC | ) | |
| NORTH AMERICA, a division of | ) | |
| EMI MUSIC PLC, | ) | |
| | ) | |
| Defendants. | ) | |

IT IS HEREBY STIPULATED AND AGREED, by and between all parties who have

appeared in the above-captioned action, that, pursuant to FRCP 41(a)(1), the within action be,

and hereby is dismissed without prejudice, with each party to bear its own costs and attorneys'

fees.

IT IS FURTHER STIPULATED AND AGREED that this stipulation may be executed in

counterparts and that facsimile signatures shall be deemed originals.

| | |
|---|---|
| VICTORY RECORDS, INC. | EMI MUSIC NORTH AMERICA, INC., d/b/a<br>Capitol Records, Inc., and VIRGIN<br>RECORDS AMERICA, INC. |
| | |
| By:  /s/  Christopher S. Griesmeyer<br>   One of Its Attorneys | By:   /s/  Andrew H. Bart<br>   One of Their Attorneys |
| | |
| Robert S. Meloni<br>Thomas P. McCaffrey<br>**MELONI & MCCAFFREY, P.C.**<br>1350 Avenue of the Americas, Suite 3100<br>New York, New York  10019<br>Telephone:  (212) 957-5577 | Andrew H. Bart (*pro hac vice*)<br>**JENNER & BLOCK LLP**<br>919 Third Avenue, 37th Floor<br>New York, New York 10022<br>Telephone:  (212) 891-1600 |

LP 1332529.1 \ 34636-68260

-and-                                           - and-

Christopher S. Griesmeyer                       C. Steven Tomashevsky
**LEVENFELD PEARLSTEIN, LLC**                   **JENNER & BLOCK LLP**
2 North LaSalle, 13th Floor                     330 N. Wabash Avenue
Chicago, Illinois  60602                        Chicago, Illinois  60611
Telephone: (312) 476-7574                       Telephone:  (312) 222-9350

*So ORDERED and SIGNED this ___ day of _____, 2007.*


_____
JAMES B. MORAN
United States District Judge

# EXHIBIT L

## MELONI & McCAFFREY, P.C.
ATTORNEYS AT LAW
1350 Avenue of the Americas
Suite 3100
New York, N.Y. 10019
Facsimile: (800)659-3985
www.m2law.net

ROBERT S. MELONI
THOMAS P. McCAFFREY

Writer's Direct Telephone: (212) 957-5577
Writer's Email: R.Meloni@m2law.net

March 19, 2008

**BY FEDERAL EXPRESS & Filed via ECF**

Honorable P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Suite 2260
New York, New York 10007

Re:  ***Victory Records, Inc., et al. v. Virgin Records America, Inc.,***
     **Case No.: 08 CV 000314 (PKC)**

Dear Judge Castel:

We represent plaintiffs Victory Records, Inc. and Another Victory, Inc. (collectively "Victory") in the above referenced action. We write in response to the letter of Andrew Bart, counsel for defendant Virgin Records America, Inc. ("Virgin") dated March 18, 2008.

We drafted this response prior to our receipt moments ago of a notice generated by the CM/ECF system that the Court had issued an order granting Defendant's request for an adjournment of the initial pre-trial conference, and waiving the pre-motion conference requirement. Nevertheless, we feel it appropriate to send our response particularly since defendant has already filed their letter via CM/ECF. An examination of the letter proves that this poorly played card does not help defendant's cause, as it cannot make a "clear and convincing" showing that transfer under Section 1404 is proper. This is particularly so since, as explained in greater detail below, the "pending" case upon which Virgin rests its argument was stayed one month ago pursuant to 11 U.S.C. 362 when the plaintiffs in that action -- the surviving members of the band Hawthorne Heights -- filed for protection under Chapter 7 of the Bankruptcy Act in the U.S. Bankruptcy Court for the Southern District of Ohio.

Victory filed this action in this Court on January 14, 2008 asserting separate claims against defendant for tortious interference with contract and tortious interference with business relations. The basis for filing in the Southern District of New York was that defendant's offices and documents are here, the relevant witnesses are based in New York and a substantial part of the

Hon. P. Kevin Castel
March 19, 2008
Page 2

tortious conduct occurred in this district. The key non-party witnesses – *i.e.,* the members of the band Hawthorne Heights, are residents of the state of Ohio. The other key non-party witnesses – *i.e.,* the band's one time business attorney, Daniel Friedman, and their former personal managers, Rick Smith and John Germanario, are residents of the states of Missouri, Michigan and New York, respectively. Thus, any depositions of those witnesses must take place in Ohio, Missouri, Michigan and New York even if the action were transferred to Illinois. Indeed, even if the action were transferred to the Northern District of Illinois, plaintiff would be forced to depose defendant's corporate officers here in New York. *See e.g., Snow Becker Krauss P.C. v. Provectos e Instaciones de Desalacion, S.A.,* No. 92 Civ 2644, 1992 WL 395598, *3 S.D.N.Y. Dec. 11, 1992)(Where a corporation is involved as a defendant to the litigation, there is a general presumption in favor of conducting depositions of a corporation in its principal place of business). Finally, both the attorneys for defendant and plaintiffs are based in New York.

It is true that in the summer of 2006, Hawthorne Heights, a band that is signed to Victory, brought an action against Victory in the Northern District of Illinois ("Hawthorne Heights Action"), seeking, among other things, a declaratory judgment that the band was no longer bound under its recording and publishing agreement with Victory (the "Victory Agreement").

It is also true that in the fall of 2006 Victory filed a prior action against defendant in the Northern District of Illinois. Victory alleged that Virgin had tortiously interfered with the Victory Agreement. Victory voluntarily discontinued that action without prejudice upon defendant's repeated representation that they had not done anything to interfere with the contract between Victory and the band Hawthorne Heights. No discovery had yet taken place in either of the actions at the time of the discontinuance. Victory took Virgin at its word.

Defendant's recitation of the history of the Hawthorne Heights Action failed to disclose that Judge Moran also ruled in 2007 that while the Victory Agreement was non-exclusive, the contract nonetheless remained extant, including Hawthorne Heights' contractual obligations to Victory to deliver an additional album within a reasonable time. Under music industry standards, Hawthorne Heights' refusal and failure to deliver an album to Victory for over two years since delivery of its last album is an additional breach under Judge Moran's ruling.

Victory continued to vigorously defend the Hawthorne Heights Action. Victory conducted significant document discovery of both Hawthorne Heights and the band's representatives in the Hawthorne Heights Action. Victory also obtained documents from and took the deposition of the non-party Jeffrey Kempler. Mr. Kempler was, during the relevant time period, an Executive Vice President of Virgin. He remains an employee of Virgin.

The documentation obtained from Mr. Kempler and others established that Virgin had been an instigator and integral part of the plan to free Hawthorne Heights from the Victory Agreement. The documents establish that beginning with meetings in New York City in March 2006 between the band's lawyer, Daniel Friedman, Mr. Kempler and David Wolter, a senior director of Virgin's Artist & Repertoire Department, a plan was hatched whereby Hawthorne Heights would, with the guidance and assistance of Virgin, retain the powerful national law firm

Hon. P. Kevin Castel
March 19, 2008
Page 3

Kaye Scholer, privately and publicly repudiate their contract with Victory, and then file a high visibility lawsuit in an attempt to force Victory into a quick capitulation. Finally the documents establish Mr. Kempler's role as the primary architect of the plan and how Virgin creatively funded the litigation. The documents also establish that other officers of Virgin were aware and/or involved with this scheme. It was only after obtaining this irrefutable proof, months after the voluntary dismissal without prejudice of the Illinois action, that Victory filed the present action against Virgin Records America, Inc. in the Southern District of New York.

Defendant's argument that this action should be transferred to the Northern District of Illinois because that is where the Hawthorne Heights Action is "pending" fails to disclose the determinant fact that on February 29, 2008, all of the surviving members of the band Hawthorne Heights[1] filed for protection under Chapter 7 of the Bankruptcy Act in the U.S. Bankruptcy Court for the Southern District of Ohio.[2] These filings automatically stayed the Hawthorne Heights Action. *See* 11 U.S.C. 362. We had been advised by the band's new counsel that it is the band's plan to, *inter alia*, reject the Victory Agreement as part of the bankruptcy proceedings. *See* 11 U.S.C. 365. Victory will be left to stand in line with the other unsecured creditors. Thus, there will be no determination by Judge Moran in the Northern District of Illinois as to whether Hawthorne Heights breached the Victory Agreement. Nor will there be any possibility of inconsistent rulings to trouble this Court.

A district court generally should disturb a plaintiff's choice of forum only if, on balance, the following factors clearly favor transfer: (1) the convenience of witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the location of relevant documents and relative ease of access to sources of proof; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the forum's familiarity with the governing law; (7) the relative financial means of the parties; (8) the weight afforded plaintiff's choice of forum; and (9) trial efficiency and the interests of justice generally. *See Gould Paper Corp. v. Gomez*, No. 07 Civ. 6087, 2008 WL 113900, *2 (S.D.N.Y. Jan. 11, 2008); *Anadigics, Inc. Raytheon Co.*, 903 F. Supp.2d 615, 617 (S.D.N.Y. 1995). The burden rests on defendant to make a "clear and convincing" showing that transfer under section 1404 is proper. *Gould Paper Corp.*, 2008 WL 113900, at *3. As demonstrated above, Virgin cannot make that showing.

Respectfully submitted,

MELONI & McCAFFREY, P.C.

By: _____

Robert S. Meloni

cc: Andrew Bart, Esq. (via Email)

---

1 One member, Casey Calvert, died from a drug overdose in November 2007.
2 Case Nos. 3-08-bk-30909, 3-08-bk-30911, 3-08-bk-30912 and 3-08-bk-30914.

# EXHIBIT M

AO279, CASREF, DENLOW

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.1.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:06-cv-04258

Bucciarelli-Tieger et al v. Victory Records, Inc. et al
Assigned to: Honorable James B. Moran
Referred to: Honorable Morton Denlow
Demand: $1,000,000
Cause: 17:501 Copyright Infringement

Date Filed: 08/07/2006
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Eron Bucciarelli-Tieger**
*an individual*

represented by **Eron Bucciarelli-Tieger**
PRO SE

**Anthony George Stamato**
Kaye Scholer LLP
70 West Madison Street
Suite 4100
Chicago, IL 60602
(312) 583-2300
Email: astamato@kayescholer.com
*TERMINATED: 02/05/2008*

**Rhonda R. Trotter**
Kaye Scholer, LLP
1999 Avenue of the Stars
Suite 1700
Los Angeles, CA 90067
(310) 788-1000
*TERMINATED: 02/05/2008*

**Robert McPherson Spalding**
Kaye Scholer LLC
70 West Madison
Suite 4100
Chicago, IL 60602
(312) 583-2300
Email: rspalding@kayescholer.com
*TERMINATED: 02/05/2008*

**Plaintiff**

**Casey Calvert**
*an individual*

represented by **Casey Calvert**
PRO SE

**Anthony George Stamato**
(See above for address)
*TERMINATED: 02/05/2008*

**Rhonda R. Trotter**
(See above for address)
*TERMINATED: 02/05/2008*

**Robert McPherson Spalding**
(See above for address)
*TERMINATED: 02/05/2008*

**Plaintiff**

**Matt Ridenour**                          represented by    **Matt Ridenour**
*an individual*                                              PRO SE

                                                             **Anthony George Stamato**
                                                             (See above for address)
                                                             *TERMINATED: 02/05/2008*

                                                             **Rhonda R. Trotter**
                                                             (See above for address)
                                                             *TERMINATED: 02/05/2008*

                                                             **Robert McPherson Spalding**
                                                             (See above for address)
                                                             *TERMINATED: 02/05/2008*

**Plaintiff**

**JT Woodruff**                            represented by    **JT Woodruff**
*an individual, collectively*                               PRO SE
*professionally*
*now known as*
Hawthorne Heights                                            **Anthony George Stamato**
                                                             (See above for address)
                                                             *TERMINATED: 02/05/2008*

                                                             **Rhonda R. Trotter**
                                                             (See above for address)
                                                             *TERMINATED: 02/05/2008*

                                                             **Robert McPherson Spalding**
                                                             (See above for address)
                                                             *TERMINATED: 02/05/2008*

**Plaintiff**

**Hawthorne Heights, LLC**                 represented by    **Hawthorne Heights, LLC**
*an Ohio limited liability company*                         PRO SE

                                                             **Anthony George Stamato**
                                                             (See above for address)

*TERMINATED: 02/05/2008*

**Rhonda R. Trotter**
(See above for address)
*TERMINATED: 02/05/2008*

**Robert McPherson Spalding**
(See above for address)
*TERMINATED: 02/05/2008*

V.

**Defendant**

**Victory Records, Inc.**
*an Illinois corporation*

represented by **Christopher Scott Griesmeyer**
Levenfeld Pearlstein
2 North LaSalle Street
13th Floor
Chicago, IL 60602
(312)346-8380
Email: cgriesmeyer@lplegal.com
*ATTORNEY TO BE NOTICED*

**Christopher M Heintskill**
Levenfeld Pearlstein
2 North LaSalle Street
13th Floor
Chicago, IL 60602
(312)346-8380
Email: cheintskill@lplegal.com
*ATTORNEY TO BE NOTICED*

**Robert S. Meloni**
Meloni & McCaffrey, PC
1350 Avenue of the Americas
Suite 3100
New York, NY 10019
(212) 957-5577
Email: robert@robertmeloni.com
*ATTORNEY TO BE NOTICED*

**Ronald W. Adelman**
Robert S. Meloni, PC
1350 Avenue of the Americas
New York, NY 10019
(212) 957-3764
Email: radelman@robertmeloni.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Another Victory, Inc.**

represented by **Christopher Scott Griesmeyer**

*an Illinois corporation*                                    (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Christopher M Heintskill**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Robert S. Meloni**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Ronald W. Adelman**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Anthony "Tony&q K. Brummel**        represented by   **Christopher Scott Griesmeyer**
*an individual*                                        (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Christopher M Heintskill**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert S. Meloni**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Ronald W. Adelman**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1-25**

**Counter Claimant**

**Victory Records, Inc.**
*an Illinois corporation*

V.

**Counter Defendant**

**JT Woodruff**                       represented by   **Robert McPherson Spalding**
*an individual, collectively*                          (See above for address)
*professionally*                                       *TERMINATED: 02/05/2008*

**Counter Defendant**

**Hawthorne Heights, LLC**            represented by   **Robert McPherson Spalding**
*an Ohio limited liability company*                    (See above for address)

*TERMINATED: 02/05/2008*

**Counter Defendant**

**Eron Bucciarelli-Tieger**                    represented by  **Robert McPherson Spalding**
*an individual*                                                (See above for address)
                                                               *TERMINATED: 02/05/2008*

**Counter Defendant**

**Casey Calvert**                              represented by  **Robert McPherson Spalding**
*an individual*                                                (See above for address)
                                                               *TERMINATED: 02/05/2008*

**Counter Defendant**

**Matt Ridenour**                              represented by  **Robert McPherson Spalding**
*an individual*                                                (See above for address)
                                                               *TERMINATED: 02/05/2008*

**Counter Claimant**

**Victory Records, Inc.**
*an Illinois corporation*

**Counter Claimant**

**Another Victory, Inc.**
*an Illinois corporation*

**Counter Claimant**

**Anthony "Tony&q K. Brummel**
*an individual*

V.

**Counter Defendant**

**JT Woodruff**
*an individual, collectively
professionally*

**Counter Defendant**

**Hawthorne Heights, LLC**
*an Ohio limited liability company*

**Counter Defendant**

**Eron Bucciarelli-Tieger**
*an individual*

**Counter Defendant**

**Casey Calvert**
*an individual*

**Counter Defendant**

**Matt Ridenour**
*an individual*

**Counter Claimant**

**Victory Records, Inc.**
*an Illinois corporation*

V.

**Counter Defendant**

| | |
|---|---|
| **JT Woodruff** <br> *an individual, collectively* <br> *professionally* | represented by **Robert McPherson Spalding** <br> (See above for address) <br> *TERMINATED: 02/05/2008* |

**Counter Defendant**

| | |
|---|---|
| **Hawthorne Heights, LLC** <br> *an Ohio limited liability company* | represented by **Robert McPherson Spalding** <br> (See above for address) <br> *TERMINATED: 02/05/2008* |

**Counter Defendant**

| | |
|---|---|
| **Eron Bucciarelli-Tieger** <br> *an individual* | represented by **Robert McPherson Spalding** <br> (See above for address) <br> *TERMINATED: 02/05/2008* |

**Counter Defendant**

| | |
|---|---|
| **Casey Calvert** <br> *an individual* | represented by **Robert McPherson Spalding** <br> (See above for address) <br> *TERMINATED: 02/05/2008* |

**Counter Defendant**

| | |
|---|---|
| **Matt Ridenour** <br> *an individual* | represented by **Robert McPherson Spalding** <br> (See above for address) <br> *TERMINATED: 02/05/2008* |

| Date Filed | # | Docket Text |
|---|---|---|
| 08/07/2006 | 1 | COMPLAINT filed by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Exhibits); Jury Demand.(mb, ) (Entered: 08/09/2006) |
| 08/07/2006 | 2 | CIVIL Cover Sheet (mb, ) (Entered: 08/09/2006) |
| 08/07/2006 | 3 | ATTORNEY Appearance for Plaintiffs JT Woodruff, JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour by Robert McPherson Spalding (mb, ) (Entered: 08/09/2006) |
| 08/07/2006 | 4 | ATTORNEY Appearance for Plaintiffs JT Woodruff, JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour by Anthony George Stamato (mb, ) (Entered: 08/09/2006) |

| 08/07/2006 | 6 | SUMMONS Issued as to Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony" K. Brummel (mb, ) (Entered: 08/09/2006) |
|---|---|---|
| 08/09/2006 | 7 | SUMMONS Returned Executed by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour as to Anthony "Tony&q K. Brummel on 8/7/2006, answer due 8/28/2006. (Spalding, Robert) (Entered: 08/09/2006) |
| 08/09/2006 | 8 | SUMMONS Returned Executed by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour as to Another Victory, Inc. on 8/7/2006, answer due 8/28/2006. (Spalding, Robert) (Entered: 08/09/2006) |
| 08/09/2006 | 9 | SUMMONS Returned Executed by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour as to Victory Records, Inc. on 8/7/2006, answer due 8/28/2006. (Spalding, Robert) (Entered: 08/09/2006) |
| 08/09/2006 | | MAILED copyright report to Registrar, Washington, D.C. (mb, ) (Entered: 08/09/2006) |
| 08/10/2006 | 10 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to strike *Exhibit A to the Complaint* (Spalding, Robert) (Entered: 08/10/2006) |
| 08/10/2006 | 11 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion to strike 10 before Honorable James B. Moran on 8/15/2006 at 09:00 AM. (Spalding, Robert) (Entered: 08/10/2006) |
| 08/15/2006 | 12 | MINUTE entry before Judge James B. Moran : Motion hearing held. Plaintiff's motion to strike the exhibits originally appended to their complaint is granted. Enter Order. It is hereby ordered that: 1. The exhibits originally appended to the complaint in this matter are stricken. 2. The Clerk is directed to remove and destroy the exhibits originally appended to the Complaint and plaintiffs are granted leave to file copies of the exhibits originally appended to their complaint that have been redacted so as to remove any personal information. Mailed notice (mb, ) (Entered: 08/17/2006) |
| 08/15/2006 | 13 | ORDER Signed by Judge James B. Moran on 8/15/2006.(mb, ) (Entered: 08/17/2006) |
| 08/17/2006 | 14 | EXHIBIT by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour regarding complaint 1 (Spalding, Robert) (Entered: 08/17/2006) |
| 08/17/2006 | 15 | NOTICE by all plaintiffs re exhibit 14 *Notice of Filing of Redacted Exhibits to Complaint* (Spalding, Robert) (Entered: 08/17/2006) |
| 08/28/2006 | 16 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt RidenourMotion to Bifurcate Claims Under Rule 42(b) and for Expedited Discovery (Attachments: # 1 Exhibit 1)(Spalding, Robert) (Entered: 08/28/2006) |

| 08/28/2006 | 17 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion for miscellaneous relief 16 before Honorable James B. Moran on 9/12/2006 at 09:00 AM. (Spalding, Robert) (Entered: 08/28/2006) |
|---|---|---|
| 08/28/2006 | 18 | MINUTE entry before Judge James B. Moran : Status hearing is set for 9/27/2006 at 09:15 AM. pursuant to Rule 16 of the F.R.C.P. Mailed notice (ldg, ) (Entered: 08/28/2006) |
| 08/29/2006 | 19 | ATTORNEY Appearance for Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel by Christopher Scott Griesmeyer (Griesmeyer, Christopher) (Entered: 08/29/2006) |
| 08/29/2006 | 20 | ATTORNEY Appearance for Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel by Christopher M Heintskill (Heintskill, Christopher) (Entered: 08/29/2006) |
| 08/30/2006 | 21 | APPLICATION for Leave to Appear Pro Hac Vice on behalf of Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel by Robert S. Meloni; Order entered granting leave by James B. Moran. Filing fee $ 50 paid, receipt number 1112866 (mb, ) (Entered: 09/01/2006) |
| 08/30/2006 | 22 | APPLICATION for Leave to Appear Pro Hac Vice on behalf of Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel by Ronald W. Adelman; Order entered granting leave by James B. Moran. Filing fee $ 50 paid, receipt number 1112866 (mb, ) (Entered: 09/01/2006) |
| 09/08/2006 | 23 | ANSWER to Complaint, COUNTERCLAIM filed by Victory Records, Inc. against all plaintiffs. by Victory Records, Inc.(Griesmeyer, Christopher) (Entered: 09/08/2006) |
| 09/08/2006 | 24 | APPLICATION for Leave to Appear Pro Hac Vice on behalf of JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour by Rhonda R. Trotter; Order entered granting leave by James B. Moran. Filing fee $ 50 paid, receipt number 10718781; Notice (mb, ) (Entered: 09/12/2006) |
| 09/12/2006 | 25 | *Amended* ANSWER to Complaint, *Amended* COUNTERCLAIM filed by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel against JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour. by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel(Griesmeyer, Christopher) (Entered: 09/12/2006) |
| 09/18/2006 | 26 | MINUTE entry before Judge James B. Moran : Status hearing set for 9/27/2006 is stricken and reset to 12/21/2006 at 09:15 AM. Mailed notice (ldg, ) (Entered: 09/18/2006) |
| 09/22/2006 | 27 | MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel to dismiss (Griesmeyer, Christopher) (Entered: 09/22/2006) |
| 09/22/2006 | 28 | MOTION by Defendants Victory Records, Inc., Another Victory, Inc., |

| | | Anthony "Tony&q K. Brummel for leave to file excess pages *to Memorandum in Support of Motion to Dismiss* (Attachments: # 1 Exhibit # 2 Exhibit)(Griesmeyer, Christopher) (Entered: 09/22/2006) |
|---|---|---|
| 09/22/2006 | 29 | NOTICE of Motion by Christopher Scott Griesmeyer for presentment of motion to dismiss 27, motion for leave to file excess pages 28 before Honorable Milton I. Shadur on 9/28/2006 at 09:15 AM. (Griesmeyer, Christopher) (Entered: 09/22/2006) |
| 09/28/2006 | 30 | MINUTE entry before Judge Milton I. Shadur : Motion hearing held. Motion for leave to file excess pages 28 is granted. MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt RidenourMotion to Bifurcate Claims Under Rule 42(b) and for Expedited Discovery 16 is entered and continued with a response to be filed on or before October 10, 2006. MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel to dismiss 27 is entered and continued with a response due on or before October 10, 2006. (srn, ) (Entered: 09/28/2006) |
| 09/28/2006 | 31 | ANSWER to counterclaim *RE: Document #25, Amended Counterclaim* by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, JT Woodruff(an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert(an individual), Matt Ridenour(an individual)(Spalding, Robert) (Entered: 09/28/2006) |
| 09/28/2006 | 32 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, JT Woodruff(an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert (an individual), Matt Ridenour(an individual) re answer to counterclaim, 31 (Spalding, Robert) (Entered: 09/28/2006) |
| 10/10/2006 | 33 | RESPONSE by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel in Opposition to MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt RidenourMotion to Bifurcate Claims Under Rule 42(b) and for Expedited Discovery 16 (Griesmeyer, Christopher) (Entered: 10/10/2006) |
| 10/10/2006 | 34 | MEMORANDUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, JT Woodruff(an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert(an individual), Matt Ridenour(an individual) in Opposition to motion to dismiss 27 (Spalding, Robert) (Entered: 10/10/2006) |
| 10/10/2006 | 35 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, JT Woodruff(an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert |

| | | |
|---|---|---|
| | | (an individual), Matt Ridenour(an individual) re memorandum in opposition to motion, 34 (Spalding, Robert) (Entered: 10/10/2006) |
| 10/16/2006 | 36 | MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel for leave to file *Reply Brief* (Attachments: # 1 Exhibit Reply Brief)(Griesmeyer, Christopher) (Entered: 10/16/2006) |
| 10/16/2006 | 37 | NOTICE of Motion by Christopher Scott Griesmeyer for presentment of motion for leave to file 36 before Honorable Milton I. Shadur on 10/18/2006 at 09:15 AM. (Griesmeyer, Christopher) (Entered: 10/16/2006) |
| 10/17/2006 | 38 | DECLARATION of Anthony K. "Tony" Brummel regarding response in opposition to motion, 33 by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel (Griesmeyer, Christopher) (Entered: 10/17/2006) |
| 10/18/2006 | 39 | MINUTE entry before Judge Milton I. Shadur : Motion to dismiss 27 is granted as to count 1, 2 and 9 and the remainder of the motion is entered and continued before Judge Moran. MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel for leave to file *Reply Brief* 36 is granted. In court notice (srn, ) (Entered: 10/19/2006) |
| 10/31/2006 | 40 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour for reconsideration (Attachments: # 1 Exhibit # 2 Exhibit)(Spalding, Robert) (Entered: 10/31/2006) |
| 10/31/2006 | 41 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion for reconsideration, 40 before Honorable Milton I. Shadur on 11/7/2006 at 09:15 AM. (Spalding, Robert) (Entered: 10/31/2006) |
| 11/07/2006 | 42 | MINUTE entry before Judge Milton I. Shadur : Motion hearing held. MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour for reconsideration 40 is denied as to the extent that it seeks reconsideration and granted in accordance with this Court's oral ruling as to the extent that it seeks clarification. MAiled notice (srn, ) (Entered: 11/07/2006) |
| 11/15/2006 | 43 | MINUTE entry before Judge James B. Moran : Status hearing set for 12/21/2006 is stricken and reset to 12/13/2006 at 09:15 AM. Mailed notice (ldg, ) (Entered: 11/15/2006) |
| 11/17/2006 | 44 | MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummelfor Ruling on Defendant's Motion to Dismiss (Griesmeyer, Christopher) (Entered: 11/17/2006) |
| 11/17/2006 | 45 | NOTICE of Motion by Christopher Scott Griesmeyer for presentment of |

Case 1:08-cv-00314-RKC    Document 11-7    Filed 04/17/2008    Page 27 of 38

| | | |
|---|---|---|
| | | motion for miscellaneous relief 44 before Honorable James B. Moran on 11/28/2006 at 09:00 AM. (Griesmeyer, Christopher) (Entered: 11/17/2006) |
| 11/17/2006 | 46 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt RidenourRenewed Motion to Bifurcate Claims Under Rule 42(b) and for Expedited Discovery (Attachments: # 1 Exhibit)(Spalding, Robert) (Entered: 11/17/2006) |
| 11/17/2006 | 47 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion for miscellaneous relief, 46 before Honorable James B. Moran on 11/28/2006 at 09:00 AM. (Spalding, Robert) (Entered: 11/17/2006) |
| 11/21/2006 | 48 | MEMORANDUM by Victory Records, Inc. in Opposition to motion for miscellaneous relief, 46 to Bifurcate Claims and Expedite Discovery (Griesmeyer, Christopher) (Entered: 11/21/2006) |
| 11/28/2006 | 49 | MINUTE entry before Judge James B. Moran : Motion hearing held on 11/28/2006 regarding motion for ruling on motion to dismiss 44 . Plaintiff's response to defendants' motion to dismiss 27 to be filed on or before 12/7/2006. Status hearing set for 12/13/2006 at 9:15 a.m. to stand. Mailed notice (ldg, ) (Entered: 11/28/2006) |
| 12/07/2006 | 50 | MEMORANDUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, JT Woodruff(an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert(an individual), Matt Ridenour(an individual) in Opposition to motion for miscellaneous relief 44 (Spalding, Robert) (Entered: 12/07/2006) |
| 12/07/2006 | 51 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, JT Woodruff(an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert (an individual), Matt Ridenour(an individual) re memorandum in opposition, 50 (Spalding, Robert) (Entered: 12/07/2006) |
| 12/13/2006 | 52 | MINUTE entry before Judge James B. Moran : Status hearing held on 12/13/2006. Court will mail ruling on pending motions 16 27 44 46 . Mailed notice (ldg, ) (Entered: 12/13/2006) |
| 12/14/2006 | 53 | NOTICE of Affiliates pursuant to Local Rule 3.2 by Victory Records, Inc., Another Victory, Inc. (Griesmeyer, Christopher) (Entered: 12/14/2006) |
| 01/10/2007 | 54 | MINUTE entry before Judge James B. Moran : Enter Memorandum Opinion and Order. Plaintiffs' motions for bifurcation and expedited discovery in Count IX 16 and 46 is, for now, denied. Status hearing is set for February 8, 2007 at 9:15 a.m.Mailed notice (mb, ) (Entered: 01/12/2007) |

| 01/10/2007 | 55 | MEMORANDUM Opinion and Order Signed by Judge James B. Moran on 1/10/2007.(mb, ) (Entered: 01/12/2007) |
|---|---|---|
| 02/06/2007 | 56 | MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel to consolidate cases (Attachments: # 1 Exhibit)(Heintskill, Christopher) (Entered: 02/06/2007) |
| 02/06/2007 | 57 | NOTICE of Motion by Christopher M Heintskill for presentment of motion to consolidate cases 56 before Honorable James B. Moran on 2/8/2007 at 09:15 AM. (Heintskill, Christopher) (Entered: 02/06/2007) |
| 02/07/2007 | 58 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour for preliminary injunction (Spalding, Robert) (Entered: 02/07/2007) |
| 02/07/2007 | 59 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion for preliminary injunction, 58 before Honorable James B. Moran on 2/8/2007 at 09:15 AM. (Spalding, Robert) (Entered: 02/07/2007) |
| 02/07/2007 | 60 | MEMORANDUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour in support of motion for preliminary injunction, 58 (Spalding, Robert) (Entered: 02/07/2007) |
| 02/07/2007 | 61 | DECLARATION of Daniel R. Friedman regarding memorandum in support of motion 60 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 02/07/2007) |
| 02/07/2007 | 62 | DECLARATION of Milton Everett Olin, Jr. regarding memorandum in support of motion 60 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 02/07/2007) |
| 02/07/2007 | 63 | DECLARATION of Eron Bucciarelli-Tieger regarding memorandum in support of motion 60 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 02/07/2007) |
| 02/07/2007 | 64 | DECLARATION of Stanley Pierre-Louis regarding memorandum in support of motion 60 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 02/07/2007) |
| 02/08/2007 | 65 | MINUTE entry before Judge James B. Moran : Enter Order. Status hearing held and continued to 3/13/2007 at 9:15 a.m. Virgin, EMI and Plaintiffs' response to defendants' motion to consolidate related cases 56 to be filed by 2/22/2007. Defendants reply brief to be filed by 2/29/2007. Defendants response brief and cross-motion for preliminary injunction to be filed by 2/20/2007. Plaintiffs' reply brief in support of their motion for preliminary injunction and response brief to Defendant's cross-motion for preliminary injunction to be filed by 2/23/2007. Defendant's reply brief in |

| | | |
|---|---|---|
| | | support of their cross-motion for preliminary injunction to be filed by 2/28/2007.Mailed notice (mb, ) (Entered: 02/13/2007) |
| 02/09/2007 | 66 | ORDER Signed by Judge James B. Moran on 2/9/2007.(mb, ) (Entered: 02/13/2007) |
| 02/20/2007 | 67 | MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel for extension of time to file *Cross-Motion for Preliminary Injunction*, MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel for leave to file excess pages (Heintskill, Christopher) (Entered: 02/20/2007) |
| 02/20/2007 | 68 | NOTICE of Motion by Christopher M Heintskill for presentment of motion for extension of time to file, motion for leave to file excess pages,, 67 before Honorable James B. Moran on 2/28/2007 at 09:00 AM. (Heintskill, Christopher) (Entered: 02/20/2007) |
| 02/22/2007 | 69 | MEMORANDMUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour in Opposition to motion to consolidate cases 56 (Spalding, Robert) (Entered: 02/22/2007) |
| 02/22/2007 | 70 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re memorandum in opposition to motion 69 (Spalding, Robert) (Entered: 02/22/2007) |
| 02/22/2007 | 71 | MOTION for leave to file *the Virgin Option Agreement Under Seal* (Bart, Andrew) (Entered: 02/22/2007) |
| 02/22/2007 | 72 | NOTICE of Motion by Andrew H. Bart for presentment of motion for leave to file 71 before Honorable James B. Moran on 3/6/2007 at 09:00 AM. (Bart, Andrew) (Entered: 02/22/2007) |
| 02/22/2007 | 73 | DECLARATION of Andrew H. Bart regarding motion for leave to file 71 by Virgin Records America, Inc., EMI Music North America, Inc. *and in Opposition to Motion to Consolidate* 56 (Attachments: # 1 Exhibits A-F)(Bart, Andrew) (Entered: 02/22/2007) |
| 02/22/2007 | 74 | MEMORANDMUM by Virgin Records America, Inc., EMI Music North America, Inc. in Opposition to motion to consolidate cases 56 *and in Support of Motion to File Under Seal* 71 (Bart, Andrew) (Entered: 02/22/2007) |
| 02/23/2007 | 75 | MEMORANDMUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour in Opposition to motion for extension of time to file, motion for leave to file excess pages,, 67 (Spalding, Robert) (Entered: 02/23/2007) |
| 02/23/2007 | 76 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re memorandum in opposition to motion 75 (Spalding, Robert) (Entered: 02/23/2007) |
| 02/28/2007 | 77 | MINUTE entry before Judge James B. Moran :Motion hearing held on 2/28/2007 regarding 67 . Defendants, Victory Records, Inc., et al motion to extend briefing schedule on plaintiffs' motion and defendants' cross- |

| | | motion for preliminary injunction, and for leave to file brief in excess of page limitation 67 is granted. Motion for leave to file the Virgin Option Agreement under seal 71 is granted. The 3/6/2007 hearing date on Virgin Records' motion for leave to file a document under seal is stricken. Status hearing set for 3/13/2007 is stricken. Defendants shall file their brief in response to Plaintiffs' motion for preliminary injunction 58 and in support of their own cross-motion for preliminary injunction 67 by 3/2/2007. Plaintiffs' shall file their reply brief in support of their motion for preliminary injunction 58 by 3/9/2007. Defendants shall file their reply brief in support of their motion for preliminary injunction 67 by 3/14/2007. The Court will rule on the cross-motions by mail. Mailed notice (ldg, ) (Entered: 03/01/2007) |
|---|---|---|
| 03/01/2007 | 78 | REPLY by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel to MOTION by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel to consolidate cases 56 (Heintskill, Christopher) (Entered: 03/01/2007) |
| 03/01/2007 | 81 | MINUTE entry before Judge James B. Moran : Enter Memorandum Opinion and Order. We grant defendants' motion to dismiss 44 as to Count V, VI, VII and VIII of plaintiffs' complaint, and deny the motion as to Counts I, II, III, IV and IX. Mailed notices(gcy, ) Modified on 3/6/2007 (gcy, ). (Entered: 03/05/2007) |
| 03/01/2007 | 82 | MEMORANDUM Opinion and Order (gcy, ) (Entered: 03/05/2007) |
| 03/02/2007 | 79 | MEMORANDUM motion for preliminary injunction, 58 by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel *and Response to Plaintiffs' Motino for Preliminary Injunction* (Heintskill, Christopher) (Entered: 03/02/2007) |
| 03/02/2007 | 80 | DECLARATION of Tony Brummel regarding memorandum 79 by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel *In Support of Cross-Motion for Preliminary Injunction* (Attachments: # 1 Notice of Filing)(Heintskill, Christopher) (Entered: 03/02/2007) |
| 03/02/2007 | 83 | VIRGIN Option Agreement by Virgin Records America, Inc. and EMI Music North America, Inc. (RESTRICTED) (DOCUMENT NOT SCANNED) (td, ) (Entered: 03/05/2007) |
| 03/06/2007 | 84 | MOTION by Defendant Victory Records, Inc. for reconsideration (Attachments: # 1 Exhibit)(Heintskill, Christopher) (Entered: 03/06/2007) |
| 03/06/2007 | 85 | NOTICE of Motion by Christopher M Heintskill for presentment of motion for reconsideration 84 before Honorable James B. Moran on 3/14/2007 at 09:00 AM. (Heintskill, Christopher) (Entered: 03/06/2007) |
| 03/09/2007 | 86 | OBJECTIONS by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to declaration, 80 (Spalding, Robert) (Entered: 03/09/2007) |
| | | |

| 03/09/2007 | 87 | REPLY by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to memorandum 79 (Spalding, Robert) (Entered: 03/09/2007) |
|---|---|---|
| 03/09/2007 | 88 | DECLARATION of Eron Bucciarelli-Tieger regarding reply, 87 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 03/09/2007) |
| 03/09/2007 | 89 | DECLARATION of Daniel R. Friedman regarding reply, 87 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 03/09/2007) |
| 03/09/2007 | 90 | DECLARATION of Robert M. Spalding regarding reply, 87 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Attachments: # 1 Exhibit)(Spalding, Robert) (Entered: 03/09/2007) |
| 03/09/2007 | 91 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re objections 86 , reply, 87 , declaration 89 , declaration 88 , declaration 90 (Spalding, Robert) (Entered: 03/09/2007) |
| 03/12/2007 | 92 | MINUTE entry before Judge James B. Moran :Status hearing set for 3/13/2007 is stricken.Mailed notice (ldg, ) (Entered: 03/12/2007) |
| 03/12/2007 | 93 | REPLY by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to reply, 87 *Amended Reply and Response Brief* (Spalding, Robert) (Entered: 03/12/2007) |
| 03/12/2007 | 94 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re reply to response to motion 93 *Notice of Filing* (Spalding, Robert) (Entered: 03/12/2007) |
| 03/13/2007 | 95 | MEMORANDMUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour in Opposition to motion for reconsideration 84 (Spalding, Robert) (Entered: 03/13/2007) |
| 03/13/2007 | 96 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour *Notice of Filing* (Spalding, Robert) (Entered: 03/13/2007) |
| 03/14/2007 | 97 | REPLY by Defendants Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel to memorandum 79 (Attachments: # 1 Exhibit # 2 Exhibit)(Heintskill, Christopher) (Entered: 03/14/2007) |
| 03/14/2007 | 98 | MINUTE entry before Judge James B. Moran :Motion hearing held on 3/14/2007 regarding motion for reconsideration 84 . Defendants' reply in support of their motion to be filed by 3/21/2007. Status hearing is set for 4/25/2007 at 09:15 AM.Mailed notice (ldg, ) (Entered: 03/15/2007) |
| 03/21/2007 | 99 | REPLY by Defendant Victory Records, Inc. to motion for reconsideration 84 (Heintskill, Christopher) (Entered: 03/21/2007) |

| 04/03/2007 | 100 | MINUTE entry before Judge James B. Moran :Defendants move to consolidate, as a related case, Victory Records vs Virgin Records America, Inc. and EMI Music North America, 06 C 5985 now pending before Judge Conlon. We deny, for now the motion to consolidate, 56 but we find that it is a related case pursuant to Local Rule 40.4 and request the Executive Committee for its reassignment. Both cases arise out of the same fight, and having one Judge handling both may likely result in a substantial saving of judicial time and effort. It is, however, premature to consolidate the cases for a single trial, although they may indeed be susceptible of disposition in a single proceeding. But that we leave to another day. Mailed notice (ldg, ) (Entered: 04/03/2007) |
|---|---|---|
| 04/25/2007 | 101 | MINUTE entry before Judge James B. Moran :Status hearing held on 4/25/2007.Mailed notice (ldg, ) (Entered: 04/25/2007) |
| 05/03/2007 | 102 | AMENDED complaint by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour against Another Victory, Inc., Anthony "Tony&q K. Brummel, Victory Records, Inc. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Spalding, Robert) (Entered: 05/03/2007) |
| 05/03/2007 | 103 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re amended complaint, 102 (Spalding, Robert) (Entered: 05/03/2007) |
| 05/10/2007 | 104 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt RidenourPlaintiff's Motion for Immediate Ruling on Plaintiff's Motion for Preliminary Injunction (Attachments: # 1 Exhibit A)(Spalding, Robert) (Entered: 05/10/2007) |
| 05/10/2007 | 105 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion for miscellaneous relief, 104 before Honorable James B. Moran on 5/15/2007 at 09:00 AM. (Spalding, Robert) (Entered: 05/10/2007) |
| 05/14/2007 | 106 | AMENDED Answer by Defendant Victory Records, Inc., Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to amended complaint, 102 , COUNTERCLAIM filed by Victory Records, Inc. against JT Woodruff (an individual, collectively professionally), Hawthorne Heights, LLC(an Ohio limited liability company), Eron Bucciarelli-Tieger(an individual), Casey Calvert(an individual), Matt Ridenour(an individual). (Heintskill, Christopher) (Entered: 05/14/2007) |
| 05/15/2007 | 107 | MINUTE entry before Judge James B. Moran :Plaintiffs' motion for immediate ruling on plaintiffs' motion for preliminary injunction 104 is taken under advisement. Motion hearing held on 5/15/2007 104 . Mailed notice (ldg, ) (Entered: 05/15/2007) |
| 05/16/2007 | 108 | MINUTE entry before Judge James B. Moran :Enter Memorandum Opinion and Order. Defendants' motion for reconsideration 84 is denied.Mailed notice (cem) (Entered: 05/17/2007) |

| 05/16/2007 | 109 | MEMORANDUM Opinion and Order Signed by Judge James B. Moran on 5/16/2007.(cem, ) (Entered: 05/17/2007) |
| 05/17/2007 | 110 | DECLARATION of Robert Meloni by Victory Records, Inc., Another Victory, Inc., Anthony "Tony&q K. Brummel (Attachments: # 1 Exhibit) (Heintskill, Christopher) (Entered: 05/17/2007) |
| 05/17/2007 | 111 | MINUTE entry before Judge James B. Moran: Enter Memorandum Opinion and Order. We grant plaintiffs' motion for preliminary injunction preventing defendants from interfering with Hawthorne Heights' rights to record new material with a producer or a record label of its choosing 58 , and deny defendants' cross-motion for preliminary injunction. Mailed (vmj, ) (Entered: 05/21/2007) |
| 05/17/2007 | 112 | MEMORANDUM Opinion and Order Signed by Judge James B. Moran on 5/17/2007(vmj, ) (Entered: 05/21/2007) |
| 05/29/2007 | 113 | ANSWER to counterclaim by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour(Spalding, Robert) (Entered: 05/29/2007) |
| 05/29/2007 | 114 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re answer to counterclaim 113 (Spalding, Robert) (Entered: 05/29/2007) |
| 09/26/2007 | 115 | MINUTE entry before Judge James B. Moran : Enter Stipulation and Order of Confidentiality regarding certain information, documents, and other materials produced during discovery.Mailed notice (vcf, ) (Entered: 10/01/2007) |
| 09/26/2007 | 116 | STIPULATION and Order of confidentiality Signed by Judge James B. Moran on 9/26/2007.(vcf, ) (Entered: 10/01/2007) |
| 10/19/2007 | 117 | MOTION by Defendant Victory Records, Inc. to compel *Production of ESI* (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit)(Griesmeyer, Christopher) (Entered: 10/19/2007) |
| 10/19/2007 | 118 | NOTICE of Motion by Christopher Scott Griesmeyer for presentment of motion to compel 117 before Honorable James B. Moran on 10/24/2007 at 09:00 AM. (Griesmeyer, Christopher) (Entered: 10/19/2007) |
| 10/24/2007 | 119 | MINUTE entry before Judge James B. Moran :Motion hearing held on 10/24/2007 regarding motion to compel 117 . Plaintiffs' response to defendant's motion to compel production of ESI 117 and motion to be filed by 11/7/2007. Defendants' reply and response to be filed by 11/21/2007. Plaintiffs' final reply to be filed by 12/5/2007. Mailed notice (ldg, ) (Entered: 10/24/2007) |
| 11/07/2007 | 120 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to compel (Spalding, Robert) (Entered: 11/07/2007) |

| 11/07/2007 | 121 | MEMORANDUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour in support of motion to compel, 120 (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C) (Spalding, Robert) (Entered: 11/07/2007) |
| 11/07/2007 | 122 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re memorandum in support of motion 121 , MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to compel 120 (Spalding, Robert) (Entered: 11/07/2007) |
| 11/07/2007 | 123 | MEMORANDUM by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour in Opposition to motion to compel 117 (Spalding, Robert) (Entered: 11/07/2007) |
| 11/07/2007 | 124 | DECLARATION of Dan Friedman regarding memorandum in opposition to motion 123 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 11/07/2007) |
| 11/07/2007 | 125 | DECLARATION of Nathan D. Meyer regarding memorandum in opposition to motion 123 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 11/07/2007) |
| 11/07/2007 | 126 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re declaration 124 , declaration 125 , memorandum in opposition to motion 123 (Spalding, Robert) (Entered: 11/07/2007) |
| 11/08/2007 | 127 | DECLARATION of J.T. Woodruff regarding memorandum in opposition to motion 123 by JT Woodruff, Hawthorne Heights, LLC, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 11/08/2007) |
| 11/08/2007 | 128 | DECLARATION of Matt Ridenour regarding memorandum in opposition to motion 123 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 11/08/2007) |
| 11/08/2007 | 129 | DECLARATION of Micah Carli regarding memorandum in opposition to motion 123 by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour (Spalding, Robert) (Entered: 11/08/2007) |
| 11/08/2007 | 130 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re declaration 129 , declaration 127 , declaration 128 (Spalding, Robert) (Entered: 11/08/2007) |
| 11/21/2007 | 131 | REPLY by Defendant Victory Records, Inc. to motion to compel 117 *Brief in Further Support of Defendant's Motion to Compel Production of ESI* (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit)(Griesmeyer, |

| | | Christopher) (Entered: 11/21/2007) |
|---|---|---|
| 11/21/2007 | 132 | MEMORANDUM by Victory Records, Inc. in Opposition to motion to compel, 120 (Attachments: # 1 Exhibit # 2 Exhibit)(Griesmeyer, Christopher) (Entered: 11/21/2007) |
| 12/05/2007 | 133 | REPLY by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to motion to compel, 120 , memorandum in opposition to motion 132 (Spalding, Robert) (Entered: 12/05/2007) |
| 12/05/2007 | 134 | NOTICE by JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour re reply, 133 (Spalding, Robert) (Entered: 12/05/2007) |
| 01/10/2008 | 135 | TRANSCRIPT of proceedings for the following dates: 11/7/2006; Before the Honorable Milton I. Shadur. (Document not scanned). (gmr, ) (Entered: 01/14/2008) |
| 01/15/2008 | 136 | TRANSCRIPT of proceedings for the following dates: 10/18/2006; Before the Honorable Milton I. Shadur. (Document not scanned). (gmr, ) (Entered: 01/16/2008) |
| 01/31/2008 | 137 | MOTION by Plaintiffs JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour, Counter Defendants JT Woodruff, Hawthorne Heights, LLC, Eron Bucciarelli-Tieger, Casey Calvert, Matt Ridenour to withdraw *as Counsel for Plaintiffs and Counterclaim-Defendants* (Spalding, Robert) (Entered: 01/31/2008) |
| 01/31/2008 | 138 | NOTICE of Motion by Robert McPherson Spalding for presentment of motion to withdraw, 137 before Honorable James B. Moran on 2/5/2008 at 09:00 AM. (Spalding, Robert) (Entered: 01/31/2008) |
| 02/05/2008 | 139 | MINUTE entry before Judge James B. Moran :Motion hearing held. Plaintiffs/counterclaim defendants motion to withdraw as counsel 137 is granted. Kaye Scholer, Anthony G. Stamato, Rhonda R. Trotter and Robert M. Spalding are withdrawn as counsel. Status hearing is set for 3/5/2008 at 9:15 a.m. Mailed notice (gmr, ) (Entered: 02/06/2008) |
| 03/24/2008 | 140 | Pursuant to Local Rule 72.1, this case is hereby referred to the calendar of Magistrate Judge Honorable Morton Denlow for the purpose of holding proceedings related to: discovery motions : Defendant's motion to compel production of ESI 117 , Plaintiffs' motion to compel, 120 . (ldg, )Mailed notice. (Entered: 03/24/2008) |
| 03/24/2008 | 141 | MINUTE entry before Judge Honorable Morton Denlow:This matter has been referred to Judge Denlow for ruling on a pending motion. If no briefing schedule has been set or if no briefing is desired, the parties are to notice the motion up on Mondays or Wednesdays at 9:15 a.m. Judge Denlow does not desire briefs on discovery disputes. Otherwise, the parties are to appear for status or argument at 10:00 a.m. on 4/22/2008.Mailed notice (dmk, ) (Entered: 03/24/2008) |

# CERTIFICATE OF SERVICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VICTORY RECORDS, INC., and ANOTHER          :
VICTORY, INC.,                              :
                                            :
                                            :     Case No.: 08-CV-00314 (PKC)
                                            :
            Plaintiffs,                     :
                                            :     **CERTIFICATE OF SERVICE**
      - against -                           :
                                            :
                                            :
VIRGIN RECORDS AMERICA, INC.,               :
a division of EMI MUSIC NORTH AMERICA,      :
                                            :
            Defendant.                      :
-------------------------------------------------------------------X

I, Carletta F. Higginson, do hereby certify that on this 17th day of April 2008 I caused the

within Attorney **Declaration of Andrew H. Bart** to be filed via the Southern District of New

York's Electronic Case Filing system and caused same to be served via U.S. First Class mail

delivery upon *Robert S. Meloni, Esq., Meloni and McCaffrey, P.C.*, 1350 Avenue of the

Americas, Suite 3100, New York, New York 10019 by having a true and correct copy of same

wrapped in a postage-paid envelope and deposited into the care and custody of the United States

Postal Service.

                              _____
                                    Carletta F. Higginson

15986